**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| IN RE MGP INGREDIENTS, INC. SECURITIES LITIGATION | Master File No. 2:20-cv-2090-DDC-JPO<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL<br><br>Hon. Daniel D. Crabtree |

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 8

III.   PARTIES ...................................................................................................... 9

       A.    Plaintiff ............................................................................................. 9

       B.    Defendants ........................................................................................ 9

IV.    DEFENDANTS' FRAUDULENT SCHEME ............................................. 10

       A.    MGP's Business and History .......................................................... 10

             1.    Background on MGP ............................................................. 10

             2.    The Need for Higher Margins Drives MGP's 2011
                   Lawrenceburg Acquisition .................................................... 12

       B.    The American Whiskey Business ..................................................... 15

             1.    2000-2020: American Whiskey, and Particularly Premium
                   Kentucky Bourbon, Surges in Popularity ............................. 17

             2.    The Whiskey Production Conundrum: "Non-Distiller
                   Producers" and Sourced Whiskey .......................................... 20

             3.    MGP Enters the Aged Whiskey Market .................................. 23

                   a)    In the Run-Up to the Class Period,
                         Defendants Heavily Promote the Potential of
                         Aged Whiskey to Increase MGP's Margins ..................24

                   b)    Defendants Fail to Disclose the Competitive
                         Headwinds Facing MGP as it Entered the
                         Aged Whiskey Market ...................................................29

                   c)    The Class Period Begins as Defendants Tout
                         MGP's Aged Whiskey Business .....................................34

V.     THE TRUTH GRADUALLY EMERGES .................................................... 40

       A.    The Truth Begins Partially to Emerge as MGP Discloses
             Disappointing Sales of Aged Whiskey, While Continuing to Buoy
             Investors' Hopes for a Rebound ...................................................... 40

       B.    Defendants Continue to Falsely Claim that MGP's Market Position
             is Strong and that Aged Whiskey Sales Would Grow with the
             Market ............................................................................................. 43

C.      The Truth Continues to Emerge as Defendants Disclose
        Increasingly Poor Results Stemming from Difficulty Transacting
        Aged Whiskey ........................................................................................ 45

D.      The Truth Ultimately Emerges in Early 2020 as Defendants
        Disclose Shocking Year-End Results and a Failure to Transact
        Aged Whiskey ........................................................................................ 51

VI.     SUMMARY OF SCIENTER ALLEGATIONS .................................................. 55

A.      Selling Whiskey Is a Core Operation for MGP ..................................... 56

B.      Defendants Held Themselves Out as Knowledgeable About
        Demand for MGP's Aged Whiskey, Competition in the Aged
        Whiskey Market, and MGP's Position in the Market ............................ 57

C.      Defendants Discussed MGP's Aged Whiskey Endeavor on Every
        Investor Call .......................................................................................... 60

D.      The Suspicious Timing of Defendant Griffin's Departure .................... 61

E.      The Expiration of Defendant Griffin's Employment Contract
        Uniquely Motivated Him to Commit Fraud............................................ 63

F.      The Proximity in Time Between Defendants' Misleading
        Statements and the Revelation of Their Falsity .................................... 63

G.      Extensive News and Analyst Coverage of the American Whiskey
        Boom Throughout the 2010s ................................................................. 64

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 66

A.      Second Quarter of 2018 ........................................................................ 66

B.      Third Quarter of 2018 ........................................................................... 69

B.      Fourth Quarter of 2018 ......................................................................... 73

C.      First Quarter of 2019............................................................................ 75

D.      Second Quarter of 2019 ........................................................................ 80

E.      Third Quarter of 2019 ........................................................................... 83

VIII.   LOSS CAUSATION................................................................................... 87

IX.     PRESUMPTION OF RELIANCE.................................................................. 90

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................... 91

XI.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT................................ 92

FIRST CLAIM FOR RELIEF ................................................................................ 92

SECOND CLAIM FOR RELIEF ................................................................. 94

XII.    CLASS ACTION ALLEGATIONS .................................................. 94

XIII.   PRAYER FOR RELIEF ................................................................. 95

XIV.    JURY DEMAND ........................................................................ 96

XV.     DESIGNATION OF PLACE OF TRIAL......................................... 96

Lead Plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami Fire & Police" or "Lead Plaintiff"), by and through its counsel, brings this action individually and on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of MGP Ingredients, Inc. ("MGP" or the "Company") from August 2, 2018 through February 26, 2020 inclusive (the "Class Period").

Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which Lead Plaintiff alleges upon personal knowledge. Lead Plaintiff's information and belief is based upon Lead Counsel's investigation, which included the review and analysis of: (i) MGP's regulatory filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) MGP's press releases and public statements; (iii) analyst reports concerning MGP; (iv) interviews with industry professionals and other knowledgeable persons; and (v) additional public information regarding the Company and its industry. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   INTRODUCTION

1.   This case concerns a distilled spirits' producer's expensive, and ultimately disastrous, attempt to increase its margins by expanding into sales of aged American whiskey, while misleading its investors about the severe competitive obstacles that prevented it from executing on that strategic plan. When MGP decided in 2015 to expand its offerings into potentially lucrative aged whiskey—an attempt to increase its profit margins—the Company invested over $90 million in barreling liquid that, four years later, would be aged whiskey ready to be sold. In 2019, however, MGP had great difficulty selling the product. As an analyst

succinctly put it, MGP "doesn't seem to have sold *any* of its fully aged inventory in 2019."[1]   Each step of the way, from MGP's announcement of its long-term plan to age and sell its own whiskey to the revelation of the truth that, in fact, it failed to execute on the strategy it had repeatedly touted to investors, Defendants MGP, Griffin (the former CEO), and Pigott (the former CFO), misrepresented the truth: that customers simply were not buying MGP's product.   While touting the Company's aged whiskey strategy and discussing it in detail with investors and analysts, Defendants issued a series of false and misleading statements that artificially inflated the price of MGP's stock.   As the truth was revealed throughout the second half of 2019 and early 2020, MGP's stock price fell severely in response to each piece of bad news.   In total, the revelation of Defendants' misleading statements wiped out *over $1 billion in shareholder value*, injuring Lead Plaintiff and the Class.

2.      As described in more detail below, MGP is a leading producer of distilled spirits and specialty food ingredients with facilities in Atchison, Kansas and Lawrenceburg, Indiana.   For much of its existence, MGP focused its distilled spirits business on the production and sale of relatively inexpensive grain neutral spirits, such as vodka and gin, as well as alcohol for industrial, personal care, and food product uses.

3.      At the turn of the twenty-first century, American whiskey—and particularly bourbon manufactured in Kentucky—experienced a rapid increase in popularity.   Between the early 2000s and 2019, the whiskey market has grown steadily every year.   MGP, as a spirits' manufacturer, capitalized on this trend in 2011 with its purchase of the historic Seagram's distillery in Lawrenceburg, Indiana.   By distilling whiskey in Lawrenceburg, MGP developed a name for

---

[1] Unless otherwise noted, emphasis is added throughout.

itself as a leading manufacturer of sourced whiskey, which the Company calls "new distillate." Sourced whiskey can be either lightly aged whiskey or unaged alcohol, which has been distilled but not barreled, and which the Company sells to brokers, whiskey bottlers, distributors, and marketers for further aging, additional blending, or sale as-is.  As the whiskey industry grew and expanded throughout the 2010s, an increasing number of small, start-up distilling companies— and, indeed, many behemoths of the spirits industry—bought sourced whiskey from MGP.  By purchasing sourced whiskey from a manufacturer like MGP, distillers avoid the significant, and often prohibitive, upfront costs of aging their own whiskey.  Some companies sell MGP's product as a stopgap while their own whiskey is aging in barrels in the background, and other companies plan to use MGP's sourced whiskey forever, merely bottling MGP's product with their own label.

4.     Before the Class Period, MGP's sales of distilled spirits comprised approximately 80% of the Company's revenue, and the Company hoped to increase that proportion further by beginning to manufacture from start to finish, and then to sell, its own aged whiskey.  In 2015, MGP announced that its long-term strategy included a dramatic expansion into the aged whiskey sector.  Simultaneously, MGP hired Defendant Griffin, who had decades of experience in the spirits industry and in the whiskey sector in particular, specifically to oversee the Company's expansion into aged whiskey.  Because whiskey requires four years of aging in charred oak barrels, however, MGP's long-term strategy would take at least four years to produce results.  Investors waited patiently to reap the benefits of this strategy, as MGP had accumulated aged whiskey that it valued, based on cost, at $73 million as of the first day of the Class Period.

5.     Between 2015 and 2019, as MGP's whiskey was aging, Defendants, including Defendant Griffin, touted at every possible opportunity the Company's insight into the aged whiskey sector, the market's "robust" and "strong" demand for aged whiskey, and MGP's

comfortable position within that strong market. Defendants neglected to comment on the fact that the market was burgeoning all around MGP—creating ever-increasing competition for the products MGP intended to sell in the years ahead. In fact, many of the competitors who were coming to market after 2015, and selling the same products as MGP, were once MGP's customers.

6.    As the Class Period began on August 2, 2018, Defendants continued their campaign to convince the market of the wisdom of their expansion into aged whiskey. Throughout the Class Period, Defendants made materially false and misleading statements about, among other topics:

- Defendants' "positive discussions" "with existing and prospective customers" of MGP's aged whiskey;

- Defendants' "increasing[] confiden[ce] in both the demand . . . and the pricing for [the aged whiskey] inventory";

- MGP's "adding [customers] at a faster clip";

- Defendants' undertaking "detailed forecasting" of customer trends, which were "reviewed by management";

- Defendants' "confiden[ce]" in their "visibility" into sales of aged whiskey; and

- MGP's having "started contracting" and "transacting" aged whiskey.

7.    Defendants also regularly expressed unfounded confidence in their ability to sell their aged whiskey inventory for "three times" the price of their new distillate, even convincing an analyst that they could sell their entire aged whiskey inventory at the "3x" price "tomorrow" if necessary. And with every passing quarter, Defendants touted the incrementally increasing value of MGP's aged whiskey inventory, which, Defendants claimed, rose from $73 million to $95 million throughout the Class Period. Defendants made their false and misleading statements without ever addressing the increasing competition in the aged whiskey market—specifically the competition from MGP's own customers.

4

8.     Defendants' optimism and confidence lifted investors' hopes that MGP's foray into aged whiskey would pay off, and analysts consistently reiterated Defendants' false claims. Analysts noted, for example, on November 1, 2018, "We continue to believe that the monetization of its class of 2015 aged [whiskey] inventory can enable at least double that growth forecast"; on February 27, 2019, "We . . . believe in the longer term profitability upside from aged inventory sales"; and on June 28, 2019, "[W]e expect aged whiskey sales to accelerate" in the second quarter of 2019.

9.     Throughout Defendants' campaign to convince the market that MGP's aged whiskey experiment would succeed, Defendants failed to disclose to investors that—as the whiskey market grew and expanded throughout the 2010s—MGP was facing steadily increasing competition. This competition came in several forms, all of which conspired to doom MGP's 2019 entry into the aged whiskey market. First, MGP was competing against smaller distillers who had previously purchased MGP's sourced whiskey as a stopgap as their own liquid aged; by 2019, those distillers' products were ready for sale and consumption, and they offered consumers an authentic, "craft" experience that MGP's products—which were manufactured in a factory in Indiana—could not. Second, by 2019, larger distillers were expanding their operations, distilling more of their own aged whiskey for sale, and making their own forays into sourced whiskey. This development reduced MGP's market position; where the Company had once stood essentially alone as the country's leading sourced whiskey provider, it now faced competition from established spirits producers, which were often located on Kentucky's prestigious bourbon trail. Finally, by 2019, MGP was facing severe pricing pressure from its customers who purchased barrels of whiskey from MGP in 2014 and 2015, kept those barrels in MGP's warehouses to age, and began to sell those barrels of fully aged whiskey in 2019 at the same time that MGP began to sell its own

aged whiskey inventory.  Realizing that they had overestimated their need for liquid, those customers reduced prices significantly—to the $1,400-$1,500 range—in order to offload the inventory, dramatically undercutting MGP's prices in the process.  By contrast, MGP initially offered its aged whiskey for around $2,100 per barrel before being forced to lower prices after the first quarter of 2020.

10.     In May 2019, the truth that MGP had kept hidden from investors first began to emerge, accompanied by multiple excuses, all variations on the theme of "the dog ate my homework."  None of these false explanations held up, as Defendants could only conceal for so long that their business was suffering in the face of increasing competition.

11.     After the first quarter in which MGP was—supposedly—actively selling its aged whiskey (the first quarter of 2019), the Company disclosed disappointing financial results stemming from "lower volumes" of aged whiskey sales.  MGP's stock declined more than $20 and 22% as a result—a decline in market capitalization of more than $341 million.  Nevertheless, Defendants continued to tout MGP's future success, "confidently confirming" their previous guidance, and telling investors to expect that the "ramp-up will accelerate" over the remainder of the year.  Defendants further tempered the release of bad news by expressing "confiden[ce] that the 3x pricing [would] hold."

12.     Defendants' "confiden[ce]" should have been short-lived.  MGP's financial results for the second quarter of 2019, which the Company released on July 31, 2019, were equally dismal.  Defendants disclosed that "sales of aged whiskey have lagged our expectations," with several sales failing to transact entirely, driving a decline across the Company's entire distillery segment.  MGP's stock declined by more than 25% in response to this news, causing MGP's market capitalization to drop by another $291 million.  Defendants blamed the downturn on one-off events

such as canceled orders, logistical problems, or customers' inability to obtain credit or financing, while claiming that demand for MGP's aged whiskey remained "solid."  Defendant Griffin touted that the Company was "***in active, ongoing discussions with specific customers for another approximately 60% of those projected sales***."

13.     Disclosures throughout 2019 and early 2020 continued to reveal the truth about Defendants' botched aged whiskey endeavor.  On October 31, 2019, Defendants revealed that customers' funding issues delayed forecasted sales of aged whiskey and new distillate, but they remained optimistic, claiming, "***We are confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales***."  And on January 17, 2020, Defendants disclosed a nearly $30 million shortfall between their projected and actual sales for the year 2019, explaining that this result was particularly disappointing given the "line of sight we believed we had" into sales of aged whiskey.  This revelation caused analysts to realize that MGP "***doesn't seem to have sold any of its fully aged inventory in 2019***."  MGP's stock declined by approximately 12% and 27%, respectively, on each of these disclosures, causing another $343 million decline in the Company's market capitalization.

14.     Finally, on February 26, 2020, Defendants disclosed the ultimate truth: that MGP's quarterly and full-year sales, profit, and operating income had declined significantly, "primarily due to lower new distillate and aged whiskey sales."  Defendant Griffin was forced to admit that these catastrophic results were "***the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast***."  Griffin additionally admitted that the customers MGP had promoted so heavily to investors prior to and throughout the Class Period

simply did not exist or chose not to buy MGP's product. On this news, MGP's stock price declined by over 10%, causing MGP's market capitalization to fall by another $57 million.

15.     Analysts were stunned, wondering "why management didn't see it coming," and suggesting that investors wait "to see consistent delivery of results before returning to the [MGP] story." All told, MGP's stock price declined by over 60% throughout the Class Period. The disclosure of the truth resulted in an aggregate decline in the Company's market capitalization of $1.035 billion and severely harmed MGP's investors.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to: (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). MGP maintains its corporate headquarters in Atchison, Kansas, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.  PARTIES

#### A.  Plaintiff

20.     Lead Plaintiff Miami Fire & Police was founded in 1937, and provides retirement and disability benefits to over 4,300 Miami-based firefighters, police officers, and survivors of fallen public safety officers.   As of September 30, 2019, Miami Fire & Police managed approximately $1.69 billion in assets.  Miami Fire & Police purchased shares of MGP common stock, which is listed and trades on the NASDAQ exchange, during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.  Defendants

21.     Defendant MGP is a producer and supplier of distilled spirits and food ingredient products.  The majority of MGP's business is the production of distilled spirits.  Incorporated in Kansas, the Company maintains its corporate headquarters at 100 Commercial Street, Atchison, Kansas, 66002.  MGP's common stock is listed and trades on NASDAQ, an efficient market, under the ticker symbol "MGPI."  As of April 25, 2019 (the midpoint of the Class Period), MGP had over 17 million shares of stock outstanding, owned by at least thousands of investors.

22.     Defendant Augustus C. Griffin ("Griffin") was the CEO and President of MGP, and was a Director on MGP's Board of Directors at all relevant times.  On February 11, 2020, the Company announced Griffin's retirement, but he remained in his role as MGP's CEO until after the Class Period.

23.     Defendant Thomas K. Pigott ("Pigott") served as MGP's Chief Financial Officer ("CFO") and Vice President of Finance from the start of the Class Period until March 2019.

24.     Defendants MGP, Griffin, and Pigott are referred to herein as "Defendants." Defendants Griffin and Pigott are referred to herein as the "Individual Defendants."

25.     During the Class Period, Defendants Griffin and Pigott, because of their positions within MGP, regularly spoke in public, at investor conferences, and on earnings calls about the subject matters in this Complaint, and/or other relevant subjects as discussed herein, and possessed the power and authority to control the contents of MGP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors.  Defendants Griffin and Pigott were each provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants Griffin and Pigott each knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    MGP's Business and History

#### 1.    Background on MGP

26.     Based in Atchison, Kansas, and founded in 1941, MGP produces and supplies premium distilled spirits, specialty wheat protein, and other starch food ingredients.  The Company's distilled products segment garners approximately 81% of the business's revenue.  The Company began its history distilling only grain neutral spirits (such as vodka and gin) in its Atchison facility, but MGP's distilled spirit offerings now include bourbon and rye whiskeys in addition to grain neutral spirits.  MGP also produces industrial alcohol for food and non-food applications.  MGP's distillery products are derived from corn and other grains, and the majority of its distillery sales are made directly, or through distributors, to manufacturers and processors of finished packaged goods.

10

27.     MGP produces distilled products by processing corn and other grains (including rye, barley, wheat, barley malt, and milo) into food grade alcohol and other distillery co-products such as distillers feed, fuel grade alcohol, and corn oil.  MGP's distillery products segment also provides non-distilling warehouse services to customers, including barrel put-away, barrel storage, and barrel retrieval.

28.     The food grade alcohol that MGP produces and sells for beverage applications is typically premium beverage alcohol—primarily bourbon and rye whiskeys ("brown goods") and grain neutral spirits such as vodka and gin ("white goods").  MGP's bourbon is created by distilling grains—primarily corn—and its whiskey is made from fermented grain mash, including rye and corn.  Generally, MGP sells its whiskeys as unaged new distillate, which its customers age from two to four years and sell at various proof concentrations; as described in more detail below, this action concerns MGP's expansion into selling fully aged whiskey.  MGP sells its white goods in bulk quantities directly at various proof concentrations.  MGP manufactures gin by redistilling grain neutral spirits with proprietary formulations of botanicals or botanical oils.

