**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **IN RE MGP INGREDIENTS, INC.**<br>**SECURITIES LITIGATION** | **Case No. 20-2090-DDC-JPO** |

## MEMORANDUM AND ORDER

This Order rules the defendants' pending Motion to Dismiss (Doc. 36).  For reasons explained below, the motion is granted.

**I.      Procedural and Factual Background**

**A.      Procedural Background**

This matter is a consolidated action filed against a publicly traded company and two of its former executive officers.  Plaintiff alleges that the company violated the Securities Exchange Act of 1934 and related regulations from the Securities and Exchange Commission ("SEC").  *See* Doc. 14 at 1.  In May 2020, the court consolidated two cases into one because the court agreed with the parties that each case involved substantially similar allegations against essentially the same defendants.  *See id.* at 3 (reviewing lead plaintiff's assertion that its Complaint names "the same parties, transactions, and events" and, although also naming one additional defendant, "the factual and legal issues are virtually identical" (internal quotation marks and citations omitted)). The defendants didn't oppose consolidation.  *Id.* at 2 ("Defendants have responded and agree consolidation is appropriate." (citation omitted)).

Lead plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami Fire & Police") filed its Consolidated Amended Complaint ("Amended Complaint") on July 22, 2020.[1]  *See* Doc. 28 (Am. Compl.).  The Amended Complaint names three defendants: (1) MGP Ingredients, Inc., (2) MGP's former CEO, Augustus C. Griffin, and (3) the company's former CFO, Thomas K. Piggott.  *See* Doc. 28 at 6 (Am. Compl. ¶ 1).  In early September 2020, defendants filed two related motions.  The first is a Motion to Dismiss (Doc. 36) which argues for dismissal under Fed. R. Civ. P. 12(b)(6).  *See id.*  The second is a Motion for Judicial Notice (Doc. 32) asking the court to consider several attachments to the motion under Fed. R. Evid. 201(b).  Defendants' Motion to Dismiss is fully briefed.  The briefing consists of defendants' Memorandum in Support of the Motion to Dismiss (Doc. 37), Plaintiff's Response (Doc. 38), and defendants' Reply (Doc. 39).  Meanwhile, defendants' Motion for Judicial Notice (Doc. 32) is unopposed.

Having reviewed the case's procedural history, the court now turns to the factual background of this dispute.  After reciting the governing facts, the court examines the governing legal standards.  And then, the court analyzes the parties' competing arguments.

## B.    Factual Background

### 1.   General Factual Background

These facts are drawn from plaintiff's Amended Complaint (Doc. 28).  On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court assumes the well-pleaded facts in the Amended Complaint are true.  *See Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d

---

[1]      Plaintiff in the second lawsuit—*i.e.*, the action that was consolidated with this one—withdrew from the case altogether in August 2020.  *See* Doc. 31 at 1 (explaining that "plaintiff Stephen Corbezzolo . . . who is not a named plaintiff in the operative Consolidated Amended Complaint . . . is dismissed as a plaintiff, without prejudice"); *see also* Doc. 29 at 1 ("Counsel's motion states Stephen Corbezzolo is no longer pursuing the case as a plaintiff.").  So, this Order addresses the operative pleading in this lawsuit, which is lead plaintiff's Consolidated Amended Complaint (Doc. 28).

864, 869 (D. Kan. 2019) (Lungstrum, J.) (citing *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006)).  Also, the court views all reasonable inferences from those facts in the light most favorable to plaintiff.  *See id.* (citation omitted).  Because this case involves allegations of securities fraud under certain federal laws and regulations, a heightened pleading standard applies to plaintiff's allegations.  *See id.*  And the court will explain these requirements in the next section of this Order.  But for now, the court offers these factual details and allegations as background for the pending Motion to Dismiss (Doc. 36).

Plaintiff Miami Fire & Police "provides retirement and disability benefits to over 4,300 Miami-based firefighters, police officers, and survivors of fallen public safety officers."  Doc. 28 at 13 (Am. Compl. ¶ 20).  "As of September 30, 2019, Miami Fire & Police managed approximately $1.69 billion in assets."  *Id.*  Plaintiff purchased stock in MGP Ingredients, and the Amended Complaint alleges it "suffered damages as a result of the violations of the federal securities laws alleged herein."  *Id.*

MGP Ingredients is a publicly traded corporation that produces and supplies "distilled spirits and food ingredient products."  *Id.* (Am. Compl. ¶ 21).  "The majority of MGP's business is the production of distilled spirits."  *Id.*  MGP incorporated in Kansas.  *Id.*  "As of April 25, 2019 . . . MGP had over 17 million shares of stock outstanding, owned by at least thousands of investors."  *Id.*  "Defendant Augustus C. Griffin . . . was the CEO and President of MGP, and was a Director on MGP's Board of Directors at all relevant times."  *Id.* (Am. Compl. ¶ 22).  He retired from the company in February 2020, but "remained in his role as MGP's CEO until after the Class Period."[2]  *Id.*  "Defendant Thomas K. Piggott . . . served as MGP's Chief Financial

---

[2]     The "class period" in this consolidated and putative class action lawsuit is August 2, 2018 until February 26, 2020.  *See* Doc. 28 at 5 (Am. Compl.).

Officer . . . and Vice President of Finance from the start of the Class Period until March 2019." *Id.* (Am. Compl. ¶ 23).[3]

Liquor is the lion's share of MGP's business. *See id.* at 14 (Am. Compl. ¶ 26). A "majority of its distillery sales are made directly, or through distributors, to manufacturers and processors of finished packaged goods." *Id.* The allegations in this lawsuit center around MGP's production of so-called "brown goods"—*i.e.*, the company's bourbon and rye whiskeys. *See id.* at 15 (Am. Compl. ¶ 28). MGP's brown goods production really involves two separate segments of its business. *First*, and traditionally, MGP has focused on producing "whiskeys as unaged new distillate, which its customers age from two to four years and sell at various proof concentrations[.]" *Id.* MGP's unaged whiskeys are sold to customers who'd prefer to get their source materials from someone else, so these buyers purchase unaged new distillate from MGP, then age the whiskey, and eventually sell it as their own. *See id.* at 24–25 (Am. Compl. ¶¶ 47–48) (explaining that the time required for aging whiskey before it's ready for sale creates a "conundrum" that some suppliers solve by "sourcing fully or partially aged liquid, still in the barrel, from large distilling companies . . . as a stopgap while their own distilled product is aging in barrels").

*Second*, more recently and central to this lawsuit, MGP also produces fully aged whiskey. *See id.* at 7 (Am. Compl. ¶ 4). "In 2015, MGP announced that its long-term strategy included a dramatic expansion into the aged whiskey sector." *Id.* In other words, the company announced major plans to release its own, ready-for-sale whiskey. *See id.* at 28 (Am. Compl. ¶ 53) ("In early 2015, Defendants revealed MGP's official plan to begin aging its own whiskey for sale.").

---

[3] When the Amended Complaint references all three defendants, it does so using the phrase "Defendants." *See id.* (Am. Compl. ¶ 24). And when referencing only defendants Griffin and Piggott, the Amended Complaint uses the phrase "Individual Defendants." *See id.* In this Order, the court will use the same or similar terminology unless referencing any one defendant specifically.

According to the Amended Complaint, this development was part of MGP's "five-year strategic plan" for which this new whiskey strategy was key. *See id.* (internal quotation marks and citation omitted). The Amended Complaint alleges that defendant Griffin joined the company around this same time, perhaps because he "had decades of experience in the spirits industry and in the whiskey sector in particular," meaning defendant Griffin was well-positioned "to oversee the Company's expansion into aged whiskey." *Id.* at 7 (Am. Compl. ¶ 4).