29.     MGP also manufactures industrial alcohol for use as an ingredient in foods, such as vinegar and food flavoring, and other personal care products, such as hair spray, hand sanitizer, cleaning solutions, pharmaceuticals, and industrial goods.  MGP's offerings of fuel grade alcohol are sold primarily to blend with gasoline to increase the gasoline's octane or oxygen levels.  Gasoline that has been enhanced using fuel grade alcohol can serve as a substitute for gasoline that has been enhanced by lead and petroleum-based enhancers.  Alcohol-enhanced gasoline can assist in meeting environmental regulations relating to air quality, reduction of carbon monoxide, and other toxic emissions generated by burning gasoline.  MGP also sells the co-products generated from its bulk alcohol production, including distillers' feed and corn oil.

### 2.    The Need for Higher Margins Drives MGP's 2011 Lawrenceburg Acquisition

30.    Prior to 2011, MGP's distillery business was largely sustained by sales of grain neutral spirits, as well as food-grade industrial alcohol for use in food and personal care products. As the whiskey boom in the United States accelerated in the early 2000s (*see* Section IV.B.1), MGP determined to expand its offerings into this lucrative area.  In an SEC filing on November 9, 2011, MGP announced that it had signed an agreement to acquire the historic Seagram's distillery in Lawrenceburg, Indiana.  The Company explained, "The acquisition would add significant new production capacity to our food grade alcohol area and ***enables us to begin producing premium bourbon and corn and rye whiskeys***, while also increasing our gin and grain neutral spirits output."

31.    In December 2011, MGP announced the completion of its acquisition of Lawrenceburg Distillers Indiana, LLC, which included the purchase of the Seagram's facilities. MGP explained that this purchase "enabled the company ***to add premium whiskeys to its spirits portfolio*** while also increasing capacities for the production of grain neutral spirits and gins."  The Lawrenceburg distillery was established in 1847 and has been home to several distilleries—the city of Lawrenceburg is nicknamed "Whiskey City."  Joseph E. Seagram & Sons purchased the distillery in 1933 and produced a wide variety of spirits there, notably Seagram's Seven Crown whiskey.

32.    At the time of the Lawrenceburg acquisition, the American whiskey boom, described further below, was accelerating.  By 2011, the Company realized that demand for brown spirits was beginning to outrun demand for its previous flagship white products like vodka and gin, and MGP ascertained that diving into the brown spirits market would allow the Company to take advantage of "steady growth in premium distilled spirits," strong sales of brown goods, and

high demand for U.S. based whiskey blends.  The Company described in a May 31, 2012 Annual

Stockholders' Meeting Presentation that the Lawrenceburg facility would contribute to its

"financial goals" by allowing for higher sales of bourbon and whiskey and follow-on orders for

new ingredients, and would increase the Company's profit margins due to beneficial new pricing

of brown products and less volatility in raw material costs.

33.     Acquiring the Lawrenceburg facility allowed MGP to focus on its production of

new distillate—also known as sourced whiskey, as described below.[2]  Beginning in August 2013,

the Company provided updates on the production of new distillate at Lawrenceburg, which

Defendants then described as "continu[ing] to grow."  By March 2016, production of new distillate

comprised the majority of MGP's offerings of brown spirits; in an SEC filing that month, the

Company first reported, "Our whiskeys are primarily sold as unaged new distillate, which are then

aged by our customers from two to four years and are sold at various proof concentrations."

34.     The Lawrenceburg acquisition and MGP's entry into brown goods would allow

MGP to access the higher margins of brown liquor, which is not a commoditized product like grain

neutral spirits or industrial alcohol.  The Company has stated that brown goods, particularly new

distillate and aged whiskey, sit atop MGP's "margin ladder," high above white goods like industrial

alcohol, vodka, and gin.  Brown liquors present a tantalizing proposition to manufacturers because,

unlike commoditized products, for which the market sets the price, the manufacturer of a brown

liquor can set the price for its product.  As such, for a high-margin product like whiskey—and

---

[2] MGP uses the term "new distillate" to describe sourced whiskey.  The first time MGP used this term was in a May 10, 2012 Form 10-Q, shortly after the acquisition of the Lawrenceburg facility: "Our goal is to maintain inventory levels for whiskey and bourbon sufficient to satisfy anticipated future purchase orders in the wholesale market, while meeting current demand for new distillate."

13

particularly aged whiskey—a relatively small amount of product can result in a dramatic increase in revenue.

35.     As described below, whiskey takes longer to bring to market than many other spirits, and the cost of holding the product in barrels for years can be significant.  Nevertheless, due to whiskey's maturation process—as well as a brand's reputation and marketing—the end product sells for significantly higher margins.  As such, aged whiskey and other brown goods are essential to MGP's business and financial results.  Although MGP does not disclose granular financial metrics for its brown goods and white goods beyond net sales, that metric alone is instructive.  For the years 2017-2019, net sales of brown goods comprised an average of 31.8% of MGP's total net sales, whereas white goods comprised an average of 17.5%, nearly half as much.

| Metric | 2017 | 2018 | 2019 |
|--------|------|------|------|
| Net Sales | $347,448,000 | $376,089,000 | $362,745,000 |
| Gross Profit (Margin %) | $76,016,000 (21.9%) | $83,599,000 (22.2%) | $76,532,000 (21.1%) |
| Net Sales – Brown Goods | $113,413,000 | $125,857,000 | $107,190,000 |
| Net Sales – White Goods | $64,585,000 | $62,574,000 | $62,862,000 |
| Sales of Brown Goods as Percentage of Net Sales | 32.64% | 33.46% | 29.55% |
| Sales of White Goods as Percentage of Net Sales | 18.58% | 16.63% | 17.33% |

36.     Even though MGP does not disclose the gross or net profit associated specifically with its brown goods business, analysts have consistently described the potential for MGP's entry into the aged whiskey market to dramatically increase the Company's profit margins.  For instance, in a May 2016 report, Craig-Hallum's analyst wrote, "MGP has been and will be investing ~$20M per year in new distillate (i.e. un-aged bourbon) that could be sold at a low profit margin today, but instead is being aged in barrels to be sold for 3x the price as aged whiskey in 3-5 years. This sets up a step-function increase in revenue and gross margin when aged inventory starts being sold in large quantities in 2019 . . . ."  SunTrust Robinson Humphrey was similarly sanguine when it

initiated coverage of MGP in June 2016, noting the Company's ability to dramatically drive up margins by focusing on premium brown goods: "We see no reason why MGPI's margins can't improve at least 400bps [4%] over the next five years as it continues its focus on value. . . . [W]e expect margins to improve on an annual basis for the foreseeable future as the company benefits from [f]aster [g]rowth of [b]rown [s]pirits." Once the Class Period began, SunTrust was even more optimistic, writing in a December 2018 analyst note, "MGPI should be able to generate **gross margins north of 70%** on its aged inventory." Critically, and as discussed below, MGP repeatedly indicated that it expected to sell its aged whiskey at "three times" the price of its new distillate. Such aged whiskey sales would have disproportionately boosted MGP's profits and margins.

### B.     The American Whiskey Business

37.     American whiskey is an alcoholic beverage nearly as old as America itself. Once an uncommon, exotic beverage with murky origins, whiskey became increasingly popular in the thirteen colonies, particularly during the Revolutionary War. Demand for and production of whiskey diminished in the United States throughout the nineteenth and most of the twentieth centuries, before increasing again at the turn of the twenty-first.

38.     Whiskey production varies depending on the style of liquor being manufactured, the country where it originates, and other factors, but the general process of production remains generally the same no matter what. All whiskey begins its life as a raw grain—in American whiskey, the grain is generally corn, and in malt whiskey, for example, the grain is barley—which is specially treated to access its sugars. The grain is moistened and allowed to partially sprout or germinate—a process called malting—which secretes an enzyme that converts the grain's starches to sugars. Then, the sugars contained in the grain are extracted, ground up, and placed in large tank with hot water where they are agitated into a mixture that resembles porridge; this process is mashing. Once the mashing process has extracted as much sugar as possible, the mixture, now

known as mash, is introduced to yeast, which converts the sugars into alcohol. This process, fermentation, can result in a wide variety of flavors depending on the type of yeast used and the length of time the mash ferments. Next, the liquid that results from fermentation is distilled in either a pot still or column still. This process increases the liquid's alcohol content and removes the volatile components from the mixture. Stills are usually made out of copper, which helps strip spirits of unwanted flavors and aromas. After the liquid is distilled, most whiskeys begin a maturation (or aging) process in a wood container, usually an oak barrel. Barrels are stored in warehouses, and as the whiskey matures, some of its alcohol evaporates—this is known as the "angels' share." Once the whiskey is matured to the appropriate age, the liquid is bottled and typically filtered to prevent it from clouding when water or ice is added. Most large whiskey brands bottle their whiskey by combining several barrels of alcohol from throughout the distillery's warehouse; single cask or single barrel whiskey, however, is made when only one barrel is bottled at a time.

39.     The six types of American whiskey—rye whiskey, rye malt whiskey, malt whiskey, wheat whiskey, bourbon whiskey, and corn whiskey—are regulated by Title 27 of the U.S. Code of Federal Regulations. Each type of whiskey is required by law to contain a certain amount of its dominant grain in order to be legally labeled as that type of whiskey. For instance, rye whiskey's mash is required to consist of at least 51% rye, while rye malt whiskey's mash must consist of at least 51% malted rye; similarly, wheat whiskey contains at least 51% wheat, and bourbon whiskey contains at least 51% corn. The "51% rule" guarantees that the majority of the product's mash consists of a single grain.

40.     In addition, Title 27 requires that, for a product to be labeled as one of the six major types of whiskey, it must be distilled to not more than 80% alcohol by volume (160 proof), and it

must not contain any added coloring, caramel, or flavor additives.  Finally, all American whiskeys must be aged in charred new oak containers.  These rules maintain the whiskey's proper flavor profile.

### 1.    2000-2020: American Whiskey, and Particularly Premium Kentucky Bourbon, Surges in Popularity

41.    Whiskey was once the backbone of the young American economy, but it fell out of fashion as other industries and products began to grow in capacity and popularity throughout the nineteenth century.  For most of the twentieth century, particularly after Prohibition and the Second World War, Americans preferred to consume white spirits like vodka and gin.  In the twenty-first century, however, American whiskey has experienced a steady resurgence, with a particularly fast acceleration after 2012.  According to data analyzed by the Distilled Spirits Council of the United States ("DISCUS"), over 26 million cases of American whiskey were sold in the U.S. in 2019— up from 13 million in 2002:



Source:  The Distilled Spirits Council of the U.S.

42.     Industry analysts and commentators explain the phenomenon of the American whiskey boom in several ways.  Some suggest that American whiskey rode the coattails of its "Old World" predecessor—Scotch whisky—which was experiencing a resurgence of its own in the early 2000s thanks to the increasing popularity of niche "single malt" whisky.  American distillers saw prices and demand for specialty whiskeys rising overseas and decided to take a similar chance on America's local counterpart.  The "craft cocktail movement" of the 2000s also contributed to the American whiskey boom by bringing more obscure brown liquors out of the woodwork (often complete with advertising featuring celebrities) and giving them a sophisticated, unique brand.  Finally, the whiskey—particularly bourbon—industry has taken a page from the wine industry, and distilleries, especially in Kentucky, have invested substantially in tourism.  Tourism gives the distilleries new revenue streams, increases interest in bourbon, its history, and its manufacturing, and provides stability to distillers' businesses even if consumers' tastes change over time.[3]

43.     Reflecting Americans' taste for premium spirits, the corn-based Kentucky bourbon—designated by Congress in 1964 as America's "native" spirit—has become particularly popular and has driven the growth of the entire American whiskey industry.

44.     As described above, bourbon is a corn-based whiskey that, by law, must be made with a minimum of 51% corn, aged in charred new oak barrels, stored at no more than 125 proof,

---

[3] Bryce Wiatrack, "Revisiting the Bourbon Boom," GuildSomm, Jul. 12, 2019, *available at* https://www.guildsomm.com/public_content/features/articles/b/bryce-wiatrak/posts/revisiting-the-bourbon-boom; Chuck Cowdery, "Milestones of the Bourbon Boom: A Decade of Whiskey Greatness," Whiskey Wash, May 30, 2017, *available at* https://thewhiskeywash.com/whiskey-styles/bourbon/milestones-bourbon-boom-decade-whiskey-greatness/; Ashlie Stevens, "Craft Bourbon Brewers Ride The Boom, Prepare For A Bust," National Public Radio, Apr. 10, 2018, *available at* https://www.npr.org/sections/thesalt/2018/04/10/600897430/craft-bourbon-brewers-ride-the-boom-prepare-for-a-bust.

and bottled at no less than 80 proof.  Bourbon must state its age on the label if its maturation time (i.e., its time spent aging in a barrel) is less than four years.

45.     America's most expensive and highest quality whiskeys are manufactured in Kentucky, a state whose natural conditions are ideal for whiskey-making.  The state's blue limestone foundation naturally filters water, which picks up minerals as it flows through the limestone, adding flavor and eliminating bitterness.  Kentucky's hard water—with a high pH and proportion of minerals—is optimal for distilling and fermentation.  Kentucky's fertile soil, some of the country's richest, is ideal for growing bourbon's essential grain: corn.  And Kentucky's extreme weather conditions—hot in the summer, cold in the winter—cause the oak barrels in which bourbon is aged to expand and contract, so the whiskey absorbs the properties of the charred wood.  As a result, Kentucky bourbon is America's premium whiskey, and the country's most expensive, exclusive, and most highly renowned whiskies originate there.  As Eric Gregory, the president of the Kentucky Distillers' Association has noted, "I believe *Kentucky bourbon* is one word.  You can make bourbon anywhere in the United States, but if you want to sell it, it better have Kentucky's name on the label."  For instance, one of America's most renowned distilleries, Buffalo Trace, which has been distilling bourbon in Frankfort, Kentucky since the early nineteenth century, bottles some of the most expensive and beloved bourbons in the world, including its own Buffalo Trace brand, and the Pappy Van Winkle, Eagle Rare, and W.L. Weller bourbons, some of which can sell for upwards of $1,500.  Michter's, another renowned Kentucky distillery, sells certain bottles of Kentucky bourbon for $3,000 or more.

46.     Kentucky produces over 95% of the world's supply of bourbon.  The number of distilleries operating in the state has increased by 250% over the past decade, and bourbon production in Kentucky has increased by more than 115% in the past five years.  Currently, 68

distilleries are making bourbon in Kentucky, and those distilleries produced 1.7 million barrels of bourbon in 2019 alone, with premium small batch and single barrel brands driving growth.  In addition, the bourbon industry—including the tourist sector along the Kentucky Bourbon Trail—drives an immense portion of Kentucky's economy.  According to a report by the Kentucky Distillers' Association, the total economic impact of the distilling industry in Kentucky in 2019 was 20,100 jobs, an annual payroll of $1 billion, and approximately $8.6 billion of economic output.  Over the past five years, according to DISCUS, "High End Premium," and "Super-Premium" whiskey brands out of Kentucky and Tennessee have driven the entire whiskey sector's progress, with "High End Premium" and "Super-Premium" revenues growing by 37% and 147%, respectively.[4]

## 2. The Whiskey Production Conundrum: "Non-Distiller Producers" and Sourced Whiskey

47.     A unique element of the distilling business—which can make aged whiskeys such as bourbon difficult to market, but which also gives aged products an important mystique—is the time whiskey spends maturing in a barrel.  The maturation requirement creates a delay between the manufacturing process and a distiller's ability to sell the product.  As such, whiskey producers can never bring a new product to market as quickly as manufacturers of white spirits (that require no aging) can.  This time lag creates a conundrum: it is simply not possible that the dozens of "distillers" that have joined the market—particularly in the past two or three years—can be selling whiskey that they themselves have distilled and matured.

---

[4] DISCUS defines a "High End Premium" spirit as retailing for between $20-$35 per bottle and generating $170 gross revenue per case for a supplier.  "Super Premium" spirits retail for $35 or more per bottle and generate $277 gross revenue per case for a supplier.

48.     To solve this problem, "non-distiller producers" ("NDPs"), many of whom entered the market between 2010 and 2018 to capitalize on the growing American whiskey boom, have developed a new business model: sourcing fully or partially aged liquid, still in the barrel, from large distilling companies to use as a stopgap while their own distilled product is aging in barrels. Some NDPs may then further age the sourced whiskey that they purchase, blend it to their own specifications, or sell it as-is.  And to solve the whiskey conundrum described above, many small craft[5] producers of whiskey must source their liquid while their business is young, while they are— sometimes—aging their own liquid in the background for eventual sale.  These producers have no choice but to use sourced whiskey in the interim.  For many small NDPs that are new to the market, the sourcing stage is a critical part of their evolution, one they hope, eventually, to outgrow; some, however, never intend to age their own liquid but simply to bottle and sell sourced whiskey.  And even some large and well-established brands, such as Bulleit, bottle sourced whiskey instead of distilling their own.  That said, the concept of NDPs is not unfamiliar to the bourbon industry— large, established distillers have often swapped barrels and contracted with one another for storage and production when necessary or convenient.[6]

---

[5] There is no uniform definition of a "craft" producer of whiskey.  DISCUS defines a "craft" distiller as one which produces up to approximately 84,000 cases annually.  The American Craft Spirits Association requires that its members produce less than 315,000 cases per year.  And the American Distilling Institute defines a "certified craft spirit" as the "product of an independently-owned distiller with maximum annual sales of 52,000 cases where the product is physically distilled and bottled on site."

[6] Emen, Jake, "Sourcing, Labeling & Lawsuits: Why American Whiskey Should Improve Its Labels,"          Eater,          Jul.          7,          2015,          *available          at* https://www.eater.com/drinks/2015/7/7/8903167/sourcing-labeling-lawsuits-why-american-whiskey-should-improve-its; Felten, Eric, "Your 'Craft' Whiskey Is Probably From a Factory Distillery in Indiana," The Daily Beast, Jul. 28, 2014, *available at* https://www.thedailybeast.com/your-craft-whiskey-is-probably-from-a-factory-distillery-in-indiana.