But, things didn't work out according to that plan. As MGP rolled out its own branded whiskey, the market response was dispiriting. At the close of the first quarter during the relevant period, "the Company disclosed disappointing financial results stemming from lower volumes of aged whiskey sales." *Id.* at 10 (Am. Compl. ¶ 11) (internal quotation marks omitted). "MGP's financial results for the second quarter . . . were equally dismal." *Id.* (Am. Compl. ¶ 12). When MGP announced results at the end of the third quarter, the news "disappoint[ed] the market once again." *Id.* at 52 (Am. Compl. ¶ 107). "Finally, on February 26, 2020, MGP announced its devastating financial results for the fourth quarter of 2019, disappointing the market yet again." *Id.* at 57 (Am. Compl. ¶ 120). Overall for 2019, MGP's distillery products experienced a 5.4% decline in sales, "primarily due to lower new distillate and aged whiskey sales." *Id.* (internal quotation marks omitted). And according to the Amended Complaint, all of these shortfalls produced a catastrophic consequence: "Defendants' misleading statements wiped out over $1 billion in shareholder value[.]" *Id.* at 6 (Am. Compl. ¶ 1) (emphasis omitted); *see also id.* at 12 (Am. Compl. ¶ 15) (asserting that "MGP's stock price declined by over 60% throughout the Class Period" and the fraud alleged in this lawsuit "resulted in an aggregate decline in the Company's market capitalization of $1.035 billion and severely harmed MGP's investors").

### 2.  Plaintiff's Causes of Action

The Amended Complaint alleges that these market missteps were more than just a half-cooked growth strategy.  According to plaintiff, it was a "fraudulent scheme[.]"  *Id.* at 14 (Am. Compl. Sec. IV).  Specifically, plaintiff alleges that defendants violated the Securities Exchange Act of 1934 under Sections 10(b) and 20(a) of that law, plus SEC Rule 10b-5.[4]  Below, the court explains these causes of action before turning to the governing legal standards.[5]

Section 10(b) liability arises when a person "use[s] or employ[s], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 tracks a similar path.  It forbids "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  Last, Section 20(a) of the Securities Exchange Act creates so-called "control person liability," meaning that "a person who controls a party that commits a violation of the securities law may be held jointly and severally

---

[4]  The Amended Complaint states:  "The claims asserted herein arise under and pursuant to:  (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5."  Doc. 28 at 12 (Am. Compl. ¶ 16); *see also id.* (Am. Compl. ¶ 17) (explaining that the court "has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331."  In other words, "Section 27 of the Securities Exchange Act of 1934 . . . grants federal district courts exclusive jurisdiction of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules or regulations thereunder."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1566 (2016) (internal quotation marks and citation omitted)).

[5]  Under the Private Securities Litigation Reform Act, which applies to this lawsuit as the court explains further in the next section of this Order, "Section 10(b) and Rule 10b-5 create an implied private cause of action arising from fraud in the purchase or sale of securities."  *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018).  Thus, these alleged violations themselves supply plaintiff's cause of action in this lawsuit.

liable with the primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 & n.7 (10th Cir. 1998) (citing 15 U.S.C. § 78t(a)).

## II.    Legal Standards

### A.    Motions for Judicial Notice

Defendants filed a Motion for Judicial Notice (Doc. 32) under Fed. R. Evid. 201(b).  That Rule explains that courts "may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)–(2).  "The court may take judicial notice at any stage of the proceeding."  Fed. R. Evid. 201(d).  The court *must* judicially notice a fact "if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Last, when "ruling a motion to dismiss, a court may consider facts subject to judicial notice without converting the motion to dismiss into a motion for summary judgment."  *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1059 (D. Kan. 2020) (citing *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006)).  In the next section of this Order, the court reviews defendants' papers and determines whether they've "supplied the necessary information" for purposes of granting their Motion for Judicial Notice.  *Id.*

### B.    Motions to Dismiss Under Rule 12(b)(6)

Defendants' Motion to Dismiss (Doc. 36) is predicated on Fed. R. Civ. P. 12(b)(6).  That Rule provides defendants with an early defense where the plaintiff has failed "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  The court will dismiss a complaint under this rule when it fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Alternatively, the court must dismiss a complaint under Rule 12(b)(6) "when an issue of law is dispositive[.]" *Yellowdog Partners, L.P.*, 426 F. Supp. 3d at 869 (citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)). Rule 12(b)(6) doesn't demand "detailed factual allegations[.]" *Twombly*, 550 U.S. at 555 (citations omitted). But still, plaintiff must put forward "more than labels and conclusions," which the Supreme Court has explained simply "will not do." *Id.* (citations omitted). "The court must accept the facts alleged in the complaint as true, even if doubtful in fact, and view all reasonable inferences from those facts in favor of the plaintiff." *Yellowdog Partners, LP*, 426 F. Supp. 3d at 869 (first citing *Twombly*, 550 U.S. at 555; then citing *Tal*, 453 F.3d at 1252). The court doesn't, however, "'take as true the complaint's legal conclusions.'" *Smallen v. W. Union Co.*, No. 17-cv-00474-KLM, 2019 WL 1382823, at *1 n.3 (D. Colo. Mar. 27, 2019), *aff'd* 950 F.3d 1297 (10th Cir. 2020) (quoting *Dronsejko v. Thornton*, 632 F.3d 658, 666 (10th Cir. 2011)).

### C.     Heightened Pleading Requirements Under the Private Securities Litigation Reform Act (PSLRA)

Although the standard described above applies generally to motions brought under Rule 12(b)(6), in this case the court also must abide certain pleading standards imposed by other sources of federal law. Specifically, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *see* 15 U.S.C. § 78u-4, "imposes heightened pleading standards for securities fraud actions." *Yellowdog Partners, LP*, 426 F. Supp. 3d at 869. "In an ordinary civil action, the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). But "Congress, as creator of federal statutory

claims, has power to prescribe what must be pleaded to state the claim, just as it has power to determine what must be proved to prevail on the merits." *Id.* at 327. And when private plaintiffs allege securities fraud in federal court, Congress has elected to require that they do so "[u]nder the PSLRA's heightened pleading instructions[.]" *Id.* at 321; *see also Smallen*, 2019 WL 1382823, at *3 ("The PSLRA adjusts the general pleading standard applicable under Federal Rule of Civil Procedure 12(b)(6)[.]" (internal quotation marks and citations omitted)). To state a claim for liability under either Section 10(b) or Rule 10b-5—our Circuit has held—a plaintiff plausibly must allege:

> that a defendant made statements that (1) contained false or misleading statements of material fact, (2) related to the purchase or sale of a security, (3) were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled (scienter), (4) led to reliance by the plaintiff, and (5) caused the plaintiff's loss (loss causation).

*Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146–47 (10th Cir. 2015) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003) (further citations omitted)).

 "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Tellabs, Inc.*, 551 U.S. at 313. The PSLRA requires plaintiffs alleging federal securities fraud "to state with *particularity* both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)) (emphasis added); *see also Smallen v. The Western Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) ("A plaintiff asserting a claim under Section 10(b) bears a heavy burden at the pleading stage because such claims are governed by the PSLRA, which imposes a heightened standard for pleading the element of scienter." (citing *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (further citations omitted))).

To satisfy the PSLRA's heightened pleading standard for scienter, plaintiffs must, "'with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong* inference that the defendant[s] acted with the required state of mind' in violating the securities laws." *Smallen*, 950 F.3d at 1305 (quoting *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012)). A "strong" inference of scienter means that the plaintiff has alleged something that's "more than merely plausible or reasonable[.]" *Tellabs, Inc.*, 551 U.S. at 314. Instead, the allegations "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

The Supreme Court instructs district courts not to answer this question by piecemeal review of the complaint. *Id.* at 324 ("The strength of an inference cannot be decided in a vacuum."); *see also In re Zagg, Inc.*, 797 F.3d at 1201 ("The inquiry is holistic."). Instead, the "'inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 323). "In assessing the sufficiency of a plaintiff's allegations under the PSLRA, a court 'must consider the complaint in its entirety' and decide 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether an individual allegation, scrutinized in insolation, meets that standard.'" *Smallen*, 950 F.3d at 1305 (quoting *Tellabs, Inc.*, 551 U.S. at 322–23). "An inference of scienter 'need not be irrefutable, *i.e.*, of the "smoking-gun" genre.'" *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1343 (quoting *Tellabs, Inc.*, 551 U.S. at 324). But, the inference must be "one that is both powerful and cogent." *In re Zagg, Inc.*, 797 F.3d at 1202 (citing *Tellabs, Inc.*, 551 U.S. at 323).