49.     While there is nothing inherently sinister about NDPs sourcing their liquid from other companies, sourced whiskey, particularly that which comes from MGP's industrial distilling facility in *Indiana,* lacks the artisanal cache associated with whiskey made by distillers who bottle their own product, particularly distillers located in areas renowned for their whiskey production, like Kentucky.  Indeed, several NDPs who attempted to create the type of brand associated with unique, small-production distilleries have been accused of deceptively marketing their products. For instance, consumers alleged that Iowa "craft" rye producer Templeton implied on its bottles that its product was native to Iowa—but it was, in fact, distilled by MGP in Indiana (*see* ¶65) and later merely bottled in Iowa.  Templeton's settlement with consumers required it to refund customers up to $6 per bottle and to change its label to read "distilled in Indiana."  Jim Beam and Maker's Mark have also been sued by consumers alleging that their labels reading "handcrafted" or "handmade" are misleading.

50.     MGP itself has come under fire for its role as a source of whiskey for other distillers. In the 2014 article "Your Craft Whiskey is Probably from a Factory Distillery in Indiana," the Daily Beast reported, "The artisan whiskey industry has a big secret—many of the 'small-batch' distillers are actually buying their product from a large factory in Indiana[, MGP]."  In particular, the article faults so-called "Potemkin distilleries" for misleading customers: these distilleries "own shiny new copper stills to wow visitors, but actually sell factory-made spirits they've acquired in bulk."  The Daily Beast also noted that, for small, upstart distillers, sourcing whiskey may be a smart business decision in the early days of their business, but the eventual transition to selling their own aged whiskey can be difficult because consumers come to associate their brand with the taste of MGP's liquor.  As a result, commentators have explained, MGP's products have "colored perceptions" of what whiskey should taste like.

22

51.     The criticism of NDPs who use MGP's products or other sourced whiskey to support their sales illustrates a basic tension between consumers' desire for whiskey from unique, small distilleries and MGP's business as a large, somewhat generic industrial producer of distilled spirits.  This tension created an obstacle, well-known to Defendants, in their efforts to launch a business selling premium, aged whiskey from their Indiana factory.  And despite facing known, and possibly insurmountable, obstacles to transitioning from a leading purveyor of sourced whiskey into selling fully aged whiskey, Defendants repeatedly, falsely assured the market that MGP could be an industry leader in this segment too.  As described in more detail below, Defendants' assurances were false when Defendants first made them, and they were false when Defendants reiterated them despite knowledge to the contrary.  Once the truth about MGP's inability to succeed in the aged whiskey market was fully revealed, investors were already suffering.

### 3.     MGP Enters the Aged Whiskey Market

52.     After acquiring the Lawrenceburg distillery, MGP saw a potential opportunity to increase its margins further by capitalizing on the growth in demand for premium whiskey products and the related expansion of NDPs.  As part of MGP's drive to increase its profit margins, and to take advantage of the ever-accelerating whiskey boom, the Company installed Augustus ("Gus") Griffin as CEO on July 28, 2014.  Griffin joined MGP with significant leadership experience in the beverage industry, particularly in the brown spirits sector, having served as a senior vice president and global managing director of Brown-Forman Corporation, overseeing its flagship product, Jack Daniel's; he also held high-ranking positions with Next Level Spirits, a California-based spirits' producer, importer, and distributor, and Green Brier Distillery, a Nashville, Tennessee-based distillery, where he launched that brand's flagship bourbon.  The Company tasked

Griffin with further expanding MGP's margins through the increased production and sale of higher-margin, premium aged whiskey products.

a)    **In the Run-Up to the Class Period, Defendants Heavily Promote the Potential of Aged Whiskey to Increase MGP's Margins**

53.    Prior to the Class Period, Defendants spent several years attempting to convince investors of the tremendous upside potential of MGP's entry into the aged whiskey market. In early 2015, Defendants revealed MGP's official plan to begin aging its own whiskey for sale. On February 5, 2015, Defendants announced MGP's "five-year strategic plan," a major component of which included "build[ing] our aged whiskey inventory." Defendant Griffin noted, "As needed to support our plans, we will add staff and capabilities in sales and marketing, as well as research and development." In a subsequent March 12, 2015 press release, Defendants explained that MGP's five-year strategic plan would "largely focus on . . . the rapidly growing whiskey category, including the working capital needed to increase our stock of aged whiskey inventory."

54.    Investors were not initially not convinced by MGP's plans. In response to Defendants' announcement of MGP's five-year strategic plan, TheStreet downgraded its rating of MGP from "Buy" to "Hold" with a score of "C," describing the Company's strengths as "its solid stock price performance, compelling growth in net income and largely solid financial position with reasonable debt levels by most measures," but noting that "as a counter to these strengths . . . the company's profit margins have been poor overall." Given the market's skepticism, Defendants were forced to further—and, ultimately, falsely—promote the potential value of their entry into the aged whiskey market, focusing particularly on the profit margins that the product could achieve.

55.    In SEC filings on April 10, 2015 and May 7, 2015, Defendants again described the Company's plans to "increase[] our stock of aged whiskey" and "increase our capacity to store

24

aged whiskey."  In November 18, 2015 and December 17, 2015 investor presentations, MGP claimed, "Aged Whiskey = potential 3X value," indicating that aged whiskey would be sold at *three times* the price of MGP's new distillate.  Defendant Griffin emphasized this further on an April 6, 2017 call with analysts, indicating that MGP expected to sell its aged whiskey "at 3x the price we could sell the new distillate now."  He elaborated further on a June 7, 2018 analyst call, "[W]e continue to believe that 4-year-old whiskey has the potential to sell at 3x the price of new distillate."  A subsequent investor presentation on April 5, 2016 again noted the higher margin potential of "Whiskey: Aged" compared to new distillate, white goods, and industrial alcohol, a further attempt to convince the market of the wisdom of MGP's plan.

56.     Defendants also made clear prior to and early in the Class Period that the inventory of whiskey the Company began aging in 2015 would be ready for sale in 2019.  For instance, throughout 2017—including in the Company's March 8, May 4, and August 3, 2017 financial disclosures and April 6, 2017 investor presentation, Defendants stated that the Company expected a 15-20% increase in operating income in 2019 "as sales of aged whiskey inventory becomes a more significant factor."  In early 2018, Defendants elaborated further, noting during their March 1, 2018 earnings call, "[W]e will think those sales [of aged whiskey] will start to increase in 2019." On a June 7, 2018 call with analysts, Defendant Griffin stated, "[A]s we get closer to 2019, we'll have more whiskey turning 4 years old and we're ready to start deploying that in a more significant way."  Then, in early 2019, Defendants informed the market that the time to begin selling aged whiskey had arrived.  On the Company's February 27, 2019 earnings call, Defendant Griffin stated, "While we have been consistent in our strategic use of limited sales of aged whiskey over the past several years, 2019 marks the next phase of our deployment of this inventory. We will begin selling

both more aged whiskey and older aged whiskey. . . . ***2019 is really the next phase of this deployment. . . . [S]ales of aged whiskey will be a key driver of our growth in [20]19***."

57.     Prior to the Class Period, Defendant Griffin himself provided frequent guidance and rosy updates on MGP's overall competitive position in the aged whiskey market.  On a November 2, 2016 earnings call, for instance, an analyst asked Defendant Griffin to "comment on the general competition environment," and specifically whether there was "much other capacity coming online that's competing with you . . . to sell bulk whiskey to other craft producers or . . . mainstream producers."  Griffin mainly ignored the analyst's question, responding instead, "The whiskey category is obviously a very robust category right now. . . . We are a very large supplier, so we are able to . . . provide high quality consistent product at a good price and that's obviously a big advantage to us.  We also have a large inventory of aged whiskey that we're putting down that will help solidify our positioning in the market long term and we think that will be very valuable to our customers and strengthen our position in the market."  Another analyst followed up, "[H]ow much of the gating factor is just waiting for that distillate that you've laid down really more aggressively since Q1 of 2015 to age more if you're looking to stay in the super premium category, does it need to get to say four years of aging as a sweet spot and that's over kind of two years away from hitting that . . . ?"  Griffin responded, "No, we did start to progressively put . . . it away in 2014 and then really ramped it up in 2015 and 2016, but we had some aged whiskey."

58.     Defendants continued throughout 2017 to indicate the positive growth in the aged whiskey sector and the expected successful returns on their investment in aged whiskey.  On March 8, 2017, Defendants announced their fourth quarter and full year 2016 results and 2017 guidance, noting, "[O]ur conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory becomes a more significant factor."  On their concurrent earnings call,

Defendants further promoted the "very strong" demand for "a lightly aged whiskey" "due to the rapid growth of the bourbon category and the accelerated M&A activity in the industry." Defendant Griffin continued, "Because of this strong demand we were able to begin leveraging limited sales of lightly aged whiskey inventory to support our strategy of building partnerships and attracting and retaining customers for our new distillate.  Our ongoing strategy is to aggressively build our inventory of aged whiskey, and despite these sales we ended the year with over $50 million of inventory, up $22.7 million versus 2015."  He also noted, "Our MGP aged whiskey inventory valued at cost has now reached $50.9 million.  We implemented strong risk management programs, managing input cost to help expand our margins."

59.     During a corporate analyst meeting a month later, on April 6, 2017, Defendant Pigott reiterated MGP's plans for its aged whiskey inventory: "Stage 2 features leveraging the aged whiskey sales, the $50 million of costs that Gus talked about, which we believe will be very margin-accretive that we start—as we start to deploy that whiskey, and we've just started to do that. . . . We are very confident that we will drive strong margin growth, executing this strategy in the future."  Griffin expressed further confidence in MGP's ability to take advantage of allegedly favorable market dynamics: "Because of the recent level of M&A in the industry, we've seen a really strong demand for whiskey, both to meet the acquirer's more aspirational growth targets and to fill holes in the inventory they might have acquired.  And finally, broad consumer base.  We're in a position to benefit from the fastest-growing categories and segments."

60.     Throughout the remainder of 2017 and early 2018, Defendants continued to provide frequent updates and guidance on their aged whiskey product, steadily increasing their valuation of their inventory.  For instance, as of May 4, 2017, MGP valued its aged whiskey inventory at $53.2 million.  By August 3, 2017, that number had risen to $56.4 million.  November 2017's

inventory was valued at $58.6 million.  The following quarter, in March 2018, MGP valued its

aged whiskey inventory at $65.7 million.  On June 7, 2018, Defendants valued their aged whiskey

inventory at $67.9 million, and at a corporate analyst meeting, they remained positive as to the

inventory's prospects.  Defendant Griffin stated:

> [W]e continue to believe the demand is very strong, the pricing is very strong[,]
> and we continue to believe that 4-year-old whiskey has the potential to **sell at 3x**
> **the price of new distillate**. . . . [A]s we get closer to 2019, we'll have more whiskey
> turning 4 years old and we're ready to start deploying that in a more significant
> way. . . . We have taken a very aggressive approach to putting away aged whiskey
> with the goal of being able to provide consistent, not unlimited, but consistent
> availability of the different mash bills at different ages.

61.     Defendant Griffin further claimed that MGP had no lack of potential customers,

stating:

> Who are we going to sell this to?  Two different types of targets.  First, established
> industry players . . . . On the craft side . . . we're going to be able to help those craft
> producers launch more new products because of the wider range of mash bills, aged
> mash bills, and also help them secure full value when they go to sell.  So they will
> be having a full and secure supply chain[, which] is crucial for a brand to realize its
> full value in terms of being an M&A target. . . . We will be optimizing our customer
> mix between the large established players and the craft producers . . . .

62.     At MGP's annual shareholder meeting on May 23, 2018, Defendants repeated their

positive statements about the forecast for MGP's aged whiskey.  Defendant Griffin stated that MGP

expects "aged whiskey to be a key driver of our long-term growth."  And during the Company's

June 7, 2018 meeting with analysts, Griffin repeated these statements, noting, "[W]e continue to

believe that 4-year old whiskey has the potential to sell at 3x the price of new distillate."  Defendant

Pigott reiterated: "The company's conservative estimate of growth in operating income in 2019 is

15% to 20%, as sales of aged whiskey become a more significant factor."  And in a June 7, 2018

report—just prior to the start of the Class Period—a SunTrust analyst wrote, "Earlier today, we

attended MGPI's analyst day at its distillery in Lawrenceburg, Indiana. . . . We came away from

the day with ***greater conviction*** that MGPI will be able to more than ***double its earnings*** over the next several years ***as its aged inventory starts to play a more significant role in its portfolio beginning in 2019***."

        **b)**      **Defendants Fail to Disclose the Competitive Headwinds Facing MGP as it Entered the Aged Whiskey Market**

63.     Throughout 2018 and 2019, Defendants were aware of a significant headwind that MGP would face as it transitioned from selling new distillate in favor of sales of fully aged whiskey: competition. Defendants blatantly failed to disclose this information to investors, instead misleadingly emphasizing the incrementally increasing value of the Company's aged whiskey inventory; misrepresenting the Company's visibility into its customer mix for its aged whiskey product; and misleading investors by repeatedly touting that the ever-growing demand for aged whiskey from customers and consumers would translate into higher margins for MGP. In 2015, when Defendants first began touting MGP's long-term plan to age whiskey, MGP was basically the only sourced whiskey game in town, operating out of Lawrenceburg on a scale that few other distillers could replicate. NDPs—many of whom aspired to distill, age, and sell their own product—needed them, and they had few other options besides MGP. Defendants could easily see, however—but omitted from their discussions with investors and analysts—that, as the years passed, MGP was at risk of being outgunned both by its own customers, who were increasingly becoming its competitors, and by new entrants into the sourced whiskey market, some of whom had positive attributes that MGP did not.

64.     First, as described above (*see* Section IV.A.2), MGP's acquisition of the Lawrenceburg distillery allowed it to become a leading producer of new distillate (also known as sourced whiskey), which it sold to whiskey bottlers for further aging, blending, or sale as-is. For many smaller, craft NDPs, MGP's new distillate served as a necessary stopgap as those distillers

were aging their own whiskey for eventual sale.  By 2019, however, many of the NDPs that began putting away their own whiskey earlier in the 2010s had sufficiently aged whiskey ready to sell themselves.  As a result, those NDPs no longer needed to utilize MGP's offerings, and by 2019, their aged whiskey was competing for market prominence with MGP's.  Once they were ready to sell their own aged whiskey, the small distillers could capitalize on their "craft" brand (and, often, on the cache of their Kentucky location), which MGP, a large factory distiller in Indiana, simply could not.

65.    For instance, in late 2018, Iowa-based distiller Templeton Rye—which had previously sourced its whiskey from MGP—announced the opening of its own 34,500-square-foot distillery.  Templeton's facility has the capacity to produce up to 500,000 gallons of rye whiskey annually, and it has allowed the distiller to bring most, if not all, of its production in-house. Similarly, both Arizona Distilling Company, based in Tempe, Arizona, and Big Sky Distillery/Bozeman Spirits, based in Bozeman, Montana, began their lives as NDPs sourcing whiskey from MGP.  Now, two of those brands' flagship products, Arizona's Copper City Bourbon and Big Sky's 1889 Whiskey, are produced entirely in-house.  Kentucky-based New Riff Distilling made its name in the early days of its existence selling an MGP-sourced high-rye bourbon called O.K.I.; however, once New Riff's own distillate, which it barreled in 2014-2015, came of age several years later, New Riff retired the O.K.I. brand, and no longer required MGP's liquid for that particular product line.

66.    Second, by 2019, many new distilleries had come to market that were offering the same product as MGP—notably, sourced whiskey—but with the added benefit of being located in Kentucky, the bourbon capital of the world.  These competitors saw the same opportunity MGP did—high consumer demand for whiskey and the need to fill a gap between consumer demand and

craft-distiller production levels and aging requirements.  For instance, Bardstown Bourbon Company was founded in 2014 and has quickly become one of the most sophisticated and technologically advanced distillers in Kentucky and the world.  Since beginning operations in 2016 and the present, Bardstown has rapidly increased its production capacity, nearly doubling its operations in 2018 to 7 million proof barrels—just as MGP was due to begin selling its own aged whiskey.  Bardstown now produces and sells its own new distillate and fully aged whiskeys, and also provides distilling, aging, blending, bottling, and consultation services to other whiskey producers.  Similarly, O.Z. Tyler Distillery opened in 2016 and now produces 72,000 barrels of whiskey annually, selling both its own bourbon and whiskey product lines and bulk spirits to other distillers.  As purveyors of sourced whiskey distilled in Kentucky, Bardstown, O.Z. Tyler, Rabbit Hole, and other Kentucky-based producers have a clout—and marketing prowess—that MGP, which is legally required to announce its Indiana location on its labels, cannot compete with.

67.    A former sales manager of bulk alcohol for a prominent spirits broker, who worked with customers to acquire sourced whiskey from MGP, explained that she had a customer who at one time regularly purchased between 200 and 700 barrels of whiskey from MGP every month.  In 2019, however, that customer instructed the broker to begin purchasing bulk whiskey from Bardstown Bourbon Company instead—specifically because Bardstown was based in Kentucky and MGP was not.

68.    Third, by 2019, MGP was facing competition from several other large, well-established whiskey producers, in  addition to new entrants like Bardstown.  As a prominent bourbon and alcohol industry expert put it, "All the big guys got bigger."  In January 2018, Lux Row Distillers, the whiskey brand owned by LuxCo spirits company, opened a massive distillery complex in Bardstown, Kentucky.  Previously, LuxCo's whiskey brands, which include Ezra

Brooks, Rebel Yell, and Blood Oath were produced for the company at an unnamed distillery, which industry commentators believed to be MGP. Lux Row's head distiller explained in an article in Whiskey Advocate that the distillery would eventually begin producing in-house all of its own products, which were previously supplied, at least in part, by MGP: "[O]nce we get whiskey that's of age, we'll be rolling that into our brands. Eventually all of our bourbons will come out of Lux Row Distillery. . . . We've taken every step to ensure that the whiskey coming out of Lux Row will match the whiskey from our [current] supplier."

69.     MGP has also faced severe competition from Michter's, a now world-renowned distiller, which began its life as an NDP (reportedly buying its product from MGP). Michter's became a licensed distiller in 2012; began to develop its own recipe for bourbon; began ramping up production in 2014; and began barreling its own liquid in August 2015. According to Forbes, "By December 2015 [Michter's] had vaulted into the 'heritage' level, joining the ranks of Brown-Forman, Beam Suntory and other companies that have at least 25,000 barrels of product aging in Kentucky. The following July, Michter's added four more 16,000-gallon fermenters and a second production shift to double its capacity to one million original-proof gallons a year." In early 2018, Michter's expanded further, purchasing 145 acres of land in Springfield, Kentucky and announcing its plans to dramatically expand its barrel aging capacity on this site and to grow grains used in its whiskey production on the land. Michter's also opened a second distillery in downtown Louisville in January 2019.

70.     In March 2015, Bacardi, another global spirits behemoth, entered the whiskey market with its purchase of Angel's Share Brands, which included the wildly popular Angel's Envy bourbon. Angel's Envy, which previously sourced its whiskey from MGP and other sources,

opened its own distillery in Louisville in late 2016 and, according to Whiskey Advocate, "has been pumping out whiskey ever since."