In sum, and "'as with any motion to dismiss,'" the court "must 'accept all factual allegations in the complaint as true.'" *Id.* at 1201 (quoting *Tellabs, Inc.*, 551 U.S. at 322). But

courts don't assume the truth of legal conclusions. *Id.* (citing *Dronsejko v. Thornton*, 632 F.3d 658, 666 (10th Cir. 2011)); *see also id.* ("We have separately noted that this standard motion-to-dismiss rhetoric is particularly true in [the scienter] context because the PSLRA's heightened pleading standard requires the complaint to allege, with particularity, *facts* giving rise to a strong inference of scienter." (internal quotation marks and citation omitted)).  In assessing the complaint's allegations for a strong inference of scienter, the court must look to the allegations in aggregate, not in isolation. *Id.* at 1201–02 (citation omitted).  The court's review may include "'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Id.* at 1201 (quoting *Tellabs, Inc.*, 551 U.S. at 322).  And "'in determining whether the pleaded facts give rise to a "strong" inference of scienter, [courts] must take into account plausible opposing inferences.'" *Id.* at 1202 (quoting *Tellabs, Inc.*, 551 U.S. at 323).  "'A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 324).

## III.   Analysis

### A.   Defendants' Motion for Judicial Notice

Defendants ask the court to take judicial notice of three sets of papers comprised of 15 total exhibits, all of them "attached to the Declaration of J. Emmett Logan[.]"  Doc. 32 at 1; *see also* Doc. 35 (Logan Decl.); Doc. 35-1–35-15 (Exs. 1–15).  These papers are:  (1) a collection of MGP's SEC Filings for the years 2015–2019, (2) conference call transcripts from MGP's third quarter 2018 and second quarter 2019 earnings calls, and (3) materials from a June 7, 2018 presentation to analysts and investors.  *See* Doc. 35 at 1–2 (providing a list of attached exhibits).

Under Fed. R. Evid. 201, the court can take judicial notice of these materials without converting the motion to dismiss into one seeking summary judgment so long as the moving party "supplie[s] the necessary information."  Fed. R. Evid. 201(c)(2); *see also Hastey*, 449 F. Supp. 3d at 1059.  Here, the Motion for Judicial Notice is unopposed, which itself lends a reason to grant the request.  *See* D. Kan. Rule 7.4(b) (explaining that unopposed motions are "ordinarily" granted "without further notice").  Still, the court must decide whether defendants have supplied the "necessary information" required by Rule 201(c)(2).

### 1.  MGP's SEC Filings

Exhibits 1 through 10, plus Exhibits 14 and 15, attach MGP's SEC Filings for the years 2015–2019.  *See* Docs. 35-1–35-10, 35-14–35-14.  According to defendants, the court may take judicial notice of these attachments because "these documents are SEC filings" and as such they're "'matters of public record not subject to reasonable dispute.'"  Doc. 33 at 2 (quoting *Hastey*, 449 F. Supp. 3d at 1060) (further citations omitted).  Defendants are right.  *See Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 930 n.43 (D. Kan. 2014) ("A court may take judicial notice of the SEC's filings because they are a matter of public record." (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 354 n.5 (2d Cir. 2010))).  The documents are publicly available records.  So, the court will take judicial notice of them.

### 2.  Conference Call Transcripts

"Exhibits 11 and 12 are transcripts of MGP conference calls."  Doc. 33 at 2.  Defendants again rely on *Hastey* for the proposition that "these documents are matters of public record" and therefore aren't "subject to reasonable dispute[.]"  *Id.* (citing *Hastey*, 449 F. Supp. 3d at 1059–60).  Also, defendants note, these transcripts are referenced in the Amended Complaint.  *Id.* (citing Doc. 28 at 74–75, 85 (Am. Compl. ¶¶ 164, 201)).  Defendants are right again.  *See GFF*

*Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to . . . be considered on a motion to dismiss."); *see also In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1292–93 (D. Colo. 2013) (taking judicial notice of conference call transcripts submitted by the defendants and citing *GFF Corp.*, 130 F.3d at 1384, for support), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).  For both reasons cited by defendants, the court will take judicial notice of these transcripts.

### 3.   Presentation Materials

"Exhibit 13 is an MGP presentation from an Analyst/Investor Day on June 7, 2018, found on MGP's public website."  Doc. 33 at 2.  Citing to *Hastey* again, defendants contend this exhibit "is 'a matter of public record available on [the corporation's] website,'" meaning that judicial notice is appropriate.  *Id.* (quoting *Hastey*, 449 F. Supp. 3d at 1060).  "The court agrees." *Hastey*, 449 F. Supp. 3d at 1060.  The court will take judicial notice of these presentation materials because they are a matter of public record and aren't subject to any reasonable dispute. *Id.* (citations omitted).

### B.   Defendants' Motion to Dismiss

Before diving into a deeper analysis, the court reviews briefly its general conclusions. The court has reviewed thoroughly the Amended Complaint (Doc. 28).  And the court assumes— as it must—that all of the Amended Complaint's well-pleaded factual allegations are true.  *In re Zagg, Inc.*, 797 F.3d at 1201 (citation omitted).  The court has considered the Amended Complaint—again as it must—"in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice." *Id.* (internal quotation marks and citation omitted).  When called upon to answer the question "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," the court has "take[n] into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323.  "The inquiry [was] holistic." *In re Zagg, Inc.*, 797 F.3d at 1201.

Using this approach, the court concludes that the most "cogent and compelling" inference from the facts alleged—considered against competing inferences—is the one argued by defendants.  *Tellabs, Inc.*, 551 U.S. at 324.  There's no question that MGP's aged whiskey plan didn't pan out.  The numbers speak for themselves—missed targets for every financial quarter during the relevant period.  *See* Doc. 28 at 10, 52, 57, (Am. Compl. ¶¶ 11, 12, 107, 120).  And defendants have conceded that MGP's stumbles stemmed "primarily [from] lower new distillate and aged whiskey sales."  *Id.* at 57 (Compl. ¶ 120).  But those facts doesn't necessarily mean they broke the law.

For the court to infer from these facts that defendants concocted a fraudulent scheme violating federal law and regulations, it must step over more compelling inferences—namely that MGP's leadership simply misread the market, even by wide margins.  *See* Doc. 39 at 31 (arguing that plaintiff fails to explain a more compelling inference "than that Defendants were simply wrong about their estimates for sales").  For one, the alleged scheme itself makes little sense, for the truth of defendants' supposed lies would be known to all no later than one year after their aged whiskey plan set sail.  *See* Doc. 37 at 7 ("Plaintiff alleges no facts showing why Defendants would have engaged in such a short-term fraud.").  But that's not all.  Even if the court assumes that plaintiff's allegations are particularized (just the first of two steps in stating its claims), the court can't agree that the Amended Complaint alleges the required state of mind—scienter—with

particularity. That required inference is barely present because it's so attenuated. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (concluding that plaintiff's scienter allegations "depend[ed] on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the company's] 'unsolvable' migration problem was revealed").

Below, the court explains its reasoning. Because any viable 10(b) and 10b-5 claim first must allege particularized factual allegations, the court starts there. *See Hampton*, 897 F.3d at 1298 (explaining that "the PSLRA requires a plaintiff to identify 'each statement alleged to have been misleading, the . . . reasons why the statement is misleading,'" and if the allegation about a statement or omission is based on information and belief, "'the complaint shall state with particularity all facts on which the belief is formed'" (quoting 15 U.S.C. § 78u-4(b)(1))). After that, the court turns to the second necessary step: providing particularized allegations of scienter producing a "strong inference" that defendants are liable. 15 U.S.C. § 78u-4(b)(2)(A); *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016).

### 1. Plaintiff's Factual Allegations

Plaintiff first must allege plausible *facts* (and with particularity) capable of supporting a finding that defendants made false or misleading statements about material facts. *See In re Zagg, Inc.*, 797 F.3d at 1200; *see also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1333. The Amended Complaint identifies six groups of allegedly false or misleading statements. *See* Doc. 28 at 70–91 (Am. Compl. ¶¶ 147–223); *see also* Doc. 37 at 19 (listing the allegedly false or misleading statements). All of these statements involved MGP's market performance and competition. *See id.* Defendants claim plaintiff hasn't satisfied its initial pleading burden. *See* Doc. 37 at 14 ("The first reason Plaintiff has not met its pleading burden is because it does not

plead with particularity facts establishing that Defendants made a false or misleading statement.").  Not so, says plaintiff.  *See* Doc. 38 at 18–30.