71.     Finally, MGP was facing competition from its customers who had purchased barrels of whiskey from MGP in 2015, and by 2019, and were selling it at significantly lower prices than MGP was.  As the owner of a prominent bulk spirits broker explained, many of MGP's large contract customers overestimated their need for four-year-old aged bulk whiskey in 2014 and 2015—fearing that, over the next several years, demand for aged whiskey would ultimately outstrip supply as the whiskey trajectory kept rising, and new distilleries continued to come to market.  These customers purchased barrels from MGP in 2014 and 2015, and MGP aged those barrels for them in MGP's warehouses—but the whiskey no longer belonged to MGP.  In 2019 and early 2020, when the whiskey was ready for sale and consumption—and, simultaneously, MGP was beginning to sell its own supply of the aged product—these customers realized that they had purchased too much inventory and sold it on to their customers at much lower prices than MGP was offering for its own inventory.  The spirits broker explained that these customers would have purchased the barrels in 2014-2015 for approximately $600-$700 per barrel and sold them several years later for between $1,400-$1,500 per barrel.  MGP, on the other hand, attempted to sell the same product for about $2,100 per barrel, until it lowered its prices to the $1,400-$1,500 range at the end of the first quarter of 2020.  The spirits broker stated that, as a major player in the industry, MGP witnessed new players coming online, particularly in Kentucky, and observed demand continuing to rise throughout the 2010s, all of which conspired to create new sources of competition for MGP.

72.     The competitive headwinds facing MGP throughout the Class Period were specific to MGP and known by Defendants, but they failed to disclose them to investors.  Instead,

Defendants doubled down on their strategy to increase margins from aged whiskey sales, repeatedly touting the strength of the Company's aged whiskey business and growing inventory.

73.     Ultimately, in February 2020, MGP, and Defendant Griffin specifically, were belatedly forced to acknowledge what was apparent before the Class Period even began: that competition in various forms was affecting and undermining MGP's sales of aged whiskey and the value of its inventory.  Defendant Griffin stated:

> We also believe that **the number of potential competitors . . . has increased**, primarily for sales of new distillate currently, but also **for sales of aged whiskey going forward**. We do not think we are losing existing customers to these competitors, but **we are competing with them for the new business required for growth**.

74.     Nor was MGP's poor performance in 2019 correlated to suffering by its competitors in an industry-wide downturn.  Just the opposite: until the Covid-19 pandemic struck in mid-2020, the growth of the American whiskey industry continued to soar, and consumer and customer sentiment and demand remained high.  MGP's downturn was a Company-specific problem that severely harmed its investors.

### c)     The Class Period Begins as Defendants Tout MGP's Aged Whiskey Business

75.     The Class Period began on August 2, 2018 with Defendants release of MGP's financial results for the second quarter of 2018, which stated, **"[I]nvestment in aged whiskey inventory continues to grow, and has now reached $73.0 million, at cost**."  MGP's earnings release also touted what Defendants purported to know about demand for the Company's aged whiskey, stating, "A portion of the sizable increase in our inventory from last quarter reflects stronger anticipated sales of our premium American Whiskey products in the second half of the year," and "[t]he Company's conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

76.     On the Company's earnings call for the second quarter of 2018, Defendant Griffin indicated that the Company would have "stronger revenue growth in the second half of the year." Griffin also confirmed MGP's revenue guidance for 2019.

77.     Specifically with respect to aged whiskey, Griffin clearly indicated during that call that the Company generally, and he personally, had a clear indication that customer demand for the product was high and consistent with the Company's plans: "***We continue to have positive discussions with existing and prospective customers about the potential for this product***. . . . [O]ur projections for sustainable growth in premium beverage alcohol remain in line with our strategic plan." The Company's Form 8-K filed that day, and its accompanying press release, stated, "The Company's conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

78.     The market credited Defendants' representations about the strength of MGP's customer relationships and Defendants' confidence in their ability to find buyers for their aged whiskey.  In an August 3, 2018 analyst report, SunTrust explained, "MGPI put away $5.1M of unallocated inventory in 2Q18.  Unlike prior inventory builds, the company expects a majority of this inventory to be sold in the next few months.  Simply put, the orders are close to the finish line and MGPI did not want to run out of capacity in the final 4 months of the year.  ***We don't believe MGPI would have done this without a high level of certainty about 2H orders***."  Similarly, Craig-Hallum Capital Group's August 2, 2018 note stated confidently, "MGPI continues to execute on its strategy of investing in barreled distillate during 2015-2018 to achieve a much higher level of profits in 2019 and beyond. We continue to believe that MGPI could potentially realize EBITDA near $90M once the company begins selling aged inventory in-line with current production, which could potentially be as soon as 2019."

79.     On November 1, 2018, in announcing MGP's third quarter 2018 financial results, Defendants continued to falsely tout the acceptance of the aged whiskey project.  On MGP's earnings call, Defendant Griffin stated, "Our strategy continues to be to build our inventory of barreled whiskey and to leverage this inventory to attract and retain customers for our new distillate products and to support the growth of our own brands. We believe this library of mash bills and ages will enable us to provide structure to a very unstructured market for aged whiskey. Discussions are ongoing with existing and prospective customers about the potential of these product offerings."  In response to an analyst's question about whether MGP was experiencing "any change" to the value of its aged whiskey inventory, Griffin stated, "We're feeling increasingly confident in both the demand for the inventory ***and the pricing for that inventory*** . . . [and the Company has not] seen anything that would change our view of the value of that inventory." MGP's Form 8-K and accompanying press release reaffirmed its upbeat forecast, "The Company's conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."  By the third quarter of 2018, Defendants estimated the value of MGP's aged whiskey inventory to be $71.5 million at cost.

80.     On MGP's earnings call on November 1, 2018, Defendant Griffin further stated, "We continue to experience strong demand for our bourbon and rye whiskeys, and our new distillate business grew nicely this quarter. We've been very successful in attracting new customers, and the additional inventory we put away last quarter supported the increased sales to both new and existing customers this quarter."  Later on this call, an analyst asked Defendant Griffin, "[O]n age[d] side, do you still expect high single-digit growth for the full year?  And if so, that implies a pretty big ramp in the fourth quarter.  Just trying to understand, is

the company capable or does it have the capacity to hit that when orders are so truncated towards the fourth quarter?"  Griffin responded confidently:

> [W]e feel we have both the capacity and the capability. . . . [T]he category continues to be very strong, whether it's both the premiumization and the overall growth in the American whiskey category continues to be very strong.  ***We continue to add customers***.  You've heard us speak repeatedly about our efforts to go out and recruit new customers to be the supplier of choice to all premium beverage suppliers***.  And so that's going very, very well.  We're adding customers***.  We don't disclose the actual number of customers, but ***we are adding them at a faster clip than we did last year, which was a faster clip than we did the year before***.  So the initiatives that we are implementing there have really paid dividends. . . .
>
> Now just looking at the next 60 days, ***we have done very detailed forecasting on the customers, very disciplined approach to this***.  ***They've been reviewed by management, and that's why we have the confidence that we'll be able to deliver those numbers***.

81.     Again, analysts were swayed by Defendants' confidence.  SunTrust's November 1, 2018 analyst report took comfort in MGP's reaffirmation of its guidance, noting, "We continue to believe that the monetization of its class of 2015 aged inventory can enable at least double that growth forecast."   The next day, SunTrust expressed further optimism, explaining, "We are maintaining our $100 price target which equates to 21x our 2019 EBITDA including inventory (slight premium to peers).  We continue to believe the monetization of [the] company's inventory will allow the company to reach a sustainable $4+ EPS level (at least through 2023).   Reiterate Buy."  Specifically, SunTrust remained confident in MGP's ability to monetize its aged whiskey inventory when the time came: "[W]e are now two months away from 2019, the year in which the $17M Class of '15 inventory comes of age. ***We heard no reason why the company can't significantly boost earnings as it monetizes this inventory***."

82.     On December 13, 2018, in response to Defendants' remarks at an investor conference, during which Defendants reiterated the strong demand for MGP's aged whiskey, SunTrust wrote, "We continue to believe that both aged and unaged sales will accelerate in 2019

and substantially boost MGPI's profit base."  SunTrust repeated MGP's claim that it has a "good line of sight to the unallocated inventory that is not already spoken for."  The analyst then elaborated:

> ***Management was adamant that it could sell the entire inventory at the 3x multiple tomorrow if needed***. . . . It plans to sell to new and existing customers who will commit to buying multiple years of the aged inventory (i.e. class of 2016 and 2017). It is seeing strong interest from larger multinational players that either 1) have a small existing brand that they want to expand or 2) want to create a new entry into the fast-growing US whiskey market. . . .
>
> The company does not view the 3x multiple as exorbitant.  In fact, the current spot price for aged whiskey is roughly 4.5x that of unaged (based on prices from whiskey wholesalers). MGPI's goal from the get-go was to sell its aged inventory well below the spot price so it could enhance the prospects of its partners. . . . MGPI should be able to generate gross margins north of 70% on its aged inventory . . . .

83.     In early 2019, the point at which investors expected MGP's aged whiskey inventory to come online, as Defendants spent several years reassuring the public it would, Defendants continued their aggressive campaign to convince the market of the impending success of MGP's push into aged whiskey.  Reporting MGP's financial results for the fourth quarter of 2018 on February 27, 2019, Defendants' press release stated that the Company "continue[s] to benefit from favorable consumer trends, and [its] strategic plan has [MGP] well positioned to fully capture the potential these trends offer. . . . We are confident that our strategy and investments have us well positioned, and will provide us the resources we need, to deliver strong growth in 2019 and beyond."  In this earnings release, Defendants touted, "We increased our aging whiskey inventory to $76.4 million, at cost, reflecting a 16.2% increase as compared to the prior year."

84.     On the February 27, 2019 earnings call, Defendant Griffin stated:

> Consistent with our long-term strategy, we continue to invest in our inventory of aged whiskey, which ***enhances our ability to extract and retain new distillate customers***, supports the development of our own brands and strengthens our market position.  Due to the sustained robust growth of the American Whiskey category, ***we continue to see strong demand for aged whiskey as customers seek to fill***

*inventory gaps driven by higher-than-expected consumer demand*.  Throughout the year, *we continue to leverage limited sales of aged whiskey to support our existing partnerships and attract new customers* for our new distillate products. Even with these strategic sales, we increased our year-end inventory by 16.2% compared to the prior year, reaching $76.4 million at cost.

85.     Griffin elaborated that the Company had a clear line of sight into demand for and customers of MGP's aged whiskey inventory and claimed that the Company should have no problem selling it.  He stated:

> We also continued to grow our inventory of aged whiskey, and this valuable asset enhances our competitive position.  While we have been consistent in our strategic use of limited sales of aged whiskey over the past several years, 2019 marks the next phase of our deployment of this inventory.  We will begin selling both more aged whiskey and older aged whiskey. *We will continue to work with our current and prospective customers and are pleased with our progress implementing this initiative*.  *As a result of sales already transacted and ongoing discussions with customers in the craft segment, multinational and national brand owners* as well as the export market, *we are confident that we have visibility to the aged sales we need to deliver* against this year's guidance.

86.     Finally, Defendant Griffin reiterated:

> [W]e feel very confident that *we have visibility to the aged sales we need to deliver the guidance this year*, and it will continue to be a driver of our growth going forward in future years.  We are going to increase our inventory, so we're going to continue to put away whiskey at a strong pace to make sure that we have the incremental inventory in future years to continue to drive that growth from sales— incremental sales of aged whiskey.

87.     In response to an analyst's question about whether the Company could see greater-than-expected returns on its aged whiskey inventory, Defendant Griffin stated that the analyst was "correct," explaining that he had this confidence because, "*We have already started contracting that.  We have started transacting it*."  Similarly, in response to a question regarding whether the Company could foresee "any change in expectations that you can get 3x the price for aged inventory," Griffin doubled down and specifically acknowledged the existence of competition, and then rejected that it would have *any* impact on MGP's aged whiskey business: "Even though *I*

39

*highlighted that there is some competitive aged whiskey out in the market and will continue to be, we think the consistency of our offerings, the quality of our offerings, that combination and our efforts to provide structure to an unstructured market will allow us to continue getting strong pricing. So no, no change in our expectation.*"  Griffin reiterated that his confidence in these expectations stemmed from MGP's "consistency and quality," and its ability to "build strong partnerships with our customers."

88.    Once again, Defendants' optimism buoyed analysts' expectations.  SunTrust's February 27, 2019 analyst report noted, "We believe the company's initial guidance for 2019 is conservative and still believe in the longer-term profitability upside from aged inventory sales."

89.    On March 14, 2019, the Company announced Defendant Pigott's "decision to resign from his role as vice president of finance and chief financial officer to pursue other career opportunities."  Brandon Gall, who had served as MGP's Corporate Controller since June 2018, was appointed to fill Pigott's role.  By this point in the Class Period, Defendants had so thoroughly comforted the market as to the success of MGP's aged whiskey inventory that analysts were unphased by Pigott's departure.  On March 14, 2019, SunTrust wrote, "In our view [Pigott's resignation] will not have any effect on the company's ability to place its aged inventory this year as the CEO, who has been in the spirits industry his entire career, has been heavily involved in the selling process.  We still believe in the earnings potential of the business over the coming years and have no change to our thesis."

## V.    THE TRUTH GRADUALLY EMERGES

### A.    The Truth Begins Partially to Emerge as MGP Discloses Disappointing Sales of Aged Whiskey, While Continuing to Buoy Investors' Hopes for a Rebound

90.    On May 1, 2019, Defendants announced the Company's financial results for the first quarter of 2019.  Specifically, Defendants announced that the Company's consolidated

operating income had decreased by 18%, gross profit had decreased by over 12%, sales of premium beverage alcohol were down by 4.7% for the quarter, and sales of brown goods (including both new distillate and aged whiskey) had declined by 12%.  Defendants attributed this earnings miss, in part, to "lower volumes" of sales of its aged whiskey inventory.  In particular, on the Company's earnings call, Defendant Griffin explained, "The softness in premium beverage alcohol sales was **_driven by a decline in our brown goods with sales of new distillate and aged whiskey declining at similar rates_**," but he attributed this decline to the "transition from selling lighter aged whiskey inventory to older whiskey inventory" and to "customer order timing."

91.     In response to this news, MGP's stock price declined by nearly 23%, from a closing price of $87.87 per share on April 30, 2019, to close at a price of $67.79 per share on May 1, 2019.

92.     Defendants took pains to temper the disclosure of disappointing news with respect to the Company's declining brown goods sales during the first quarter in which the aged whiskey inventory was supposed to sell.  In MGP's press release, Defendant Griffin explained, "**_We do not believe [MGP's financial results] are the result of any changes to underlying consumer trends or our position in the market_**. . . . We have reviewed our outlook for the remainder of the year and are **_confidently confirming our previous guidance_**."  And on the Company's earnings call, Griffin was similarly optimistic, stating, "2019 is the year when we expect to ramp up sales from our inventory of aged whiskey, selling both more aged whiskey and older aged whiskey.  **_This ramp-up will accelerate over the balance of the year_**.  Aged sales for the quarter reflect lower volumes but stronger pricing as we transition from selling lightly aged whiskey inventory to older whiskey inventory.  We expect both parts of our brown goods business to return to growth over the remainder of the year as a result of stronger demand and continued strong pricing."  Griffin continued to insist that the Company had already been obtaining, and would continue to obtain,

"3x" pricing on its aged whiskey: "[F]or a product that's less than 4 years old, we've been getting above the 3x when you extrapolate it out. And for the product that we've sold, the 4-year-old product we have sold, we've been getting better than that. So we are very confident that the 3x pricing will hold." Additionally, Defendants touted the ever-increasing value of MGP's aged whiskey, noting, "[O]ur investment in aged whiskey inventory has now reached $79.5 million, at cost, an increase of $3.1 million from 2018 year end."

93.     On the earnings call, analysts sought additional detail from Griffin on the Company's disappointing quarter for brown goods, and Defendants continued to reassure the market that the quarter's results were not indicative of bigger problems with MGP's expansion into aged whiskey sales:

> <u>William Bates Chappell</u>: I know a big tranche of what was put away 4 years ago occurred in the second quarter. So does that in part say we're holding back on selling that until it gets to full aged and there's more to come kind of in 2Q and beyond that?

> <u>Defendant Griffin</u>: [W]e are very confident in the plan we have to sell that. . . . [W]e're comfortable that both the volume demand and pricing is there for us to be able to use that lever to deliver on it. . . . We talked about the ramp-up accelerating. And we're very comfortable and confident that it will ramp up over the year as we planned.

94.     SunTrust's May 1, 2019 analyst report reflected the misleading reassurance that Griffin provided on the call. The note explained: "The end market growth in whiskey remains strong[,] and the company continues to invest in the business, putting away additional inventory (added $3.1M in the quarter) and expanding its warehouses." SunTrust commented in an additional analyst note:

> Based on the commentary on the conference call, the ***weakness in brown spirits this quarter can be explained by timing impacts on unaged sales and a mix shift on aged barrels***. . . . ***For the aged sales decline, we believe this has more to do with the mix of sales***. Recall the company sold some lightly aged barrels in the year ago period to help lock in longer term customers. In 1Q19 it pulled back on

the number of barrels [of aged whiskey] sold, but because they are now fully aged barrels the pricing has gone up . . . This gives us *confidence in the profitability potential of the model, and that the company can place its aged sales in the market* (i.e. market pricing is not eroding).

95.     Defendants' attempt to attribute the first quarter 2019 decline in sales of aged whiskey to a "transition" period suggested to the market that the decline would be short term, and that aged whiskey sales would accelerate to remain consistent with the Company's "plan" in terms of both dollar volume and profit margins.  This, however, was not the case.  Defendants continued to misrepresent the potential for MGP's aged whiskey inventory—and the Company's ability to sell it in a market newly saturated by whiskey aged by MGP's customers and competitors—and thus the full truth remained far from revealed.

### B.     Defendants Continue to Falsely Claim that MGP's Market Position is Strong and that Aged Whiskey Sales Would Grow with the Market

96.     On May 7, 2019, Defendants made a presentation to potential investors in which they continued to promote the potential for growth and margin expansion due to sales of aged whiskey.  They specifically noted in the "Why Invest" section of the presentation, "Proven success of implementing long-term strategy to maximize growth and expand margins . . . Well positioned against favorable macro trends with a strong, competitive position . . . *Sales of aged whiskey sales [sic] begin second stage of meaningful sales growth and margin expansion* . . . Third growth stage of branded platform in early stages."