Several factors guide the court's inquiry into whether the plaintiff's factual allegations plead the requisite particularity.  Specifically, our Circuit explains that courts must evaluate:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Hampton*, 897 F.3d at 1298–99 (citation omitted).[6]  Also, all of plaintiff's factual allegations involving the defendants are pleaded on information and belief.  Doc. 28 at 5 (Am. Compl.).  When allegations are based on a movant's information and belief, the complaint must state—with particularity—the facts on which the belief is based.  *Id.* at 1298 (citations omitted).

### a.  Increasing Market Competition

Plaintiff's central-most allegation is that increasing market competition undermined MGP's ability to perform.  *See, e.g.*, Doc. 28 at 9 (Am. Compl. ¶ 9) ("Defendants failed to disclose to investors that . . . MGP was facing steadily increasing competition.").  And plaintiff does allege some specific facts to advance this point.  *See* Doc. 28 at 35–37 (Am. Compl. ¶¶ 67–71); *see also id.* at 69 (Am. Compl. ¶ 146 (describing "general news coverage" about growing competition)).  But most of plaintiff's factual allegations are just conclusory statements.  *See, e.g., id.* at 33 (Am. Compl. ¶ 63) ("Throughout 2018 and 2019, Defendants were aware of a significant headwind that MGP would face as it transitioned from selling new distillate in favor of sales of fully aged whiskey:  competition.").  And even its specific factual allegations are largely anecdotal.  *See id.* at 35–37 (Am. Compl. ¶¶ 67–71) (describing statements by a "former

---

[6]     Plaintiff's Response to the motion doesn't even address these factors.  *See* Doc. 38.

sales manager of bulk alcohol" and describing a few large-scale new entrants to the whiskey market).

Even if the court were to conclude that plaintiff's allegations about competition are sufficiently particular, it still disagrees with plaintiff's central premise. Plaintiff's theory about competition can make sense only if MGP lost market share because of new competition. In other words, it only could be true that increasing competition doomed MGP's growth strategy if the market either stagnated or contracted during the relevant time period. But plaintiff hasn't alleged any particularized facts about MGP's market share. Instead, plaintiff just has supplied conclusory assertions. *See id.* at 71 (Am. Compl. ¶ 154) ("This competition dramatically decreased MGP's market share for aged whiskey and thus the number of customers with whom MGP could have been in discussions.").

On top of that, the Amended Complaint alleges affirmatively that demand was booming at the same time. *See id.* at 27 (Am. Compl. ¶ 52) ("MGP saw a potential opportunity to increase its margins further by capitalizing on the growth in demand for premium whiskey products[.]"); *see also id.* at 34 (Am. Compl. ¶¶ 66–67) (discussing MGP's competitors' own line of sight toward "high consumer demand for whiskey"). Indeed, the 100-page-plus Amended Complaint opens its narrative with a story about the booming trend in growing consumer demand for American whiskeys. *See id.* at 16 (Am. Compl. ¶ 30) (describing the "whiskey boom in the United States accelerat[ing] in the early 2000s" and framing this market trend as the central basis for MGP's decision to produce its own branded whiskey). But if demand was booming while competition was also increasing, MGP's plan only could qualify as a fraudulent scheme if MGP already had known that its access to growing demand was a pipe dream. And the Amended Complaint's allegations offer nothing particularized on that front.

Also, defendants are right that many of the Amended Complaint's assertions affirmatively contradict this general premise.  For instance, a portion of the Amended Complaint lists several newer distilleries with whom, plaintiff alleges, MGP couldn't compete for a number of reasons.  *See, e.g.*, Doc. 28 at 35 (Am. Compl. ¶ 66) (listing several distilleries based in Kentucky and alleging that their location and "marketing prowess" created a force that MGP "cannot compete with").  But, defendants correctly note that the Amended Complaint's allegations specify the timeline when these producers rolled out their whiskeys, and most of them did so after the end of the class period in this case.  *See* Doc. 39 at 10 (discussing plaintiff's allegations involving Templeton Rye, a company whose whiskey, based on the Amended Complaint's allegations, couldn't have been ready for sale any sooner than 2022); *see also id.* at 11 (discussing several more distilleries whose operations, based on the Amended Complaint's allegations, couldn't have affected MGP's business until after the end of the class period).

At this juncture, the complaint must specify "the who, what, when, where, and how" of the fraudulent statements alleged.  *Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150, 158 (10th Cir. Feb. 2004) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).  Plaintiff's anecdotal examples don't suffice to show that market competition was increasing in a way that simultaneously diminished MGP's market share.  Nor does plaintiff specify the basis for much of this information, despite pleading it upon information and belief.  *See Hampton*, 897 F.3d at 1298–99.  Thus, under all of the factors laid out in *Hampton* plus the guidance from *Caprin*, plaintiff's factual allegations aren't particularized enough to show that increasing market

competition undermined MGP's ability to perform in its aged whiskey strategy.[7]  *See id.*; *see also Caprin*, 99 F. App'x at 158 (citation omitted).

This issue is dispositive to the first prong of the court's inquiry because plaintiff's entire theory of fraud rests on the notion that MGP failed to disclose enough information about increasing competition to render its public statements either not false or misleading.  *See Adams*, 340 F.3d at 1098 (explaining that plaintiffs must "identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements"); *see also SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1127 (N.D. Cal. 2020) (observing that "Plaintiff does not explain how many competitors Align had in the comprehensive case market, nor suggest how much market share Align had lost or was expecting to lose to those competitors" and noting "[a]s a result . . . the court grants Defendants' motion to dismiss").

In sum, the court doesn't need to delve deeper into this prong because the foundation of plaintiff's case is flawed in a fundamental fashion.  And regardless, the next section of this Order explains why plaintiff's allegations about scienter come up short as well.

## 2.   Plaintiff's Scienter Allegations

Even when plaintiff makes particularized factual allegations about securities fraud, it also must allege that "the defendant acted with scienter, that is, with intent to defraud or recklessness[.]"  *In re Zagg, Inc.*, 797 F.3d at 1200 (quoting *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1333) (emphasis omitted).  "Scienter is a mental state embracing [1] intent to deceive, manipulate, or defraud, or [2] recklessness."  *Smallen*, 950 F.3d at 1304 (internal quotation marks and citation omitted).  "'Intentional misconduct is easily identified since it encompasses deliberate illegal behavior.'"  *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245,

---

[7]      Obviously, MGP's whiskey strategy didn't perform as planned.  *See* Doc. 28 at 10, 52, 57, (Am. Compl. ¶¶ 11, 12, 107, 120).  But the issue here isn't the general fact that MGP fell short of its goals.  Instead, what matters is *why*.  And plaintiff's factual allegations don't supply a cogent answer.

1260 (10th Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), *cert. denied*, 521 U.S. 1012 (2000)).   "Recklessness, on the other hand, is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"   *Smallen*, 950 F.3d at 1304–05 (quoting *In re Zagg, Inc.*, 797 F.3d at 1201 (further citations omitted)).   "In the securities-fraud context, recklessness is akin to conscious disregard—allegations of negligence or even gross negligence fall 'below the high threshold for liability under Section 10(b) of the Exchange Act.'"   *Id.* at 1305 (quoting *Dronsejko*, 632 F.3d at 668).   And with all of this in mind, the plaintiff's scienter allegations must establish a "strong inference" that the defendants are liable.   *Tellabs, Inc.*, 551 U.S. at 324–25 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." (footnote omitted)).