97.     Similarly, during MGP's May 23, 2019 annual shareholders' meeting, Defendants reported that the Company was benefitting from the "sustained robust growth of the American whiskey category," and that it was "continu[ing] to see strong demand for aged whiskey." Additionally, during this shareholders' meeting, Defendant Griffin stated:

> The growth of the *craft distillery segment has been an important driver of overall category growth, helping to increase both volumes and consumer interest*. . . .

One of our biggest strategic initiatives was the decision to begin aggressively putting away barreled whiskey inventory for aging. We began building this inventory in earnest in 2015, and we have continued to build this program over the past 4 years. While we have sold some of this inventory over the past few years, as part of a strategic effort to support our existing customer partnerships and attract new customers for our new distillate product offerings, at the end of 2018, we had grown to level of this inventory to $76.4 million, at cost.

***2019 marks the next phase of our deployment of this inventory. We are beginning to sell both, more aged whiskey and older aged whiskey***. We will continue to work with current and prospective customers in all tiers of the market, including the craft segment, multinational and national brand owners as well as the export market. Due to the sustained robust growth of the American whiskey category, we continue to see strong demand for aged whiskey. Existing customers seek aged whiskey to fill inventory gaps driven by higher-than-expected consumer demand for their current brands as well as to help get new brands to the market sooner.

New customers are seeking a trusted partner with both the expertise and inventory to help them launch and grow brands in this fast-growing category.

98.     Making these statements, Defendant Griffin failed to disclose to investors that, in fact, the strength of the craft distillery segment across the United States was, in part, to blame for MGP's inability to sell its own aged whiskey. Specifically, as small and start-up craft distillers grew and developed, they were equipped to successfully distill and age their own products and no longer needed to purchase either new distillate or fully aged whiskey from MGP to fill in the gaps in their inventory while they grew. In addition, as new competitors, particularly in Kentucky and Tennessee, began to sell and expand their sales of sourced whiskey, MGP was faced with additional new competition from brands that offered customers a more premium image than MGP could provide. Defendants Griffin and MGP knowingly misled the market about the impact of these factors, and as a result, investors did not know that MGP was losing essential customers for both their new distillate and aged whiskey because those one-time customers of MGP were now selling their own products, or purchasing products from MGP's competitors.

99.     Due to Defendants' misleading reassurance, the market remained optimistic about MGP's prospects.  On June 28, 2019, SunTrust analysts met with Defendant Griffin and MGP's CFO Gall.  Following the meeting, the analysts reported that MGP's "1Q results [were] not likely to create 2Q hangover," because, first of all, "***MGPI has not seen any cutbacks in orders from existing customers like it saw in 2Q18*** . . . impl[ying] that the company should face a highly favorable comp for whiskey sales in the current quarter;" and second of all, "***we expect aged whiskey sales to accelerate*** as the first major tranche of inventory was not put away until 2Q15 (meaning it didn't hit maturity until 2Q19)."   SunTrust's analysis suggests that Griffin had explained away MGP's low first quarter sales by pointing to isolated events—such as order cutbacks and the precise timing of the aging of the first tranche of inventory—and claimed those problems were now resolved.

## C.     The Truth Continues to Emerge as Defendants Disclose Increasingly Poor Results Stemming from Difficulty Transacting Aged Whiskey

100.     Despite Defendants' reassurances throughout May and June of 2019, MGP's July 31, 2019 announcement of its financial results for the second quarter of 2019 was rife with more bad news.  Specifically, MGP again announced lower than expected sales of aged whiskey and revised its full-year guidance downward.  The Company announced a decline in gross profits in its distillery segment, driven "by a decline in sales of aged whiskey."  MGP's Form 8-K filed July 31, 2019 noted, "Sales of aged whiskey were down for the quarter and continue to trail last year.  Several orders failed to transact at the end of the quarter, highlighting both the longer term demand and the inherent challenges in implementing this strategy on a timely basis."   The Company also lowered the bottom end of its operating income growth range from 15% to 10%. Defendants continued to tout, however, that "our investment in aged whiskey inventory has now

reached $85.5 million, at cost, an increase of $6.0 million from the first quarter 2019 as we continue to see long-term value in building this inventory."

101. Upon this news, MGP's stock price declined by about 26%, from a closing price of 67.14 per share on July 30, 2019 to close at $49.99 per share on July 31, 2019.

102. Again, during MGP's July 31, 2019 earnings call, Defendant Griffin blamed one-off events such as canceled orders and logistical problems in filling orders for the disappointing aged whiskey sales, while still claiming that demand for MGP's aged whiskey was strong. He stated:

> Several orders failed to transact at the end of the quarter, highlighting both longer-term demand and the inherent challenges in implementing this strategy. As we progress through the implementation of this strategy, we are beginning to better understand the timing of demand and obstacles to transacting customers' orders. Although the ***demand is solid and we have consistently achieved pricing at or above our target,*** some of our customers struggle with access to credit or financing, which poses a challenge to transacting the sale on a timely basis.

103. Griffin went even further, announcing: "We are off to a good start to the back half of the year, having already recorded actual sales or received purchase orders for about 12% of our projected sales of aged whiskey for the remainder of the year. Additionally, ***we are in active, ongoing discussions with specific customers for another approximately 60% of those projected sales***." And he again promoted the Company's confidence in a rebound ahead, while leaving open the possibility that the Company's prospects for aged whiskey were not as rosy as Defendants had, for years, been suggesting: "We remain confident in both the long-term demand for and the value of this inventory[,] and expect to see a significant increase in sales of aged whiskey over the remainder of the year. However, we believe there is some possibility we might have difficulty completing transactions for all of our projected sales of aged whiskey by the close of the year."

104.    When questioned by an analyst about the lowered guidance, and whether some projected sales for the third quarter had "show[ed] up," Griffin attributed the changed guidance to "other headwinds," *i.e.* sectors of the business besides aged whiskey such as industrial alcohol. He stated he was "more confident" in MGP's ability to "lean in and execute incremental sales to overcome those shortfalls by the end of the year."  That is, Griffin stated that the sales in aged whiskey would make up for any shortfalls in the industrial alcohol sector during the rest of 2019. Griffin, notably, continued to fail to disclose the true "other headwinds" facing MGP: competition from its former customers, competition from new purveyors of sourced whiskey, and the widespread growth of the distilling business that was increasingly pushing factory distillers like MGP into obsolescence.

105.    A July 31, 2019 Craig-Hallum analyst report attributed the disappointing second quarter results to the one-off event that Griffin had mentioned on the earnings call: "[C]ustomers not being able to secure financing[.]"  The note reiterated Griffin's claim that:

> [The disappointing aged whiskey sales] did not appear to represent any drop off in demand for bourbon or rye whiskey.  Management says demand and pricing for aged whiskey continues to be strong and they appear to be putting their money where their mouth is: MGPI is continuing to build its inventory of barreled distillate through 2019 and is continuing to expand its warehouses, neither of which would make sense if it appeared that demand or pricing was in fact slowing down.

106.    Despite optimism from Defendants and the market, MGP's results for the third quarter of 2019 continued to reveal the truth: Defendants had been consistently misrepresenting the market's demand for, and customer interest in, MGP's aged whiskey.  In addition, Defendants had blatantly misrepresented the impact of competitors' sourced whiskey products on MGP's business, and as such, MGP's disappointing sales were not just attributable to one-off events such as customers' lack of financing, bad timing, and canceled orders.

107.    On October 31, 2019, MGP announced its financial results for the third quarter of 2019, disappointing the market once again.  Specifically, Defendants disclosed that consolidated sales decreased by 4.6%, "reflecting a decline in the Distillery Products segment," that consolidated gross profit decreased by 4.1% "due to declines in the . . . Distillery Products segment[]," and that consolidated operating income decreased by 3.4%.  Notably, the Company reported that this quarter's disappointing results were due in larger part to a decline in sales of new distillate, offset slightly by a minor increase in sales of aged whiskey.  By the third quarter of 2019, Defendants disclosed that the value of MGP's aged whiskey inventory had increased to "$95.2 million, at cost," and Defendants "remain[ed] confident in the long-term value of this inventory and its ability to meet the needs of our ever growing and diverse mix of customers."

108.    In response to this news, MGP's stock price declined by about 12% from a closing price of $48.49 on October 30, 2019 to close at a price of $42.89 on October 31, 2019.

109.    In the third quarter 2019 press release, MGP gave the same falsely reassuring statements that it had for the second quarter, claiming that it was "off to a strong start to the fourth quarter" and that MGP was "***confident in [its] line of sight to the sales required to deliver against [its] full year guidance***."   Undeterred, Defendants continued to promote the Company's aged whiskey business.  In the press release, Defendant Griffin explained:

> As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible.  These issues affected sales of both new distillate and aged whiskey inventory.  Despite this, we did have a very strong quarter for sales of aged whiskey, selling both more whiskey and older whiskey, ***as customers continue to need our inventory*** to launch new brands, fill holes in their inventory and support brand acquisitions. ***We believe these customer needs will be ongoing***.

110.    Similarly, on the October 31, 2019 earnings call, Griffin again leaned into the false narrative that demand for MGP's aged whiskey was strong, and that one-off issues were preventing MGP from achieving the sales and growth reflecting that demand:

> While the overall American whiskey market remains robust and **our position within that market is still very strong**, timing and volatility of customers' orders continue to be a challenge this year.  As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible.  These issues have affected sales of both new distillate and aged whiskey inventory throughout the year.

111.    On the Company's earnings call that day, Griffin again attributed disappointing sales of new distillate to the delay of forecasted orders and timing issues, rather than to low or decreasing customer demand, reassuring investors that MGP was "now seeing the type of demand we anticipated when we initiated this investment."  Griffin stated:

> While sales of aged whiskey were very strong this quarter, sales of new distillate declined for the quarter as, in addition to funding issues and timing delays, some of our existing customers reduced orders versus the prior year to work through temporary excess inventory situations.  We do not believe these changes in short-term order patterns are any indication of weakness in the health of the overall industry or our customers' businesses.

112.    Griffin also touted his knowledge of the landscape in the industry and specifically claimed that MGP's customer relationships were robust, healthy, and growing, stating that MGP "now support[s] over 300 new distillate and aged [whiskey] customers.  We also work hard to develop long-term relationships with our customers and we recently signed a new multi-year new distillate supply agreement with one of our largest existing customers." And Griffin reassuringly touted the strength of the Company's aged whiskey business, noting:

> We believe these **customer needs will be ongoing**. . . . Our aged whiskey inventory has us **well positioned** to meet future demand.  We now believe that other than what is reserved to support the future growth of our own brands, we will have very minimal 2015 vintage inventory remaining at the end of the year.  We are also confident that any remaining inventory from that year will continue to increase in value. . . . **We are confident in our line of sight to those sales as we have either**

49

*transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales*. . . . We are doing an outstanding job recruiting new customers for our new distillate and aged whiskey offerings, adding more new customers this quarter than both the year-ago period and last quarter.

113.    During in the call, however, Griffin attempted to distance himself from previous statements, stating, "We weren't sure how [aged whiskey sales] would fall out in terms of a quarterly basis," despite heavily implying earlier in the year that MGP expected sales to come through in the third and fourth quarters of 2019.   But while an analyst questioned MGP's confidence, noting the pattern from the previous quarters of 2019—that whiskey sales were lower than expected—MGP again reassured investors and analysts that sales would pick up later in the year:

> Alex Fuhrman: Can you give us a sense of *how much of your anticipated Q4 sales has already been transacted?*  And for the sales that you anticipate for the rest of the year, again, can you just give us a sense of *what gives you the confidence that we're not going to see this pushed out another quarter or two?*

> Defendant Griffin: As oppose[d] to after the second quarter when we gave you the percentages by how much had been transacted and how much we're in discussions with and how much had been targeted with, we've progressed that quite a bit.  And so now we're really down to about a dozen customers that we're dealing with.  *We are in active ongoing discussions with them, specific customers for specific inventory to deliver those sales. The majority of them, the vast majority of them are existing customers*. . . . [W]e don't need them all to come through.  And we feel . . . very good about that outlook.  And that's why we're so confident in our ability to reconfirm our guidance.

114.    Despite Defendants' mixed messages, analysts remained positive on the Company, while still adjusting their estimates in accordance with the disappointing disclosures.   Craig-Hallum's October 31, 2019 analyst note reiterated Defendants' statements and expressed its own confidence in future results, noting:

> Third quarter results were below expectations with *similar issues to previous quarters this year, including order delays due to customer funding issues and the desire to delay purchasing as long as possible*.  This customer behavior impacted both new distillate and aged whiskey inventory . . . . This year, the company says

the expected strength in Q4 comes from a combination of sales transacted in October and several large sales anticipated in November and December, and noted that the company does not need all of its anticipated Nov/Dec sales to come through in order to hit its guidance.  Importantly, we believe sales are less likely to be delayed from Q4 into Q1 than in other quarters because a meaningful number of customers have annual or semi-annual supply contracts with MGP which specify minimum volumes, and the vast majority of these contracts are on a calendar year basis.

115.    SunTrust was less buoyant, noting, "To say this is disappointing would be a massive understatement," but nevertheless looking towards a bright future, as Defendants intended: "Admittedly there are no signs of a slowdown in the brown spirits market and *we do not believe the company is losing customers*. Instead we think this quarter and the YTD performance is the result of poor forecasting and execution from management.  Normally we would consider throwing in the towel after another quarter like this, but we believe there is too much underlying value in the distillery (appraised at $350M) and aged whiskey inventory (currently $95.2M at cost) to change course at this point."  In SunTrust's post-earnings call note, its analyst remained optimistic despite lowering its estimates for the stock, explaining, "[W]e have a difficult time giving up on the stock at current levels and do believe at this point in the year that management has visibility into its 4Q outlook."

**D.    The Truth Ultimately Emerges in Early 2020 as Defendants Disclose Shocking Year-End Results and a Failure to Transact Aged Whiskey**

116.    Regardless of Defendants' incessant, falsely reassuring optimism throughout 2019, in truth, MGP's aged whiskey sales during the Company's first year of supplying its own aged whiskey were a colossal failure.  On January 17, 2020, MGP announced its preliminary full year 2019 financial results, disclosing that, in 2019, the Company had garnered $362 million in sales— a nearly $30 million shortfall compared to its 2019 forecasted sales of $391 million.  In the Company's Form 8-K filed that day and accompanying press release disclosing these preliminary results, Defendant Griffin stated:

The shortfall versus our previously communicated guidance is ***the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter***[.]   While this shortfall is disappointing, particularly given the line of sight we believed we had to these aged sales, we do not believe it reflects weakness in the overall American Whiskey category, our overall position in that market or the potential long-term value of our aged whiskey inventory.  We are currently conducting additional analysis to better understand the aged whiskey market, and, going forward, we will continue to refine our strategies and tactics to improve the sales predictability and management of this important piece of our business.

117.    In response to this news, MGP's stock price declined by about 28%, from a closing price of $52.78 on January 16, 2020 to close at $38.18 on January 17, 2020.

118.    Any remaining optimism in the market had finally burnt out.  SunTrust's analyst concluded that, despite MGP's previous representations about its transacted and forecasted sales, MGP "***doesn't seem to have sold any of its fully aged inventory in 2019***."  SunTrust stated, "The company indicated that a key reason for the shortfall was the inability to sell a large portion of its aged whiskey inventory. The company's inability to execute on its aged inventory's potential ($95M as of 3Q19) was a recurring theme in 2019 so this failure doesn't come as a complete surprise. What is surprising is that the company needed such a large sell to occur in 4Q to make its numbers."  The analyst pulled no punches, stating, "[W]e cannot fully understand how the company whittled away the opportunity over the past 12 months. . . . [T]he company will need to show at least a couple of quarters of consistency before investors can regain faith in the story."

119.    Barely a month later, on February 11, 2020, MGP unexpectedly announced that Defendant Griffin would be "retir[ing] from his position as Chief Executive Officer on May 21, 2020."  The announcement of Griffin's departure came on the heels of Defendants' disclosure of a nearly $30 million shortfall in forecasted sales for 2019, due in part to disappointing sales of aged whiskey, and just two weeks before Defendants disclosed disappointing results for the fourth quarter of 2019, specifically, the Company's failure to transact "a large portion" of its aged whiskey

inventory. Although the Company took pains to ensure that the announcement of Griffin's departure would not be linked to the MGP's failure to launch its aged whiskey business—the very sector Griffin joined the Company to develop—the market was not convinced. A February 11, 2020 analyst report from SunTrust explained, "[Griffin] and the MGPI team had a disastrous 2019, ***not only being unable to execute on the aged whiskey inventory but also likely overestimating the demand for its new distillate*** (assuming that new distillate sales were flat to down in 2019)."

120.    Finally, on February 26, 2020, MGP announced its devastating financial results for the fourth quarter of 2019, disappointing the market yet again. Specifically, Defendants disclosed that quarterly consolidated sales decreased 11.8% "as a result of a decline in Distillery Products segment sales"; that quarterly consolidated gross profit decreased 15.8% "due to lower Distillery Products segment gross profits"; and that quarterly consolidated operating income decreased 2.2%, and that Distillery Products segment sales decreased 15.1% over the quarter "primarily due to lower new distillate and aged whiskey sales." These metrics declined significantly for the full year of 2019 as well. Specifically, for the full year of 2019, Distillery Products sales declined 5.4% "primarily due to lower new distillate and aged whiskey sales." Defendant Griffin stated in the Company's Form 8-K filed February 26, 2020 and accompanying press release, "While the shortfall versus our 2019 guidance was ***the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter***, sales of both new distillate and aged whiskey were down for the full year."

121.    Significantly, Defendants finally disclosed the full truth—that MGP's customers were becoming its competitors, slowing MGP's sales of both new distillate and aged whiskey, and ultimately the Company's growth in brown goods. Griffin explained, "We also believe that ***the number of potential competitors for that volume has increased***, primarily for sales of new

distillate currently, but also *for sales of aged whiskey going forward*.  We do not think we are losing existing customers to these competitors, but *we are competing with them for the new business required for growth*."  Despite claiming that they "still believe in the long-term value of our aged whiskey inventory," Defendants were forced to "reduc[e] our forecast for predictable ongoing annual volume growth in our sales of aged whiskey."

122.    In response to this news, MGP's stock price declined by more than 10%, from a closing price of $31.80 on February 25, 2020 to close at $28.42 on February 26, 2020.