### a.  Defendants' Arguments

Defendants argue that "the most compelling inference is straight-forward."  Doc. 37 and 27.  In their view, the facts alleged can't produce a compelling inference of fraudulent conduct, and, instead, show simply that MGP's aged whiskey plan didn't go as well as planned.  *Id.*  It was a risky strategy, defendants concede.  *Id.*  But, they say, that doesn't mean it was fraud.  *Id.* "This is what corporations do; they attempt to better their results through new endeavors, sometimes succeeding and sometimes failing."  *Id.*

### i.  The Supposed Scheme's Short Duration

Defendants raise a compelling argument that "the supposed fraudulent scheme Plaintiff tries to allege makes no sense, for it would necessarily be a short-term fraud."  *Id.*  According to

defendants, any "deception would necessarily end when MGP's actual 2019 results were disclosed." *Id.* at 28. And defendants are correct that the "Ninth Circuit recently rejected similar allegations of a fraudulent scheme in *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020)." *Id.* In that Ninth Circuit case, plaintiff's "central theory [was] that company executives knew" all along that their proposed medical device was doomed to be denied FDA approval. *Nguyen*, 962 F.3d at 407. The Ninth Circuit concluded that implausible allegations "do not create a strong inference of scienter[,]" and that plaintiff's theory had "no basis in logic or common experience." *Id.* at 408. In other words, the plaintiff's foundational theory "depend[ed] on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" once the inevitable outcome came to pass. *Id.* at 415. And then defendants direct the court back to our own Circuit for the proposition that "'the absence of an apparent motive does not necessarily defeat a finding of scienter, [but] it does make such a finding more difficult to sustain.'" Doc. 37 at 28 (quoting *Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1173 (10th Cir. 2018)).

### ii. Defendant Griffin's Knowledge About the Market

Defendants also refute plaintiff's arguments about defendant Griffin's "knowledge of MGP's aged whiskey strategy and about the aged whiskey market." *Id.* at 31 (citing Doc. 28 at 60–65, 68–69 (Am. Compl. ¶¶ 127–38, 144–46)). Defendants don't "dispute that Griffin had knowledge of MGP's aged whiskey strategy and about the market for aged whiskey." *Id.* But, they reject the argument that his insights signal anything about a fraudulent intent, and they cite the Tenth Circuit's ruling in *Anderson* for support. *Id.* at 31–32 (quoting *Anderson*, 827 F.3d at 1246 ("Based on the plaintiffs' allegations of the defendants' involvement in Spirit's core

operations, we can infer only that the four executives were overly optimistic about Spirit's ability to achieve the forecasted production schedules and cost reductions.")).

As *Anderson* concluded, defendants contend plaintiff may have pleaded facts about what a company executive knew about the relevant market.  Doc. 37 at 32.  But, that's not the same thing as alleging particularized facts that an executive knew specific market details contradicting his public statements.  *Id.*  And while the allegations at issue in *Anderson* involved knowledge of details from *within* the defendant company, this case involves allegations about *externalities* in the market—*i.e.*, market phenomena involving *other* actors.  *Id.* at 32–33.  Thus, defendants argue, "the facts alleged here are more favorable for Defendants than the facts alleged in *Anderson*."  *Id.* at 32.

### iii.  Defendant Griffin's Departure from MGP

Defendants also spotlight plaintiff's allegations about defendant Griffin's departure from MGP.  *Id.* at 33 (citing Doc. 28 at 65–67 (Am. Compl. ¶¶ 139–41)).  "Plaintiff alleges that the timing of Griffin's May 2020 retirement from MGP was 'suspicious' . . . and that Griffin was motivated to defraud because his employment contract was expiring in May 2020 and he needed to 'create the appearance' of success so the company would renew the contract."  *Id.* (quoting Doc. 28 at 65–67 (Am. Compl. ¶¶ 139–142)).

But defendants say "the most compelling inference" supported by the timing of Griffin's retirement "is provided by Plaintiff's allegations themselves:  his contract was up in May 2020." *Id.* (citing Doc. 28 at 67 (Am. Compl. ¶ 142)).  And, defendants argue, plaintiff's own allegations show that this detail was publicly known since 2017.  *Id.* (citing Doc. 28 at 67 (Am. Compl. ¶ 142)).  Plus, even if defendant Griffin was forced out of his role at MGP, defendants argue that fact still would not support an inference of scienter.  *Id.*  They point to *In re Zagg,*

*Inc.*:  an executive's "'forced resignation [is] at most an acknowledgment that the company identified a better way of doing things . . . not an indicator that fraudulent intent existed[.]'"  *Id.* (quoting *In re Zagg, Inc.*, 797 F.3d at 1205).

### iv.  The Timeline Between Stated Estimates and Actual Results

"Finally, Plaintiff alleges that '[t]he proximity in time between certain of Defendants' false statements and the subsequent revelation of them as false further supports Defendants' scienter.'"  *Id.* at 34 (quoting Doc. 28 at 67 (Am. Compl. ¶ 143)).  Defendants acknowledge that defendant Griffin expressed confidence about MGP's ability to perform even later in the 2019 fiscal year, even though—barely three months later—yearly totals proved otherwise.  *Id.* (citing Doc. 28 at 67 (Am. Compl. ¶ 143)).

But defendants call this a "baseless" argument.  *Id.*  And they identify Tenth Circuit precedent supporting their view.  *Id.* (citing *Anderson*, 827 F.3d at 1249).  In *Anderson*, the court considered similar allegations.  *See Anderson*, 827 F.3d at 1249.  There, the plaintiff alleged that an executive's "October acknowledgments" about a company's performance showed that his optimistic predictions two months earlier must've "been designed to mislead investors."  *Id.*  The Circuit held that this timeline supported an inference exactly the opposite of the one sponsored by plaintiff here.  *See id.*  Specifically, the Circuit rejected plaintiff's argument "that the October acknowledgements prove that the August prediction had been designed to mislead investors."  *Id.*  Reason being, those "statements were made over two months apart, and the complaint [did] not allege that the chief executive officer was aware in August 2012 that [the company] was not meeting cost estimates."  *Id.* (citation omitted); *see also* Doc. 37 at 34 (citing *Davis v. Skullcandy, Inc.*, No. 2:16-cv-00121-RJS-PMW, 2018 WL 1415192, at *4–5 (D. Utah Mar. 21, 2018) (declining to endorse plaintiff's scienter allegation based on the fact "that only two months

passed between Defendants' positive statements about growth in November 2015 and the announcement in January 2016 of dramatically lower results")).  In sum, defendants say, "[a]ny short-term prediction is necessarily going to become accurate or inaccurate soon after it was made."  Doc. 37 at 34.  "But that does not suggest fraud; it suggests that short-term forecasting is uncertain in the same way long-term forecasting is uncertain."  *Id.* at 35.

### b.  Plaintiff's Arguments

Plaintiff's arguments focus on knowledge and recklessness.  It argues that the Amended Complaint "pleads scienter by alleging facts supporting a strong inference that Defendants knew or recklessly disregarded the allegedly withheld facts."  Doc. 38 at 31 (citing *Nakkhumpun*, 782 F.3d at 1150).  "A strong inference of scienter exists where, as here, plaintiff alleges that defendants 'knew facts or had access to information suggesting their public statements were materially inaccurate[.]'"  *Id.* (quoting *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010)).  Alternatively, plaintiff argues, the facts alleged show that defendants "'egregious[ly] refus[ed] to see the obvious, or to investigate the doubtful.'"  *Id.* (quoting *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1241 (N.D. Okla. 2003)).

### i.  Plaintiff's Arguments About Defendants' Discussions of MGP's Core Operations

According to plaintiff, defendants misrepresented material details about "MGP's core operation, the production and sale of whiskey," which means that "[t]hese facts support an inference of scienter."  *Id.* (citing *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1010 (D. Colo. 2016) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." (internal quotation marks and citation omitted))).  Plus, plaintiff argues, MGP "convinced analysts that its foray into aged whiskey sales could sell at 'three times' the price of new distillate."  *Id.* at 32 (citation omitted).  In sum,

as plaintiff sees things, allegations about a "company's 'most important product,' which held executives' attention, can support an inference of scienter." *Id.* (quoting *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1127–28 (D. Colo. 2017) (further citations omitted)).

### ii. Plaintiff's Arguments About Defendants' Statements on the Aged Whiskey Market

Also, plaintiff argues that defendants "frequently discussed—and held themselves out as knowledgeable about—the market for MGP's aged whiskey." *Id.* (citation omitted). "Defendants informed investors that they were personally involved in monitoring MGP's entry into aged whiskey sales." *Id.* (citation omitted). According to plaintiff, "[t]hese facts support the inference that Defendants knew the truth about MGP's inability to successfully sell its own aged whiskey, and the effect on the Company's financial results of the failure of this long-term plan." *Id.* (citation omitted).