123.    On MGP's earnings call on February 26, 2020, analysts were eager for more "color" on how MGP's "aged whiskey transactions . . . failed to materialize in the fourth quarter," seeking detail on "the nature of those transactions . . . how many customers there were, why they were not transacted and what types of customers they might have been, whether it be smaller craft brands or larger multinationals?"  In a remarkable about-face from his extreme confidence in the market's demand for MGP's aged whiskey, Griffin chalked MGP's failures up to its inexperience, reminding the market that "2019 was our first year of selling 4-year-old products[,] [s]o we're really starting on a new venture there."  Ultimately, however, Griffin was forced to own the truth—that MGP's customers simply were not there:

> Some of the issues we've had in the past, funding came up, delays, people pushing off things that we thought they were certainly going to—do happen.  We had one sale just evaporate.  Sometimes, we sell to a company who sells to somebody else.  Some of the smaller customers might like to deal only with one supplier.  So in essence, it's a customer of a customer.  And we had one that just evaporated, so we don't know what—since it was a customer of a customer, was that really a viable sale to begin with?  We certainly thought so.

> And then we've had people—we had people put off because they'd found other temporary solutions.  I can't get too much into specifics because several of those customers that didn't transact, we have ongoing business relationships with them, and so we can't go into too much more detail than that.

124.   Analysts were quick to connect the precipitous decline in MGP's stock price to the disclosure of the news that Company failed to successfully transact its aged whiskey inventory. SunTrust's analyst noted, "[T]he main driver of the lower than expected result was an inability to sell a large portion of aged product, and noted that both sales for aged and unaged distillate were down YoY," and explained that while he believed MGP's explanations for its failings, he was incredulous as to "***why management didn't see it coming until December***."   SunTrust followed up after the earnings call, "[W]e believe investors will need to see consistent delivery of results before returning to the story."   Craig-Hallum was similarly skeptical, with its analyst explaining:

> If there were to be any substantial sales of aged whiskey, such as the sales management had previously forecast for Q4 but failed to materialize, we believe that would largely represent upside to our estimates.   However, we are concerned that the projection of rising sales of aged whiskey in 2020 appears to be based on growing export sales, which represents a new channel for MGPI and could very well prove to be easier said than done. . . . [W]e think it is far from assured that the company will find it any easier to sell aged whiskey abroad.

125.   As the truth gradually emerged throughout 2019 and 2020 about MGP's failure to sell its aged whiskey inventory, the Company's stock price slid consistently and sharply, with an overall decline in its share price—between August 2, 2018, the first day of the Class Period, and February 26, 2020, the last day of the Class Period—of close to 61%.

## VI.   SUMMARY OF SCIENTER ALLEGATIONS

126.   As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, the Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VII, were materially false and misleading when made.   The information in this section summarizes certain of the allegations—that are set forth more fully above—that detail the Defendants' scienter.   All of these allegations must be considered holistically in evaluating Defendants' scienter.   The cumulative knowledge of all members of

MGP's senior management team, including the Individual Defendants, regarding the matters addressed herein is properly imputed to MGP.

### A. Selling Whiskey Is a Core Operation for MGP

127. The topic of MGP's ability to successfully age and sell its own aged whiskey formed the basis of all of Defendants' material misrepresentations and omissions, and the fact that distilling and selling whiskey was a core operation of MGP's business and critical to MGP's financial success supports Defendants' scienter.

128. MGP is a manufacturer and supplier of premium distilled spirits, and as such, the Company's executives, particularly Defendant Griffin, held themselves out as knowledgeable about the Company's plans for and ability to begin aging its own whiskey, potential sales of MGP's own aged whiskey, and the effect of distilling and selling aged whiskey on MGP's overall financial performance.

129. As noted above, aged whiskey and other brown goods are essential to MGP's business and financial results. Although MGP does not disclose granular financial metrics for its brown goods and white goods product lines beyond net sales, that alone is instructive. For the years 2017-2019, net sales of brown goods comprised an average of 31.8% of MGP's total net sales, whereas white goods comprised an average of 17.5%, nearly half as much. Additionally, analysts have consistently described the potential for MGP's entry into the aged whiskey market to dramatically increase the Company's profit margins. For instance, in a May 2016 report, Craig-Hallum's analyst wrote, "MGP has been and will be investing ~$20M per year in new distillate (i.e. un-aged bourbon) that could be sold at a low profit margin today, but instead is being aged in barrels to be sold for 3x the price as aged whiskey in 3-5 years. This sets up a step-function increase in revenue and gross margin when aged inventory starts being sold in large quantities in 2019 . . .

."  SunTrust similarly wrote in a December 2018 analyst note, "MGPI should be able to generate gross margins north of 70% on its aged inventory."

130.    Even more critically, and as discussed below, MGP repeatedly indicated that it expected to sell its four-year aged whiskey at "three times" the price of its new distillate.  Such aged whiskey sales would have disproportionately boosted MGP's profits and margins.  As such, whiskey sales, and in particular, sales of aged whiskey, were the key determinant in both MGP's profitability, and revenue and income growth.  Given the critical importance of this business to MGP's overall financial success, aged whiskey was a core operation.

**B.      Defendants Held Themselves Out as Knowledgeable About Demand for MGP's Aged Whiskey, Competition in the Aged Whiskey Market, and MGP's Position in the Market**

131.    In addition, because distilling spirits was a core component of MGP's business, Defendants held themselves out as knowledgeable about—and involved in the monitoring of—customer interest and demand, potential sales, and overall market conditions for the Company's aged whiskey.  This further supports an inference that Defendants knew the truth about MGP's inability to successfully age and sell its own aged whiskey products, and the effect of this long-term plan on MGP's overall business and relationships.

132.    For instance, prior to the Class Period, Defendant Griffin stated, "We are starting to see the benefits of our targeted investments, which should ensure that we can fully support the growth of the whiskey category.  Strong tailwinds for our business include spirits gaining share from beer, the continued strong demand for bourbon and rye whiskeys, and the overall premiumization of the beverage alcohol industry."  And during MGP's 2019 annual shareholders' meeting, Defendant Griffin explained, "2019 marks the next phase of our deployment of this [aged whiskey] inventory.  We are beginning to sell both, more aged whiskey and older aged whiskey.  We will continue to work with current and prospective customers in all tiers of the

market, including the craft segment, multinational and national brand owners as well as the export market.  Due to the sustained robust growth of the American whiskey category, we continue to see strong demand for aged whiskey.  Existing customers seek aged whiskey to fill inventory gaps driven by higher-than-expected consumer demand for their current brands as well as to help get new brands to the market sooner."  Throughout the Class Period, Defendants Griffin and Pigott also held themselves out as knowledgeable about the market conditions for MGP's aged whiskey and about the Company's plans for and ability to begin aging its own whiskey, potential sales of MGP's own aged whiskey, and the effect of distilling and selling aged whiskey on MGP's overall financial performance.  For example, on MGP's August 2, 2018 earnings call, Defendant Griffin stated, "Longer term, we are assessing the best approach to provide structure to a very unstructured market for aged whiskey.  We continue to have positive discussions with existing and prospective customers about the potential for this product. . . [O]ur projections for sustainable growth in premium beverage alcohol remain in line with our strategic plan."  And on MGP's November 1, 2018 earnings call, Defendant Griffin similarly stated, "[W]e're feeling increasingly confident in both the demand for the inventory and the pricing for that inventory . . . and we haven't seen anything that would change our view of the value of that inventory."  Similarly, on February 27, 2019, Defendant Griffin stated that the Company "continue[s] to benefit from favorable consumer trends, and [its] strategic plan has [MGP] well positioned to fully capture the potential these trends offer."  On October 31, 2019, even once the truth had already begun to emerge, Defendant Griffin reiterated MGP's comfortable position within the aged whiskey market, noting on, "[T]he overall American whiskey market remains robust and *our position within that market is still very strong*."

58

133.    In addition, Defendants have at times made statements supporting the inference that they were aware of the growth of their customers—and thus were aware of one source of growing competition—but chose not to disclose to investors any further detail about this development.  For instance, on February 27, 2019 and February 26, 2020, MGP filed Forms 10-K with the SEC in which the Company stated, "Our brands compete with the brands of our bulk alcohol customers." And on May 7, 2019, MGP released an investor presentation, in which Defendants spun the growth of the market as, if anything, favorable—not detrimental—to MGP's market position.   The presentation stated: "Industry is adding capacity . . . Existing producers to support growth of existing brands . . . New producers to support growth of new brands . . . Customers building capacity . . . To expand product offerings and marketing efforts . . . Continue to understand our value and role as their brands grow."

134.    Defendant Griffin also specifically answered analysts' questions about the market conditions for MGP's aged whiskey.  For instance, on MGP's pre-Class Period earnings call on August 3, 2017, an analyst asked Griffin to comment on "some of the pressures that the premium beverage alcohol . . . products are facing," and in particular, "As your barrel put-away decelerates significantly, is it less confidence in where the market is going to be 2 or 3 years from now or is it just adjusting significantly with the short-term dynamics?"  Defendant Griffin responded:

> Let me be very clear.  We have – there's certainly no lessening in our confidence, in our bullish outlook for the – both the distilled spirits industry, and obviously, American whiskey industry or the bourbon category.  And so any fluctuation our quarter-to-quarter put-away has no reflection of our long-term view. . . . Because we believe the long-term potential is very, very strong.  The underlying fundamentals of the market are very, very strong.  If you look at the growth over the last 5 years, or whether you look at the growth of the last 12 weeks or the last 4 weeks, everything is pointing in the right direction.

135.    Defendant Griffin also stated on MGP's November 1, 2018 earnings call that the Company had "**done very detailed forecasting on the customers**," and he further admitted that this

forecasting had been "*reviewed by management, and that's why we have the confidence that we'll be able to deliver those numbers*." As the CEO of MGP, Griffin would have been one of the executive-level managers to review the Company's "detailed forecasting on the customers." Indeed, Defendant Griffin admitted on the Company's February 27, 2019 earnings call that there already "*is some competitive aged whiskey out in the market and will continue to be*," implying that Griffin understood and was well aware that MGP faced competition from those purveyors of aged whiskey already in the market and those brands that were coming to market in the future, simultaneously with MGP's aged whiskey. Nevertheless, Griffin consistently doubled down on his false statements that MGP would face no significant headwinds from those competitors.

### C. Defendants Discussed MGP's Aged Whiskey Endeavor on Every Investor Call

136. Aged whiskey was a critical topic of discussion on every Company earnings call and at every annual shareholders' meeting during the Class Period—and even in the years prior to the Class Period. The Company's plans to age and sell its own whiskey were also the subject of both Defendants' and analysts' intense focus, with Defendants professing to know detailed information concerning the value of MGP's aged whiskey inventory—which, allegedly, grew incrementally every quarter—and the Company's visibility into potential sales of the inventory. For example, between March 7, 2017 and the present, Defendants have provided an update on the growing value of MGP's aged whiskey inventory in every quarterly financial report and on every earnings call. These statements portrayed what appeared to be a deep and detailed knowledge of MGP's own sales, demand for its products, industry trends, and competitive considerations. Those discussions were either based on the knowledge portrayed, making Defendants' false and misleading statements knowing, or they were severely reckless, if Defendants' statements were not based on the necessary diligence and knowledge their disclosures implied.

137.   In addition, analysts asked Defendants detailed questions about MGP's aged whiskey inventory, and Defendants gave them detailed responses to their questions on every conference call during the Class Period. For instance, on MGP's pre-Class Period earnings call on August 3, 2017:

> Alex Fuhrman: [T]hinking about just the launch of an aged bourbon brand, do you have sufficient quantities of whiskey aged beyond just what you've been putting away since 2015 to be able to hit the market quickly with a brand like that? Or do you need a few years to let your own inventory age into a launch like that?
>
> Defendant Griffin: In terms of whiskey, we even – when we bought the distillery, there was some there, and we've been very judicious about what we've hung on. So obviously, this Remus Repeal Reserve we're coming out with is going to have some old whiskey in it. And so we have the whiskey to come out with products like that. And as we've said before, the last thing we want to do is short our own brands. And so we are making sure that we hang on to the whiskey we have and are putting away the right amount of whiskey to support all of our brands initiatives, whatever they may be.

138.   Fuhrman probed further on this same earnings call regarding the growth of MGP's customers and their demand for MGP's products:

> Alex Fuhrman: [A] lot of your customers that have been growing nicely themselves for the last couple of years. Some of them are seeing accelerating growth even the last few years. To the extent that you're getting interest in having conversations with customers about selling lightly-aged whiskey. Just trying to get a sense of the pricing that will be seen in the market for whiskey that is 12, 18 months old, not necessarily fully-aged bourbon, but would be curious to the extent that you can comment on the supply and demand dynamics for the more lightly-aged bourbon.
>
> Defendant Griffin: Yes. Alex, there continues to be a very strong demand for it, not a very transparent and visible market for it. But we are seeing – there's nothing to diminish our view, outlook of what that whiskey will be worth. And we're seeing, for the lighter-aged whiskey, we are seeing things in line proportionately with that longer-term view.

**D.   The Suspicious Timing of Defendant Griffin's Departure**

139.   The suspicious timing and circumstances of Defendant Griffin's departure from MGP further support scienter. As CEO of MGP during the Company's execution of its strategic plan—and particularly, its expansion into the aged whiskey market—Griffin played a key role in,

and spoke frequently and authoritatively about, MGP's growth into the aged whiskey market.  In fact, the Company hired Griffin, who had decades of experience in the whiskey sector, specifically to oversee MGP's long-term strategic plan, noting that his "talents have primarily been focused on *the development and execution of beverage alcohol growth strategies*."

140.    On February 11, 2020, however, MGP unexpectedly announced that Griffin would "retire from his position as Chief Executive Officer on May 21, 2020."  The announcement of Griffin's departure came on the heels of Defendants' disclosure of a nearly $30 million shortfall in forecasted sales for 2019, due in large part to disappointing sales of aged whiskey, and just two weeks before Defendants disclosed disappointing results for the fourth quarter of 2019, specifically, the Company's failure to transact "a large portion" of its aged whiskey inventory.  Although the Company took pains to ensure that the announcement of Griffin's departure would not be linked to the MGP's failure to launch its aged whiskey business—the very sector Griffin joined the Company to launch—the market was not convinced.  A February 11, 2020 analyst report from SunTrust explained, "[Griffin] and the MGPI team had a disastrous 2019, not only being unable to execute on the aged whiskey inventory but also likely overestimating the demand for its new distillate (assuming that new distillate sales were flat to down in 2019)."

141.    Griffin's unexpected departure from the Company supports Griffin's scienter.  Either Defendant Griffin was pushed out of the Company because he was, in part, responsible for the failure of MGP's aged whiskey sector to launch successfully, or he voluntarily left the Company to avoid being further associated with the disaster he oversaw throughout his tenure and that Defendants concealed by their fraud.  In either event, the timing of Griffin's retirement suggests that he was aware of, and intimately involved in, the Company's fraudulent conduct: the truth fully emerged about the Company's failure to sell its aged whiskey inventory (and the

resulting instability of its financial position) in the weeks surrounding the announcement of his departure.

### E.    The Expiration of Defendant Griffin's Employment Contract Uniquely Motivated Him to Commit Fraud

142.    The impending expiration of Defendant Griffin's employment contract with MGP uniquely motivated him to commit fraud.  According to a Form 8-K filed with the SEC on November 1, 2017, the operative version of Griffin's employment agreement with MGP began on October 31, 2017 and would terminate on May 31, 2020.  With his employment agreement set to expire on May 31, 2020, Defendant Griffin took drastic measures during the Class Period to create the appearance that the Company's financial position was meeting or exceeding the growth expectations that he had been brought into the Company to achieve.  Griffin undertook this misconduct in the hopes that creating the appearance of success in the short time remaining on his contract would convince the Company to renew it.

### F.    The Proximity in Time Between Defendants' Misleading Statements and the Revelation of Their Falsity

143.    The proximity in time between certain of Defendants' false statements and the subsequent revelation of them as false further supports Defendants' scienter.  As one example, in discussing MGP's financial results for the third quarter of 2019, Defendant Griffin stated that Defendants were "***confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales***."  Less than three months later, however, on January 17, 2020, Defendants disclosed that they could not, in fact, close the sales they had promised the prior quarter—and had been promising for the prior four years.  Upon disclosing that, in 2019, the Company's sales fell $30 million short of its forecasts, Defendant Griffin admitted, "The shortfall versus our previously communicated guidance is ***the result of us ultimately being unsuccessful in transacting a large portion of the***

*aged whiskey sales we had forecast for the fourth quarter*," and noted that this result was particularly disappointing considering the "line of sight" the Company believed it had into those sales.  It defies reason and belief to assume that MGP's sales prospects could have changed so dramatically between Griffin's falsely reassuring statements in October 2019 and the Company's January 2020 revelation of "unsuccessful" sales that, in making those statements in October 2019, Griffin did not know that they were false.

### G.    Extensive News and Analyst Coverage of the American Whiskey Boom Throughout the 2010s

144.    Extensive news and analyst coverage of the American whiskey boom throughout the 2010s further supports Defendants' scienter.   In the years prior to Defendants' 2015 announcement of MGP's entry into the aged whiskey market, and between that announcement and the 2019 commencement of their sales of aged whiskey, the American news media was inundated with coverage about consumers' ever-increasing demand for whiskey; the influx of distilleries opening across the country, and particularly in Kentucky; and the growing competition for market share.   Analysts and commentators also aggressively covered the market for alcohol stocks.  Widespread news and analyst coverage support the inference that Defendants would have been well aware of the fact that competition for its products was growing, and thus, that their statements downplaying the existence of this competition were false.   Despite this widespread public information, Defendants repeatedly made clear that competition would not affect MGP's aged whiskey sales (*see generally* Section IV.B.3), and that they were confident in MGP's position within this burgeoning market.  Investors credited Defendants' statements to their detriment.

145.    For instance, as described above, the 2014 revelation that MGP provided whiskey to many small (and some larger) distillers led to a flurry of news coverage about NDPs and MGP's role in their growth; all of these articles suggested that many NDPs would, eventually, outgrow

their reliance on MGP.  The July 29, 2014 Daily Beast expose, for example, noted, "A principal in the New Mexico company, Bernasconi says that purchasing whiskey from MGP and bottling it is 'a means to develop a brand and help fund the next step' of actually distilling a unique product." Eater's July 2015 analysis of the sourced whiskey market explained similarly:

> Many small brands who are opening their doors for the first time often source whiskey. . . . It's a fiscal necessity . . . while their whiskey is left maturing in the barrel.  Therefore, they buy somebody else's whiskey as they begin the process of putting away their own stock.  Along the way, these new brands may begin incorporating their own juice into the purchased whiskey, or they may simply wait until their whiskey is fully of age and release it separately.