Plaintiff argues that defendant Griffin touted his (and MGP's) "knowledge and understanding of the market for aged whiskey," which included consumer trends and general demand for the spirit. *Id.* (citation omitted). "This supports Griffin's scienter[,]" plaintiff argues. *Id.* at 32–33 (citing *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 607 (N.D. Cal. 2019) (remarking that defendant's "statements touting their knowledge of the . . . market" supported scienter)). And plaintiff identifies a string of cases where courts held that public statements about a company's operations can support an inference of scienter. *Id.* at 33 (first citing *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018); then citing *SEB Inv. Mgmt. AB*, 351 F. Supp. 3d at 906; then citing *In re PTC Therapeutics, Inc. Sec. Litig.*, Civ. No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017)). In addition, plaintiff argues that *Anderson* differs from this case because it involved a company's "failed attempt to manufacture and supply" materials

that were "always its core business." *Id.* (citing *Anderson*, 827 F.3d at 1235).  In contrast, plaintiff argues, this case involves a defendant company breaking into "an entirely new sector" and "install[ing] Griffin, who was deeply experienced in that sector, as its CEO specifically for that purpose." *Id.* at 33–34 (citation omitted).

### iii. Plaintiff's Arguments About the Timeline Between Defendants' Statements and Disappointing Results

Contrary to defendants' view, plaintiff contends that the "proximity in time between certain of Defendants' statements and their revelation as false supports an inference of Defendants' scienter." *Id.* at 34 (citation omitted).  "Griffin stated that Defendants were 'confident in our line of sight' to sales or are in 'advanced discussions' with customers for specific sales." *Id.* (quoting Doc. 28 at 67–68 (Am. Compl. ¶ 143)).  But not even three months later, "Defendants disclosed that they could not close the promised sales." *Id.* (citation omitted). In plaintiff's view, it's "illogical that MGP's sales prospects could have deteriorated so drastically in three months that, in reassuring the market in October 2019," defendant Griffin didn't already "know that his statements were false." *Id.* (citation omitted).  From these details, according to plaintiff, the "more compelling inference is that Defendants knew in October 2019 that they could not sell the aged whiskey they had promised the market, and instead, misled investors to keep MGP's stock price afloat for several months longer." *Id.*

### iv. Plaintiff's Arguments Based on Defendant Griffin's Motive to Defraud

Plaintiff also directs the court back to defendant Griffin, arguing that the "Complaint alleges two facts specific to [his] motive to defraud." *Id.* at 35 (citation omitted).  The first is "the impending expiration of Griffin's contract with MGP[,]" which plaintiff argues "uniquely

motivated him to commit fraud." *Id.* (citation omitted).  And the second is "Griffin's unexpected departure from MGP [which] further supports an inference of his scienter." *Id.* at 36.

On the first of these two allegations, plaintiff highlights MGP's declining performance in aged whiskey sales at the same time "Griffin's contract was up for renewal[.]" *Id.* (citation omitted).  "As such, Griffin created the appearance that MGP was meeting or exceeding the growth expectations that he had been brought in to achieve—a ploy to convince the Company to renew his contract." *Id.* (citation omitted).  "The survival of a defendant's career can support the inference of scienter." *Id.* (first citing *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, Civil Action No. 17-341, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020); then citing *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, Civil Action No. 15-7658 (MAS) (LHG), 2017 WL 1658822, at *8 (D.N.J. Apr. 28, 2017)).

As for the second allegation, plaintiff points out that "MGP announced Griffin's departure immediately after disclosing a nearly $30 million shortfall in 2019 sales, just before disclosing MGP's failure to transact a large portion of its aged whiskey inventory." *Id.* (internal quotation marks and citation omitted).  So, "despite the Company's attempt to distance Griffin's departure from the failed aged whiskey venture, the Company's choice not to renew" his contract "suggests that Griffin was aware of, and intimately involved in, the Company's fraudulent conduct." *Id.* (citation omitted).  Plaintiff says that *SemGroup* supports its argument that these details bolster its scienter rationale. *Id.* (citing *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d at 1299).

### c.  Defendants' Scienter Arguments are More Compelling than Plaintiff's

As explained more thoroughly below, this is not a close case.  For every avenue that plaintiff might pursue, defendants identify controlling or highly persuasive precedent

establishing that avenue actually is a dead end. And above all else, plaintiff's theory of scienter is neither even equally plausible as defendants' assertions about nonculpable conduct. The Supreme Court instructs that this scenario requires dismissal of a complaint alleging securities fraud. *Tellabs, Inc.*, 551 U.S. at 314 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

### i. Plaintiff's Core Operations Arguments Aren't More Compelling than Defendants' Offered Inferences

Even if knowledge about a company's core operations is a relevant factor in considering scienter, it's not more than that: just a factor. And, it's a factor that didn't turn the tables in a similar case: *Anderson*. *See Anderson*, 827 F.3d at 1246 ("Based on the plaintiffs' allegations of the defendants' involvement in Spirit's core operations, we can infer only that the four executives were overly optimistic[.]"). In this case, there is every basis for an inference that MGP's executives were overly optimistic. After all, the growth strategy failed. *See* Doc. 28 at 10, 52, 57 (Am. Compl. ¶¶ 11, 12, 107, 120). But that failure doesn't mean the defendants *knew* all along that the plan would fail. And plaintiff hasn't alleged anything with particularity that could support an inference of culpable intent. In sum, it hasn't alleged anything that is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Zagg, Inc.*, 797 F.3d at 1202 (quoting *Tellabs, Inc.*, 551 U.S. at 324).

### ii. Plaintiff's Arguments About SEC Filings and Statements to Investors Either are Foreclosed by Statute or Aren't More Compelling Compared to Defendants' Arguments

The public statements at issue included cautionary language. *See* Doc. 35-4 at 8 (providing "Cautionary Note Regarding Forward-Looking Statements"). According to the statute itself, a statement about forward-looking impressions isn't actionable if "accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). And, the public statements to investors at issue here lacked the concrete certainty that plaintiff tries to attribute to them. *See* Doc. 28 at 29 (Am. Compl. ¶ 56) (quoting defendant Griffin during a March 2018 earnings call as stating, "[W]e think those sales [of aged whiskey] will start to increase in 2019"). Instead, the words alleged by the Amended Complaint establish that the speaker was discussing possibilities, not certainties.

Simply put, none of these statements manifest anything more than the corporate optimism that the Tenth Circuit rejected in *Anderson*, 827 F.3d at 1246, and in *Smallen*, 950 F.3d at 1312. *See also Smallen*, 950 F.3d at 1312 (explaining that plaintiff's scienter allegations revealed that the defendants "were too optimistic about [the company's] compliance systems" but still didn't show recklessness when weighed against the "more compelling inference . . . of negligence or possibly even gross negligence"). Even if negligent or grossly negligent, these statements weren't reckless—*i.e.*, they don't show a "conscious disregard" or "an extreme departure from the standards of ordinary care" evidencing "a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1343 n.12 (internal quotation marks and citations omitted). And, to survive a motion to dismiss, that's exactly what plaintiff must show. *See In re Zagg, Inc.*, 797 F.3d at 1201 ("Recklessness in the context of securities fraud is a high bar.").

### iii.  Plaintiff's Arguments About Defendant Griffin's Departure Aren't Compelling

Plaintiff asks the court to infer fraudulent intent from the timing of defendant Griffin's departure from MGP. *See* Doc. 38 at 36. But on its best day, this argument is a stretch. It's far more reasonable to infer from these facts that defendant Griffin left MGP when he did either

because he fell short of expectations or simply because his contract already was scheduled to expire. *See* Doc. 37 at 33. Either of these two inferences is more cogent and more powerful than the notion that, because he left MGP around the same time that its aged whiskey plan failed, defendant Griffin was acting with fraudulent intent. *See* Doc. 38 at 36 (asserting that because the "truth fully emerged about the Company's failure to sell aged whiskey" around the same time that defendant Griffin left MGP, "[t]his fact support Griffin's scienter"). Plaintiff's reference to the district court's ruling in *SemGroup* isn't persuasive. *See id.* More recently, our Circuit declined to embrace the rationale of this argument. *See In re Zagg, Inc.*, 797 F.3d at 1205 ("[F]orced resignation[s] are at most an acknowledgement that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred." (citations omitted)).