146.    Similarly, general news coverage about the whiskey industry throughout the 2010s clearly suggested that increasing demand for whiskey was causing increasing competition among whiskey producers, and that this competition was encroaching on MGP's market position.  Both local and national news sources covered spirits brands'—such as Diageo, Bacardi, and Gruppo Campari—expansions into the whiskey business, and the rapid growth of the bourbon-based tourist industry in Kentucky.  Market commentators recommended Brown-Forman and Diageo, spirits companies with a particular focus on whiskey, as "stocks to buy" in 2017, 2018, and 2019.  And industry groups like the Kentucky Distillers' Association and DISCUS reported regularly throughout the 2010s that whiskey and bourbon were experiencing unprecedented growth in the United States, and showed no signs of slowing.  Despite extensive news coverage suggesting that, by the time MGP's whiskey was sufficiently aged in 2019, Defendants knew the Company would be facing steep competition in the market, Defendants never disclosed to investors that this competition could suppress, or in any other way adversely affect, their plans to barrel, age, and sell their own aged whiskey.

## VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS

147.  As summarized in detail below, throughout the Class Period, Defendants MGP, Griffin, and Pigott each made materially false and misleading statements and omissions concerning: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

### A.    Second Quarter of 2018

148.  On the first day of the Class Period, August 2, 2018, MGP released its financial results for the second quarter of 2018.  The Company's earnings press release stated, "The Company's conservative ***estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor***."  The earnings release included Defendants' valuation of MGP's aged whiskey inventory as $73 million, at cost.  The press release was annexed to a Form 8-K signed by Defendant Pigott.

149.  The same day, the Company held its earnings call for the second quarter of 2018, during which Defendant Griffin stated, "***We continue to have positive discussions with existing and prospective customers about the potential for this product*** . . . [O]ur projections for sustainable growth in premium beverage alcohol remain in line with our strategic plan."

150.  During the same call Defendant Pigott stated, "The Company's conservative ***estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor***."

151.    On that same earnings call, Defendant Griffin also stated, "[W]e are reaffirming our guidance for the year."

152.    Defendants' statements in ¶¶148-51 above were materially false and misleading when made.  Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

153.    Defendants' $73 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

154.    Defendants' statements during the second quarter of 2018 regarding the "positive discussions with existing and prospective customers" that the Company was having—and Defendants' resulting estimates of growth for the Company—were false and misleading when made because Defendants failed to disclose the competitive headwinds that MGP was facing as it prepared to sell its aged whiskey inventory.  This competition dramatically decreased MGP's market share for aged whiskey and thus the number of customers with whom MGP could have been in discussions.  By the time MGP's aged whiskey was sufficiently aged, in 2019, MGP's products were entering a market completely saturated with aged whiskey—notably, aged whiskey being offered by former customers, and now competitors, of MGP's.  Defendants failed to disclose that—as the market for aged whiskey in America continued to expand—MGP faced competitive

headwinds that it had not faced when it first began barreling whiskey for aging in 2015. For example, MGP had previously sold significant amounts of new distillate to non-distiller producers to use as a stopgap while the NDPs' own whiskey was aging; as MGP's own whiskey was aging between 2015 and 2019, the NDPs were simultaneously aging their own whiskey to sell themselves. As a result, by the time MGP's aged whiskey was ready for sale, those NDPs would no longer need to utilize MGP's offerings, and the NDPs' aged whiskey would be competing for market prominence with MGP's. Once the NDPs were ready to sell their own aged whiskey, these small distillers could capitalize on the "craft" brand and, often, on the cache of their Kentucky location, which MGP, a large factory distiller in Indiana, could not. In addition, between 2015 and 2019, many new distilleries, including Bardstown, O.Z. Tyler, Rabbit Hole, and others began to expand their offerings to provide the same services as MGP—notably, sourced whiskey—but they were located in Kentucky, the bourbon capital of the world, and could market themselves as authentic producers of Kentucky bourbon. Additionally, in the years between 2015 and 2019—as MGP's whiskey was aging—several global spirits brands and well-established whiskey producers, including Diageo, LuxCo, Michter's, and Bacardi, entered the whiskey market, or further expanded their offerings in the whiskey market, including by opening or expanding distillery operations in Kentucky, creating additional competition for MGP's aged whiskey inventory.

155.  Prior to and throughout the Class Period, Defendants held themselves out as knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements—which failed to disclose essential information about the competitive landscape that MGP was facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading. For instance, Defendant Griffin repeated numerous times before and throughout the Class Period that the market

for aged whiskey in America would benefit MGP's attempts to expand its offerings into this lucrative area.  Specifically, before the Class Period began, Defendant Griffin touted the favorable market conditions that MGP would find as it entered the aged whiskey market; on March 8, 2017, Griffin promoted the "very strong" demand for aged whiskey "due to the rapid growth of the bourbon category and the accelerated M&A activity in the industry."  Defendant Griffin continued, "Because of this strong demand we were able to begin leveraging limited sales of lightly aged whiskey inventory to support our strategy of building partnerships and attracting and retaining customers for our new distillate."  Approximately one year later, on June 7, 2018, Griffin explained, "[W]e continue to believe the demand is very strong, the pricing is very strong, and we continue to believe that 4-year-old whiskey has the potential to *sell at 3x the price of new distillate*."  As such, Defendants were aware of the rapid expansion of the aged whiskey market throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

### B.  Third Quarter of 2018

156.  On November 1, 2018, MGP released its financial results for the third quarter of 2018.  In the accompanying press release, Defendant Griffin stated, "[W]e are poised for further growth in the fourth quarter. Based *on the improved momentum of our business* and the *continued solid execution of our strategic plan*, we are again reaffirming our operating income growth guidance for the year[.]"

157.  The Company's earnings press release further stated, "The Company's conservative *estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor*."  The press release was annexed to a Form 8-K signed by Defendant Pigott.

158.     The Company's third quarter of 2018 earnings release included Defendants' valuation of MGP's aged whiskey inventory as $71.5 million, at cost.

159.     The same day, the Company held its earnings call for the third quarter of 2018, during which Defendant Pigott stated, "[T]he Company's conservative *estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor*."

160.     On that same earnings call, Defendant Griffin stated:

Our strategy continues to be to build our inventory of barreled whiskey and to *leverage this inventory to attract and retain customers for our new distillate products and to support the growth of our own brands*. We believe this library of mash bills and ages will enable us to provide structure to a very unstructured market for aged whiskey. *Discussions are ongoing with existing and prospective customers about the potential of these product offerings*.

161.     On that same earnings call, Defendant Griffin stated further, "[W]e're feeling *increasingly confident in both the demand for the inventory and the pricing for that inventory* . . . [W]e haven't seen anything that would change our view of the value of that inventory*."

162.     On the same earnings call, Defendant Griffin stated, "We *continue to experience strong demand for our bourbon and rye whiskeys*, and our new distillate business grew nicely this quarter. *We've been very successful in attracting new customers*, and the additional inventory we put away last quarter supported the increased sales to both new and existing customers this quarter."

163.     Defendant Griffin further stated, "[T]he category continues to be very strong, whether it's both the premiumization and the overall growth in the American whiskey category continues to be very strong."

164.     When asked if Griffin still expected "high single-digit growth" in sales of aged whiskey sales "for the full year" of 2019, he responded:

[T]he category continues to be very strong . . . *We continue to add customers*. You've heard us speak repeatedly about our efforts to go out and recruit new customers to be the supplier of choice to all premium beverage suppliers. *And so that's going very, very well. We're adding customers*. We don't disclose the actual number of customers, but *we are adding them at a faster clip than we did last year, which was a faster clip than we did the year before* . . . Now just looking at the next 60 days, *we have done very detailed forecasting on the customers, very disciplined approach to this*. *They've been reviewed by management, and that's why we have the confidence that we'll be able to deliver those numbers*.

165.    On December 13, 2018, Defendants held an investor conference and invited SunTrust to travel with MGP management to meet with investors.  SunTrust's analyst reporting on the conference reiterated MGP management's statement that "*it could sell the entire [aged whiskey] inventory at the 3x multiple tomorrow if needed*."

166.    Defendants' statements in ¶¶156-65 above were materially false and misleading when made.  Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

167.    Defendants' $71.5 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

168.    Further, Defendants' claims during the third quarter of 2018 regarding their "confiden[ce] in both the demand for the inventory and the pricing for that inventory," their "ongoing" discussions with potential customers, their "success" in adding and attracting new

customers, and their certainty in their ability to sell the "entire [aged whiskey] inventory at the 3x multiple tomorrow if needed" were materially false or misleading for the reasons set forth in ¶154 and in more detail in Section IV.B.3.b above.  Specifically, Defendants failed to disclose the industry-wide competitive headwinds that had dramatically increased between 2015 and 2019, and that were facing MGP as it prepared to sell its aged whiskey inventory.

169.    In addition, Defendant Griffin's November 1, 2018 statement that Defendants had conducted "very detailed" and "very disciplined" forecasting into MGP's customer mix, which had been "reviewed by management," was materially misleading for creating a false impression to investors.  In truth, either the forecasting had not been done as Defendants claimed, or the forecasting had been done in an entirely reckless manner—for a truly "detailed" and "disciplined" forecasting would have revealed the serious competitive headwinds facing MGP.  Defendants' February 26, 2020 admission revealed that Defendants either had not done this forecasting as claimed, or they had done it so recklessly so as to be materially misleading.

170.    As described in Section VI.B above, prior to and throughout the Class Period, Defendants admitted that they were knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements— which failed to disclose essential information about the competitive landscape that MGP was facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading.  During the third quarter of 2018, Griffin was similarly confident, stating on November 1, 2018, "[T]he category continues to be very strong, whether it's both the premiumization and the overall growth in the American whiskey category continues to be very strong."  As such, Defendants were aware of the rapid expansion of the aged whiskey market

throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

### B.    Fourth Quarter of 2018

171.    On February 27, 2019, MGP released its financial results for the fourth quarter of 2018.  In the accompanying press release, Defendant Griffin stated, "***We saw increased demand for our premium beverage alcohol*** products in the fourth quarter[.]"

172.    In the earnings press release, Defendant Griffin stated that the Company "continue[s] to benefit from favorable consumer trends, ***and [its] strategic plan has [MGP] well positioned to fully capture the potential these trends offer.*** . . . We are confident that our strategy and investments have us well positioned, and will provide us the resources we need, to deliver strong growth in 2019 and beyond."  The press release was annexed to a Form 8-K signed by Defendant Pigott.

173.    The Company's fourth quarter of 2018 earnings release included Defendants' valuation of MGP's aged whiskey inventory as $76.4 million, at cost.

174.    The same day, the Company held its earnings call for the fourth quarter of 2018, during which Defendant Griffin stated, "Due to the sustained robust growth of the American Whiskey category, ***we continue to see strong demand for aged whiskey as customers seek to fill inventory gaps*** driven by higher-than-expected consumer demand.  Throughout the year, we continue to leverage limited sales of aged whiskey to support our existing partnerships and attract new customers for our new distillate products."

175.    Defendant Griffin stated further, "We will continue to work with our current and prospective customers and are pleased with our progress implementing this initiative. . . . ***As a result of sales already transacted and ongoing discussions with customers in the craft segment***,

multinational and national brand owners as well as the export market, ***we are very confident that we have visibility to the aged sales we need to deliver against this year's guidance***."

176.    Defendant Griffin also stated that it was "***correct***" that the Company could see greater-than-expected returns on its aged whiskey inventory, explaining, "***We have already started contracting that.  We have started transacting it***."

177.    When asked whether the Company had any change in its "3x" expectation for the price of aged whiskey, Defendant Griffin stated that there was "no change in our expectation" because of MGP's "consistency and quality," and its ability to "build strong partnerships with our consumers."

178.    Defendants' statements in ¶¶171-77 above were materially false and misleading when made.  Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

179.    Defendants' $76.4 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

180.    Further, Defendants' claims during the fourth quarter of 2018 regarding the "increased" and "strong" demand for their products; MGP's positioning to benefit from positive consumer trends in the whiskey market; MGP's "sales already transacted and ongoing discussions

74

with customers in the craft segment"; Defendants' "confiden[ce]" in their "visibility to the aged sales" they need to deliver against the year's guidance; and their continued expectation to achieve "3x" for aged whiskey compared to new distillate were materially false or misleading for the reasons set forth in ¶154 and in more detail in Section IV.B.3.b above.  Specifically, Defendants failed to disclose the industry-wide competitive headwinds that had dramatically increased between 2015 and 2019, and that were facing MGP as it prepared to sell its aged whiskey inventory.

181.    As described in Section VI.B above, prior to and throughout the Class Period, Defendants admitted that they were knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements— which failed to disclose essential information about the competitive landscape that MGP was facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading.  During the fourth quarter of 2018, Griffin was similarly confident, stating on February 27, 2019 that MGP "continue[s] to benefit from favorable consumer trends," and "continue[s] to see strong demand for aged whiskey as customers seek to fill inventory gaps driven by higher-than-expected consumer demand."  As such, Defendants were aware of the rapid expansion of the aged whiskey market throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

## C.    First Quarter of 2019

182.    On May 1, 2019, MGP released its financial results for the first quarter of 2019.  In the accompanying press release, Defendant Griffin stated, "*[W]e do not believe [the headwinds affecting MGP's financial results] are the result of any changes to* underlying consumer trends or *our position in the market* . . . . We have reviewed our outlook for the remainder of the year and are confidently confirming our previous guidance."  In the Form 8-K, Defendant Griffin

attributed the unexpected decline of aged whiskey sales to the "transition from selling lighter aged whiskey inventory to older whiskey inventory" and to "[customer] order timing."

183.   The Company's first quarter of 2019 earnings release included Defendants' valuation of MGP's aged whiskey inventory as $79.5 million, at cost.

184.   The same day, MGP held its earnings call for the first quarter of 2019, during which Defendant Griffin stated, "2019 is the year when we expect to ramp up sales from our inventory of aged whiskey, selling both more aged whiskey and older aged whiskey. This ramp-up will accelerate over the balance of the year. . . . We expect both parts of our brown goods business to return to growth over the remainder of the year *as a result of stronger demand and continued strong pricing*."

185.   Griffin stated further, "[F]or a product that's less than 4 years old, we've been getting above the 3x when you extrapolate it out. And for the product that we've sold, the 4-year-old product we have sold, we've been getting better than that. So we are very confident that the 3x pricing will hold."

186.   Analyst William Bates Chappell asked Griffin, "I know a big tranche of what was put away 4 years ago occurred in the second quarter. So does that in part say we're holding back on selling that until it gets to full aged and there's more to come kind of in 2Q and beyond that?" Griffin responded, "*[W]e are very confident in the plan we have to sell that*. . . . [W]e're *comfortable that both the volume demand and pricing is there for us to be able to use that lever to deliver on it*. . . . We talked about the ramp-up accelerating. And we're very comfortable and confident that it will ramp up over the year as we planned."

187.   On May 7, 2019, Defendants released a presentation to potential investors. In the "Why Invest?" section, MGP stated: "Proven success of implementing long-term strategy to

maximize growth and expand margins . . . ***Well positioned against favorable macro trends with a strong, competitive position . . . Sales of aged whiskey sales [sic] begin second stage of meaningful sales growth and margin expansion*** . . . Third growth stage of branded platform in early stages."

188.    On May 23, 2019, MGP held its annual shareholders' meeting.   During this appearance, Defendants reported that the Company was benefitting from the "sustained robust growth of the American whiskey category," and that it was "continu[ing] to see strong demand for aged whiskey."

189.    During this appearance, Defendant Griffin stated further:

The growth of the ***craft distillery segment has been an important driver of overall category growth, helping to increase both volumes and customer interest . . . 2019 marks the next phase of our deployment of this inventory.   We are beginning to sell, both more aged whiskey and older aged whiskey***.   ***We will continue to work with current and prospective customers in all tiers of the market***, including the craft segment, multinational and national brand owners as well as the export market. Due to the sustained robust growth of the American whiskey category, ***we continue to see strong demand for aged whiskey***."

190.    Defendants' statements in ¶¶182-89 above were materially false and misleading when made.   Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

191.    Defendants' $79.5 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

192.    Further, Defendants' claims during the first quarter of 2019 regarding the unexpected decline of aged whiskey sales due to the "transition from selling lighter aged whiskey inventory to older whiskey inventory" and to "[customer] order timing"; the Company's "expect[ation] to ramp up sales from our inventory of aged whiskey," which "will accelerate over the balance of the year"; Defendants' "confiden[ce] that the 3x pricing will hold" and "confiden[ce]" in their plans to sell their inventory; and the continued "strong demand" for MGP's products were materially false or misleading for the reasons set forth in ¶154 and in more detail in Section IV.B.3.b above.  Specifically, Defendants failed to disclose the industry-wide competitive headwinds that had dramatically increased between 2015 and 2019, and that were facing MGP as it prepared to sell its aged whiskey inventory.

193.    In addition, Defendants' first quarter of 2019 statements were false because, as described in ¶71, Defendants failed to disclose that, by the beginning of 2019, MGP was in competition with its former customers who were selling barrels of MGP's whiskey for significantly lower prices than MGP itself.  Specifically, in 2014 and 2015, many of MGP's large contract customers overestimated their need for four-year-old aged bulk whiskey—fearing that, over the next several years, demand for aged whiskey would ultimately outstrip supply as the bourbon trajectory kept rising and new distilleries continued to come to market.  These customers purchased barrels from MGP, and MGP was aging it for them in MGP's warehouses—but the whiskey no longer belonged to MGP.  By 2019, when the whiskey was ready for sale and consumption—and, simultaneously, MGP was beginning to sell its own supply of the aged product—these customers

realized that they had purchased too much inventory and sold it on to their customers at much lower prices than MGP was offering for its own inventory. An industry insider explained that these customers would have purchased the barrels from MGP in 2014-2015 for approximately $600-$700 per barrel and sold them several years later for between $1,400-$1,500 per barrel, significantly undercutting MGP, who was attempting to sell the same product for about $2,100 per barrel before being forced to lower its prices several quarters later.

194.    In addition, Defendant Griffin's statement that "[t]he growth of the craft distillery segment has been an important driver of overall category growth, helping to increase both volumes and customer interest" was materially false and misleading because, as described in ¶¶64-67, Griffin failed to disclose that the craft distilleries that Defendants had implied were potential customers had actually become their competitors. Defendants omitted the fact that the growth of craft distilleries was a significant reason why MGP was unable to sell its aged whiskey. Some craft distilleries were now equipped to successfully distill and age their own product and had no more use for the source aged whiskey that MGP was selling. Other craft distilleries were sourcing aged whiskey from competitors located in Tennessee and Kentucky, which were considered to have a more premium product. Defendants knowingly omitted this information and misled the market about the impact of the growth of craft distilleries, and as a result, investors did not know that MGP was losing essential customers, or that those one-time customers of MGP were now selling their own products or purchasing product from competitors.