### iv. The Timeline Between Disclosures and Disappointing Results Doesn't Produce an Equal or More Compelling Inference

Plaintiff's best arguments rely on the timing of defendants' disclosures and disappointing results. But these assertions still can't carry the day.

As defendants point out, in *Anderson* the Tenth Circuit rejected a similar argument. *See* Doc. 37 at 34; *see also Anderson*, 827 F.3d at 1249. But in that case, our Circuit held that the "statements were made over two months apart" and "the complaint [did] not allege that the chief executive officer was aware in August 2012 that Spirit was not meeting its cost estimates." *Anderson*, 827 F.3d at 1249. In the current case, defendant Griffin spoke publicly about market performance with an air of confidence that makes it seem at least as plausible (if not more so) that his statements stretched reality. But plaintiff still must show more than just negligence or even gross negligence. *In re Zagg, Inc.*, 797 F.3d at 1201.

Instead, plaintiff must allege facts with particularity that provide a cogent and at-least-equally plausible inference that defendants acted recklessly.  *Id.*  And in this case, the closest plaintiff gets is negligence or gross negligence because each of defendant Griffin's public statements also included cautionary language, indefinite phrasings, or both.  *See, e.g.*, Doc. 35-12 at 8 (quoting defendant Griffin during a July 31, 2019 earnings conference call as stating, "[W]e *continue to believe* that despite quarterly volatility, an aggressive implementation of our strategic plan will drive strong growth in 2019 and beyond").  The Amended Complaint simply doesn't provide a basis for a strong inference of "something akin to conscious disregard."  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1343 n.12 (internal quotation marks and citation omitted).

### v. Plaintiff's Central Theory of Fraud Simply Doesn't Adduce an Inference of Scienter as Strong as Competing, Nonculpable Inferences

And even if plaintiff had carried the day with his last spate of arguments, the court can't view the Amended Complaint's allegations "in a vacuum."  *Tellabs, Inc.*, 551 U.S. at 323.  Instead, the court's "inquiry is holistic."  *In re Zagg, Inc.*, 797 F.3d at 1201.  The court must "ask 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Id.* at 1201–02 (quoting *Tellabs, Inc.*, 551 U.S. at 323).  The court must "compare the 'inferences urged by the plaintiff' with 'competing inferences rationally drawn from the facts alleged.'"  *Anderson*, 827 F.3d at 1237 (quoting *Tellabs, Inc.*, 551 U.S. at 314) (alteration omitted).

Using that approach, the margin is a decided one.  The most compelling inference is simple:  MGP missed its mark by wide margins despite corporate optimism, and not because of any fraudulent intent.  *See* Doc. 37 at 30 ("[T]he most compelling inference is the simplest one:

Defendants misestimated how much aged whiskey MGP would sell in 2019.").  This inference becomes particularly clear when one considers plaintiff's most fundamental assertion—that this was a scheme to defraud shareholders—makes very little sense.  *See* Doc. 28 at 91 (Am. Compl. ¶ 224) ("During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.").

Defendants argue this exact point.  *See* Doc. 37 at 27 ("This inference is consistent with the fact that the supposed fraudulent scheme Plaintiff tries to allege makes no sense, for it would necessarily be a short-lived fraud.").  The court agrees.  The Ninth Circuit's holding in *Nguyen* is especially persuasive because the rationale there so neatly fits the details of this case's factual background.  *See Nguyen*, 962 F.3d at 415.  And just as the Ninth Circuit pondered in that case, so too must this court wonder:  Why would defendants promise something to the market when they supposedly knew all along that the plan would fall short?  *Id.*  And on top of that, why would defendants undertake this fraudulent scheme if they knew already that investors soon would uncover their deceit?

The court strains to make sense of plaintiff's theory, which is why it's the least compelling inference that one can draw from the facts alleged.  *Cf. Tellabs, Inc.*, 551 U.S. at 314 (explaining that plaintiff's scienter burden will be satisfied only where the inference of culpability is "cogent and at least as compelling as any opposing inference of nonfraudulent intent").  As *Nguyen* observed, this theory "might have more legs" if plaintiff alleged that defendants took ancillary actions at the same time (or similar times) which further evidenced fraud.  *Nguyen*, 962 F.3d at 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs." (citation omitted)).  But, plaintiff makes no such allegations here.  In fact,

defendant Griffin "made open market *purchases* of MGP stock in December 2018 and August 2019, when plaintiff asserts he knew the stock price was fraudulently inflated." Doc. 37 at 29 n.14 (citing Docs. 35-14, 35-15). From these facts, the court would sooner infer that defendant Griffin felt confidence in the aged whiskey strategy than infer that he was perpetuating a fraudulent scheme. *See Nguyen*, 962 F.3d at 415; *see also City of Livonia Emps. Ret. Sys. and Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it." (first citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 776–77 (2d Cir. 2010); then citing *R2 Inv. LDC v. Phillips*, 401 F.3d 638, 644–45 (5th Cir. 2005)).

Plaintiff's arguments to the contrary don't shift the scales. For instance, plaintiff's Response references *Tellabs* for the premise "that the absence of motive allegations 'is not fatal' to the scienter analysis." Doc. 38 at 37 (quoting *Tellabs, Inc.*, 551 U.S. at 325). And on this point, plaintiff is right—but only in part. The Supreme Court held that "[w]hile it is true that motive can be a relevant consideration, *and personal financial gain may weigh heavily in favor of a scienter inference*," a plaintiff's case isn't doomed by their failure to plead financial gain. *Tellabs, Inc.*, 551 U.S. at 325 (emphasis added). It's not the absence of motive, standing alone, that's fatal to plaintiff's case. Instead, and in keeping with the Supreme Court's instructions (in the same passage of text no less), it's that the "allegations . . . considered collectively[,]" don't add up to produce an inference of scienter that's equally or more compelling than plaintiff's nonculpable explanations. *Id.* The tides don't turn because of plaintiff's reference to Tenth Circuit precedent either. *See* Doc. 38 at 37 (citing *Nakkhumpun*, 782 F.3d at 1152).

In *Nakkhumpun*, the Tenth Circuit explained that as a matter of law, the absence of motive isn't dispositive. *Nakkhumpun*, 782 F.3d at 1152 ("Legally, this argument is invalid

because scienter allegations may suffice even without a motive." (citing *Tellabs, Inc.*, 551 U.S. at 325)).  Here, the court doesn't decide the case on that approach.  Also, *Nakkhumpun* rejected the defendants' lack-of-motive argument because it wasn't sound in a factual sense.  *Id.* ("Factually, the argument is invalid because [the individual defendant's] motives were not aligned with all class members.").  But here, the argument, though not legally dispositive, is factually on-point and therefore influential.  *See Anderson*, 827 F.3d at 1239 ("Thus, the plaintiffs failed to allege facts indicating a motive for securities fraud, which mitigates an inference of scienter from the plaintiffs' other factual allegations.").

### C.    Control Person Liability Under Section 20(a)

Section 20(a) of the Securities Exchange Act creates "control person liability."  In other words, "a person who controls a party that commits a violation of the securities law may be held jointly and severally liable with the primary violator."  *Maher*, 144 F.3d at 1304–05 & n.7 (citing 15 U.S.C. § 78t(a)).  But liability under Section 20(a) can arise only when, first, the plaintiff identifies a primary violation of the securities laws.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1347; *see also Adams*, 340 F.3d at 1107 ("[W]e have explained that to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged control person." (internal quotation marks, citation, and alteration omitted)).

As already explained, plaintiff hasn't satisfied the first step in this process because the Amended Complaint's allegations of a primary violation don't survive defendants' Motion to Dismiss.  So, the claim for control person liability also must fall to the wayside.  *See In re Zagg Sec. Litig.*, No. 2:12-CV-852, 2014 WL 505152, at *8 (D. Utah Feb. 7, 2014), *aff'd*, 797 F.3d 1194 (10th Cir. 2015) (concluding that because plaintiffs "have not sufficiently alleged a primary

violation of either § 10(b) or § 14(a) by any of the Defendants[,]" their Section 20(a) "claims fail as a matter of law" (citation omitted)).

### D.     The Question Whether to Dismiss the Amended Complaint With or Without Prejudice

There's one more issue to resolve.  Defendants ask the court to "dismiss this case with prejudice."  Doc. 37 at 35.  Meanwhile, plaintiff "respectfully requests leave to amend the Complaint."  Doc. 38 at 37 (footnote omitted).  In defendants' corner, they cite the Circuit for the premise that a court shouldn't grant leave to amend when the plaintiff "'fail[s] to identify the specific factual allegations they would allege in an amended complaint.'"  Doc. 39 at 34 (quoting *Carroll v. Lawton Indep. Sch. Dist.*, 805 F.3d 1222, 1231 (10th Cir. 2015)).  Plaintiff, on the other hand, points to a district court decision from another court in our Circuit for the point that "[l]eave to amend 'should be freely given' where, as here, amendment wouldn't be futile."  Doc. 38 at 37 n.9 (quoting *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1209 (D. Colo. 2004) (quoting Fed. R. Civ. P. 15(a))).

Here again, the court must side with defendants.  On the one hand, *Carroll* wasn't a securities fraud case.  *See Carroll*, 805 F.3d at 1224 (explaining the case involved allegations that a "child with autism" was subjected to "abuse at school by her special-education teacher").  In contrast, plaintiff directs the court to a case involving securities fraud.  *See In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d at 1186 ("The plaintiffs have postured their complaint as a class action on behalf of all Qwest shareholders who purchased or otherwise acquired the publicly traded securities of Qwest between May 24, 1999 and February 14, 2002[.]").  But defendants' reference to our Circuit is more recent, and there, the Tenth Circuit spoke in unequivocal terms.

In *Carroll*, as here, plaintiffs "never moved for leave to amend their complaint but rather asked for leave to amend as an alternative to dismissal in their opposition" to a motion to dismiss. *Carroll*, 805 F.3d at 1231. According to our Circuit, "Rule 7 [of the Federal Rules of Civil Procedure] requires a request for relief to be made by a motion that (1) is in writing, (2) states with particularity the grounds for seeking the order, and (3) specifies the relief sought." *Id.* (internal quotation marks and citations omitted). The Tenth Circuit has "recognized the importance of Fed. R. Civ. P. 7(b) and [has] held that normally a court need not grant leave to amend when a party fails to file a formal motion." *Id.* (internal quotation marks and citation omitted). Most of all, and again just like this case, the *Carroll* plaintiffs "failed to identify the specific factual allegations they would allege in an amended complaint." *Id.* As the Circuit noted, a "bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based." *Id.* (internal quotation marks, citation, and alteration omitted).

And last, the court is mindful that Congress enacted the PSLRA precisely because it wanted to mitigate proliferation of expensive private securities fraud actions. *Tellabs*, 551 U.S. at 313. "Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006)). "As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)[.]" *Id.* And it's for this reason, the Supreme Court explained, that Congress included "[e]xacting pleading requirements" as part of the PSLRA's demands for private securities fraud actions. *Id.*

This court must follow the Supreme Court's interpretation of what's required by federal law. *See Tellabs, Inc.*, 551 U.S. at 313–14 (explaining that the Court was called on to decide what's required under the PLSRA's "strong inference" requirement for pleading scienter). Likewise, when faced with one party's reference to a district court within our Circuit whose reasoning contradicts and predates a definitive statement from the Circuit itself, the court will abide by the Tenth Circuit's directive. *See Carroll*, 805 F.3d at 1231. The court agrees with defendants and dismisses the Amended Complaint with prejudice.[8]

## IV.    Conclusion

Plaintiff could prevail against the pending Motion to Dismiss only by satisfying a two-step pleading process. *First*, the Amended Complaint must proffer particularized factual allegations identifying the specific statements it claims are false or misleading. *See Anderson*, 827 F.3d at 1236 n.4. Here, the Amended Complaint's theory of fraud relies centrally on market fluctuation, namely that competition increased and stymied MGP's growth plan. *See, e.g.*, Doc. 28 at 9 (Am. Compl. ¶ 9) ("Defendants failed to disclose to investors that . . . MGP was facing steadily increasing competition."). But the Amended Complaint's factual allegations say nothing about competition relative to *market share*, aside form conclusory assertions. *See id.* at 71 (Am. Compl. ¶ 154) ("This competition dramatically decreased MGP's market share for aged whiskey and thus the number of customers with whom MGP could have been in discussions."). And the

---

[8]     In a separate-but-similar case, the court opted to dismiss a plaintiff's claims *without* prejudice. *See Dorfman on behalf of MGP Ingredients, Inc. v. Griffin*, No. 20-2239-DDC-JPO, 2021 WL 1209734, at *22–24 (D. Kan. Mar. 31, 2021). But that case involved a different species of securities fraud actions: a derivative suit filed on behalf of a corporation by one of its shareholders. *See id.* at *1 ("[Plaintiff's] action is a derivative lawsuit."). And in that kind of private securities lawsuits, there's a wealth of caselaw supporting the view that "the court should dismiss plaintiff's claims *without* prejudice." *Id.* at *23 (collecting cases); *see also id.* at *23–24 & n.14. But here, plaintiff hasn't identified a consensus view favoring its position that the court should dismiss the Amended Complaint without prejudice. Meanwhile, defendants have identified clear statements from our Circuit supporting the opposite view. *See* Doc. 39 at 34 (citing *Carroll*, 805 F.3d at 1231).

Amended Complaint does allege that demand for American whiskey was booming all the while. *See, e.g.*, *id.* at 27 (Am. Compl. ¶ 52) (alleging that MGP "installed" defendant Griffin as CEO, at least in part, to capitalize on "the ever-accelerating whiskey boom" in the United States). Plaintiff's central theory—as a matter of fact—can hold water only if the market either stagnated or shrunk at the same time competition and demand boomed. But, the Amended Complaint doesn't make that particularized allegation. And so, it too can't withstand the Motion to Dismiss.

There's a second and independent reason to grant the Motion to Dismiss. Plaintiff's scienter allegations don't pass muster. Here, the barrier to entry is even higher. *See Nguyen*, 962 F.3d at 414 ("The PSLRA's strong inference requirement has teeth. . . . [and] presents no small hurdle for the securities fraud plaintiff." (internal quotation marks, citations, and alteration omitted)); *see also Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 441 (6th Cir. 2014) ("A plaintiff only clears the high hurdle imposed by the PSLRA if 'a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference.'" (quoting *Tellabs, Inc.*, 551 U.S. at 326)). Plaintiff's scienter allegations here lack any compelling, particularized details. And while the court could strain to infer that defendants knowingly or recklessly engaged in a scheme to defraud, *see* Doc. 28 at 31, that inference is not as immediately available as the competing, nonculpable inferences posited by defendants, *see* Doc. 37 at 27.[9]

"Here, the most compelling inference is straight-forward." Doc. 37 at 27. Corporations often take gambles on new strategies. Sometimes, they hit the jackpot. Other times, they don't. But a gamble gone wrong does not a fraud make. And that's the problem with plaintiff's

---

[9]     Even if the court inferred from the allegations that defendants acted with negligence or gross negligence, that still wouldn't suffice. *See In re Zagg, Inc.*, 797 F.3d at 1201; *see also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1343 n.12 ("Neither negligence nor even gross negligence will meet this 'particularly high standard.'" (quoting *Dronsejko*, 632 F.3d at 668)).

allegations in this case, and the primary reason the Amended Complaint's allegations fall short of providing a strong inference of scienter.  *See Tellabs, Inc.*, 551 U.S. at 328–29.  "Ultimately, the facts plaintiff alleges may constitute 'a brushstroke' or two, but they fail to paint a 'portrait [that] satisfies the requirement for a strong inference of scienter under the PSLRA.'"  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1347 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002)).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Judicial Notice (Doc. 32) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 36) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's claims against defendants are dismissed with prejudice.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Clerk of Court is directed to enter judgment for defendants and close the case.  The court also directs the Clerk of Court to close the companion case in this matter, No. 2:20-cv-02180-DDC-JPO.

**IT IS SO ORDERED.**

**Dated this 31st day of August, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**