195.    As described in Section VI.B above, prior to and throughout the Class Period, Defendants admitted that they were knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements— which failed to disclose essential information about the competitive landscape that MGP was

facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading.  During the first quarter of 2019, Defendant Griffin specifically identified the "growth of the craft distillery segment," as an "important driver" of MGP's market position, neglecting to disclose that this growth actually diminished it.  As such, Defendants were aware of the rapid expansion of the aged whiskey market throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

### D.  Second Quarter of 2019

196.  On July 31, 2019, MGP released its financial results for the second quarter of 2019, filing a Form 8-K and accompanying press release.  MGP reported lower than expected sales of aged whiskey and reported that it would be revising its full-year guidance downward, lowering the bottom end of its operating income growth range from 15% to 10%.

197.  In the press release, Defendant Griffin stated that despite the quarter's disappointing results, "***We remain confident in both the long-term demand for, and the value of this [aged whiskey] inventory, and expect to see a significant increase in sales of aged whiskey over the remainder of the year***."

198.  The Company's second quarter of 2019 earnings release included Defendants' valuation of MGP's aged whiskey inventory as $85.5 million, at cost.

199.  The same day, MGP held its earnings call for the second quarter of 2019.  During that call, Defendant Griffin stated, "As we progress through the implementation of this strategy, ***we are beginning to better understand the timing of demand and obstacles to transacting customers' orders***.  Although the ***demand is solid*** and we have consistently achieved pricing at or above our target, ***some of our customers struggle with access to credit or financing, which poses a challenge to transacting the sale on a timely basis***."

200.    Griffin stated further:

We are off to a good start to the back half of the year, *having already recorded actual sales or received purchase orders for about 12% of our projected sales of aged whiskey for the remainder of the year*.  Additionally, *we are in active, ongoing discussions with specific customers for another approximately 60% of those projected sales* . . .  We remain confident in both the long-term demand for, and the value of this inventory, and expect to see a significant increase in sales of aged whiskey over the remainder of the year.

201.    When questioned by an analyst on that earnings call about the Company's lowered guidance, and whether some projected sales for the third quarter had "show[ed] up," Griffin attributed the changed guidance to "*other headwinds*," including sectors of MGP's business other than aged whiskey such as industrial alcohol.

202.    Defendants' statements in ¶¶196-201 above were materially false and misleading when made.  Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

203.    Defendants' $85.5 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

204.    Further, Defendants' claims during the second quarter of 2019 that they "remain confident in both the long-term demand for, and the value of this [aged whiskey] inventory, and expect to see a significant increase in sales of aged whiskey over the remainder of the year," and

their statement that "demand is still solid," but that they were "beginning to better understand the timing of demand and obstacles to transacting customers' orders" were materially false or misleading. Additionally, Defendants' statements regarding the reasons for their disappointing aged whiskey sales—notably, customers who "struggle with access to credit or financing" and "other headwinds" facing the Company—and their assertion that they had "already recorded actual sales or received purchase orders for about 12% of our projected sales of aged whiskey for the remainder of the year" and "we are in active, ongoing discussions with specific customers for another approximately 60% of those projected sales" were materially false or misleading. These statements were all materially false or misleading when made for the reasons set forth in ¶154 and in more detail in Section IV.B.3.b above. Specifically, Defendants failed to disclose the industry-wide competitive headwinds that had dramatically increased between 2015 and 2019, and that were facing MGP as it prepared to sell its aged whiskey inventory.

205. In addition, as described in ¶193, Defendants' statements in the second quarter of 2019 were false because Defendants failed to disclose that, by the beginning of 2019, MGP was in competition with its former customers who were selling barrels of MGP's whiskey for significantly lower prices than MGP itself.

206. As described in Section VI.B above, prior to and throughout the Class Period, Defendants admitted that they were knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements—which failed to disclose essential information about the competitive landscape that MGP was facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading. During the second quarter of 2019, Defendants focused investors' attention on the benefits to MGP of "the long-term demand for . . . this [aged whiskey] inventory," while similarly

failing to disclose that the "long-term demand" for aged whiskey—and simultaneously increasing supply of aged whiskey—was, in part, responsible for the decline of MGP's position in the market. As such, Defendants were aware of the rapid expansion of the aged whiskey market throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

### E.   Third Quarter of 2019

207.   On October 31, 2019, MGP announced its financial results for the third quarter of 2019, filing a Form 8-K and accompanying press release.

208.   In the press release, Defendant Griffin stated that the Company was "off to a strong start to the fourth quarter" and that the Company was "***confident in [its] line of sight to the sales*** required to deliver against [its] full year guidance."

209.   Defendant Griffin further stated, "[W]e did have a very strong quarter for sales of aged whiskey, selling both more whiskey and older whiskey, ***as customers continue to need our inventory*** to launch new brands, fill holes in their inventory and support brand acquisitions. ***We believe these customer needs will be ongoing***."

210.   The Company's third quarter of 2019 earnings release included Defendants' valuation of MGP's aged whiskey inventory as $95.2 million, at cost.

211.   The same day, MGP held its earnings call for the third quarter of 2019.  On that call, Defendant Griffin stated that the Company was "***now seeing the type of demand we anticipated*** when we initiated this investment" and that "sales of aged whiskey were very strong this quarter[.]"

212.   Griffin stated further:

We believe ***these customer needs will be ongoing. . . . Our aged whiskey inventory has us well positioned to meet future demand***.  We now believe that other than what is reserved to support the future growth of our own brands, we will have very

minimal 2015 vintage inventory remaining at the end of the year . . . ***We are confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales***.

213.    Griffin specifically stated that MGP "now support[s] ***over 300*** new distillate and ***aged [whiskey] customers***" and that MGP was "doing an outstanding job recruiting new customers for our new distillate and aged whiskey offerings, adding more new customers this quarter than both the year-ago period and last quarter."

214.    On that call, Griffin had the following exchange with an analyst:

<u>Alex Fuhrman</u>: Can you give us a sense of how much of your anticipated Q4 sales has already been transacted?  And for the sales that you anticipate for the rest of the year, again, can you just give us a sense of what gives you the confidence that we're not going to see this pushed out another quarter or two?

<u>Defendant Griffin</u>: As oppose[d] to after the second quarter when we gave you the percentages by how much had been transacted and how much we're in discussions with and how much had been targeted with, we've progressed that quite a bit.  And so now we're really down to about a dozen customers that we're dealing with.  ***We are in active ongoing discussions with them, specific customers for specific inventory to deliver those sales***.  The majority of them, the vast majority of them are existing customers [but] [w]e don't need them all to come through.  And we feel very good about that outlook.  And that's why we're so confident in our ability to reconfirm our guidance.

215.    Defendants' statements in ¶¶207-14 above were materially false and misleading when made.  Specifically, Defendants misrepresented, or omitted facts necessary to make their statements on the following subjects not misleading: (i) MGP's position in the aged whiskey market; (ii) the market's demand for MGP's aged whiskey; (iii) MGP's customer mix for its aged whiskey products; (iv) the heightened competition in the whiskey market for MGP's products, including both new distillate and fully aged whiskey; (v) the impact of that heightened competition on MGP's ability to successfully market and sell aged whiskey; and (vi) the misleading valuation and touting of the Company's aged whiskey inventory.

216.    Defendants further misrepresented, or omitted facts necessary to make their statements not misleading, the Company's "confidence" in confirming the guidance it provided in the first and second quarters of 2019; the continued "strong demand" for MGP's aged whiskey; MGP's connections with "specific customers" for orders of aged whiskey in the second half of 2019; and that MGP's lower-than-expected sales of aged whiskey were the result of one-off events such as the timing of customers' orders or customers' difficulties obtaining financing.

217.    Defendants' $95.2 million valuation of MGP's aged whiskey inventory created the false and misleading impression of a robust end-market for that product, when, in fact, increased competition and product acceptance had impaired MGP's ability to sell it.

218.    Further, Defendants' statements that the Company was "confident in [its] line of sight to the sales required to deliver against [its] full year guidance"; that "customers continue to need our inventory"; that those "customer needs will be ongoing"; that the Company was now "seeing the type of demand we anticipated when we initiated this investment"; that "sales of aged whiskey were very strong this quarter"; that "[o]ur aged whiskey inventory has us well positioned to meet future demand"; that the Company is "confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales"; that MGP "now support[s] over 300 new distillate and aged [whiskey] customers"; that the Company is in "active ongoing discussions with them, specific customers for specific inventory," but that the Company does not in fact "need" those customers, were materially false and misleading for the reasons set forth in ¶154 and in more detail in Section IV.B.3.b above.   Specifically, Defendants failed to disclose the industry-wide competitive headwinds that had dramatically increased between 2015 and 2019, and that were facing MGP as it prepared to sell its aged whiskey inventory.

219.    In addition, as described in ¶193, Defendants' statements in the third quarter of 2019 were false because Defendants failed to disclose that, by the beginning of 2019, MGP was in competition with its former customers who were selling barrels of MGP's whiskey for significantly lower prices than MGP itself.

220.    As described in Section VI.B above, prior to and throughout the Class Period, Defendants admitted that they were knowledgeable about the market conditions and demand for aged whiskey in America, which supports the inference that they knew that their statements— which failed to disclose essential information about the competitive landscape that MGP was facing—were materially false or misleading, or omitted facts necessary to render their statements not misleading.  During the third quarter of 2019, Defendants again noted their belief that because "customer needs will be ongoing," "our aged whiskey inventory has us well positioned to meet future demand," but again failed to explain that "customer needs" were largely being met by MGP's competitors.  As such, Defendants made clear throughout the Class Period that they were aware of the rapid expansion of the aged whiskey market throughout the U.S., and thus the ever-increasing competition for their aged whiskey inventory, which they would face when they brought their aged whiskey to market in early 2019.

221.    The following quarter, when Defendants released their disappointing financial results for the fourth quarter of 2019 on February 26, 2020, Defendant Griffin was forced to admit, "The shortfall versus our previously communicated guidance is *the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter*."

222.    This admission rendered all of Defendants' prior statements false. Defendant Griffin's admission revealed that MGP's previous claims of working with "specific customers,"

claims that the Company's disappointing financial results stemmed from one-off events, and that demand for MGP's products was consistently "strong" were false or misleading when made. Defendant Griffin further admitted during MGP's earnings call for the fourth quarter of 2019, "[W]e had people put off because they'd found other temporary solutions." That is, ***there was no demand for MGP aged whiskey*** from potential customers. Defendants knew this was the case, but continuously told the market throughout the Class Period that it had many potential customers in its "line of sight" and that there was "strong demand" for its aged whiskey.

223.    A January 17, 2020 SunTrust analyst report concluded that MGP "***doesn't seem to have sold any of its fully aged inventory in 2019***." The report, referencing Defendant Griffin's previously reassuring but misleading statements that MGP had customers in its "line of sight," stated, "What is surprising is that the company needed such a large sell to occur in 4Q to make its numbers." The analyst continued, "[W]e cannot fully understand how the company whittled away the opportunity over the past 12 months." This indicates that Defendants ***failed to disclose to the market*** MGP's failure to bring in customers for its aged whiskey inventory during ***every*** quarter of 2019 and early 2020.

## VIII.   LOSS CAUSATION

224.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants' scheme artificially inflated the price of MGP stock and operated as a fraud and deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 1, 2019, July 31, 2019, October 31, 2019, January 17, 2020, and February 26, 2020, the price of MGP's stock fell. As a result of their purchases of MGP securities during the Class Period, Lead Plaintiff and other members of the Class suffered harm. Until the final disclosure, on February 26, 2020, each of MGP's disclosures described below only partially

revealed the truth, and Defendants accompanied each disclosure with additional false and misleading information that maintained the artificial inflation in the price of MGP's stock. As such, the full amount of inflation was not removed until after the final disclosure on the last day of the Class Period.

225.  Specifically, Defendants' materially false and misleading statements misrepresented MGP's ability to sell its aged whiskey inventory, the existence of customers lined up to purchase MGP's aged whiskey, and the financial impact of MGP's plan to age and sell its own brand-name aged whiskey on the Company's overall financial performance. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of MGP securities fell significantly. As a result of the disclosure of the truth of Defendants' fraud, the price of MGP's common shares declined by 60.45%, from a closing price of $71.86 per share on August 2, 2018, the first day of the Class Period, to a closing price of $28.42 per share on February 26, 2020, the last day of the Class Period.

226.  The disclosures that partially corrected the market price of MGP's common stock and reduced the artificial inflation caused by Defendants' materially false and misleading statements are detailed below:

| Date | Corrective Event | Closing Stock Price | Change from Previous Day's Close | S&P 500 Price Change |
|------|------------------|---------------------|----------------------------------|----------------------|
| May 1, 2019 | MGP discloses first quarter 2019 results: 18% decline in operating income, 12% decline in consolidated gross profit, and 4.7% decline in premium beverage sales, stemming from "lower volumes" of aged whiskey sales. | $67.79 | -22.85% | -0.75% |

| Date | Corrective Event | Closing Stock Price | Change from Previous Day's Close | S&P 500 Price Change |
|---|---|---|---|---|
| July 31, 2019 | Defendants revise full-year guidance downward, lowering the bottom end of MGP's operating income growth range to 10% from 15%, noting that "sales of aged whiskey have lagged our expectations" and that several sales of aged whiskey failed to transact. | $49.99 | -25.54% | -1.09% |
| October 31, 2019 | Defendants disclose a 3.4% decline in consolidated operating income, a 4.6% decline in consolidated sales, and a 4.1% decline in gross profit, noting that forecasted sales of aged whiskey and new distillate were delayed by customers with funding issues. | $42.89 | -11.55% | -0.30% |
| January 17, 2020 | Defendants disclose $362 million in 2019 sales, a shortfall from the $391 million previously forecasted, noting that the results were particularly disappointing given the "line of sight we believed we had" to sales of aged whiskey. | $38.18 | -27.66% | 0.39% |
| February 26, 2020 | Defendants disclose disappointing financial results for the fourth quarter of 2019, specifically that the Company failed to transact "a large portion" of the aged whiskey. | $28.42 | -10.63% | -0.38% |

227.    On the date of each disclosure, no other adverse, company-specific information entered the market, and therefore the entirety of MGP's stock price decline on the date of each corrective event is attributable to the disclosure of previously undisclosed material facts concerning MGP's known inability to sell aged whiskey at the volumes and to the customers it had previously stated.

228.     It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions regarding MGP's ability to sell aged whiskey at the volumes and to the customers it had previously stated would artificially inflate the price of MGP's common stock.  It was also foreseeable to Defendants that the revelation of the truth about MGP's aged whiskey sales would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatement and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## IX.     PRESUMPTION OF RELIANCE

229.     At all relevant times, the market for MGP common stock was efficient for the following reasons, among others:

(a)     MGP stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, MGP filed periodic public reports with the SEC and NASDAQ;

(c)     MGP regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     MGP was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales

force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

230.    As a result of the foregoing, the market for MGP common stock promptly digested current information regarding MGP from all publicly available sources and reflected such information in the price of MGP stock.  Under these circumstances, all purchasers of MGP stock within the defined Class during the Class Period suffered similar injury through their purchase of MGP stock at artificially inflated prices, and the presumption of reliance applies.

231.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding MGP's ability to successfully manufacture, age, and transact its aged whiskey inventory—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the MGP's ability to successfully manufacture and transact its aged whiskey inventory, as set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

232.    MGP's "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

233.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading, and the statement was authorized and/or approved by an executive officer of MGP who knew that the statement was false, and/or the statement omitted material adverse

information whose disclosure was necessary to render the statement not misleading.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, because they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Thereunder
(Against All Defendants)**

234.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

235.    During the Class Period, Defendants MGP, Griffin, and Piggott carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiff and other members of the Class.

236.    Defendants MGP, Griffin, and Piggott: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

237.    Defendants MGP, Griffin, and Piggott, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

238.    During the Class Period, Defendants MGP, Griffin, and Piggott made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

239.    Defendants MGP, Griffin, and Piggott had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants MGP, Griffin, and Piggott engaged in this misconduct to conceal MGP's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

240.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased MGP stock and were harmed when the truth about MGP negatively impacted the price of those securities.  Plaintiff and the Class would not have purchased MGP stock at the prices they paid, or at all, had they been aware of the truth about MGP.

241.    As a direct and proximate result of Defendants MGP, Griffin, and Piggott's wrongful conduct, Plaintiff and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

242.    By virtue of the foregoing, Defendants MGP, Griffin, and Piggott violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

243.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

244.     The Individual Defendants acted as controlling persons of MGP within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about MGP, the Individual Defendants had the power and ability to control the actions of MGP and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.   CLASS ACTION ALLEGATIONS

245.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of MGP between August 2, 2018 through February 26, 2020, inclusive (the "Class Period"). Excluded from the Class are Defendants and their families, directors, and officers of MGP and their families and affiliates.

246.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of the midpoint of the Class Period, MGP had approximately 17 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

247.     Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)   Whether Defendants violated the Exchange Act;

(b)   Whether Defendants misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)   Whether Defendants' misconduct impacted the price of MGP securities that are a part of the defined Class;

(f)   Whether Defendants' misconduct caused the members of the Class to sustain harm; and

(g)   The extent of harm sustained by Class members and the appropriate measure of harm.

248.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained harm from Defendants' wrongful conduct.

249.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

250.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Lead Plaintiff demands a trial by jury.

## XV.    DESIGNATION OF PLACE OF TRIAL

Pursuant to Local Rule 40.2(a), Lead Plaintiff designates Kansas City, Kansas as the place of trial.

Dated: July 22, 2020                     Respectfully submitted,

_/s/ Ryan K. Meyer_
**FLEESON, GOOING, COULSON**
**  & KITCH L.L.C**
Ryan K. Meyer, KS State Reg. # 24340
David G. Seely, KS State Reg. #11397
1900 Epic Center, 301 N. Main
Wichita, Kansas 67202
Telephone: (316) 267-7361
Facsimile: (316) 267-1754
rmeyer@fleeson.com
dseely@fleeson.com

_Liaison Counsel for Lead Plaintiff City of Miami_
_Fire Fighters' and Police Officers' Retirement_
_Trust and Lead Counsel for the Class_

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**
James A. Harrod, NY State Reg. # 3058252
(_pro hac vice_)
Kate W. Aufses, NY State Reg. # 5440532 (_pro_

96

*hac vice*)
Amanda M. Boitano, NY State Reg. # 5705843
(*pro hac vice*)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jim.harrod@blbglaw.com
kate.aufses@blbglaw.com
amanda.boitano@blbglaw.com

*Counsel for Lead Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN
 & LEVINSON**
Robert D. Klausner, FL State Reg. # 244082
Stuart A. Kaufman, FL State Reg. # 979211
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust*